## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IVAX PHARMACEUTICALS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-CV-2180-RWR |
| | ) | |
| MICHAEL O. LEAVITT, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF IVAX PHARMACEUTICALS, INC.'S MEMORANDUM
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND .................................................................................................................... 2

1. The Operative Statutory Framework -- The Hatch-Waxman Act Encourages Generic Drug Companies To Assert Patent Challenges In Order To Bring Their Products To Market. ........................................................................................................ 3

2. The Reward For Expeditiously Asserting Patent Challeges - - Hatch-Waxman's 180-Day Exclusivity Provisions ........................................................................................ 8

3. IVAX Files The First ANDA For Four Dosages Of Simvastatin. ..................................... 11

4. FDA Removes The '481 And '520 Patents From The Orange Book And Denies IVAX's Citizen Petition. .................................................................................................. 12

ARGUMENT ........................................................................................................................ 15

FDA'S DELISTING OF PATENTS FROM THE ORANGE BOOK AFTER A PARAGRAPH IV CERTIFICATION CHALLENGING THOSE PATENTS WAS FILED IS ARBITRARY, CAPRICIOUS, AND CONTRARY TO LAW. ............................ 15

A. FDA's Litigation Distinction Is Arbitrary And Capricious. ........................................... 16

B. FDA's Litigation Distinction Has Been Rejected By Caselaw And Is Not Entitled To *Chevron* Deference. .................................................................................................. 21

C. FDA's Position Here Is Flatly Inconsistent With Prior Positions Taken By The Agency .......................................................................................................................... 30

D. The Only Reasonable Approach Is To Prohibit Delisting Once A Paragraph IV Certification Has Been Filed. ........................................................................................ 34

CONCLUSION .................................................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*aaiPharma Inc. v. Thompson,*
  296 F.3d 227 (4th Cir. 2003) ...................................................................7, 27

*Andrx Pharms., Inc. v. Biovail Corp. Int'l,*
  256 F.3d 799 (D.C. Cir. 2001)..................................................................6, 8

*Alphapharm PTY Ltd. v. Thompson,*
  330 F. Supp. 2d 1 (D.D.C. 2004).................................................................7

*American Bioscience, Inc. v. Thompson,*
  269 F.3d 1077 (D.C. Cir. 2002)..................................................................27

*Apotex, Inc. v. Thompson,*
  347 F.3d 1335 (Fed. Cir. 2003)....................................................................7

*In re Barr Labs.,*
  930 F.2d 72 (D.C. Cir. 1991)........................................................................6

*Bush-Quayle '92 Primary Comm., Inc. v. Fed. Election Comm'n,*
  104 F.3d 448 (D.C. Cir. 1997).....................................................................33

*\*Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc.,*
  467 U.S. 837 (1984)...............................................................21, 22, 32, 33

*Columbia Broad. Sys. v. FCC,*
  454 F.2d 1018 (D.C. Cir. 1971)...................................................................33

*Dr. Reddy's Labs. Ltd. v. Pfizer, Inc.,*
  No. 03-CV-726, 2003 WL 21638254 (D.N.J. July 8, 2003)........................9, 29

*Eli Lilly & Co. v. Medtronic, Inc.,*
  496 U.S. 661 (1990)...........................................................................4, 5, 6, 8

*Granutec, Inc. v. Shalala,*
  139 F.3d 889 (Table), 1998 WL 153410 (4th Cir. 1998) ..................................10

*Inwood Labs., Inc. v. Young,*
  723 F. Supp. 1523 (D.D.C. 1989).........................................19, 22, 25, 26

*Mead Johnson Pharm. Group v. Bowen,*
  838 F.2d 1332 (D.C. Cir. 1988)....................................................................5

*Minnesota Mining & Mfg. Co. v. Barr Labs.,*
    289 F.3d 775 (Fed. Cir. 2002)...........................................................................9, 24, 29

*\*Mova Pharm. Corp. v. Shalala,*
    140 F.3d 1060 (D.C. Cir. 1998)................................................................... passim

*Mova Pharm. Corp. v. Shalala,*
    955 F. Supp. 128 (D.D.C. 1997)...........................................................................19, 22

*Mylan Pharms., Inc. v. Henney,*
    94 F. Supp. 2d 36 (D.D.C. 2000)................................................17, 18, 21, 22, 25

*Mylan Pharms., Inc. v. Shalala,*
    81 F. Supp. 2d 30 (D.D.C. 2000)...........................................................................5, 8, 9

*Mylan Pharm. Inc. v. Thompson,*
    268 F.3d 1323 (Fed. Cir. 2001)...........................................................................7, 27

*Pharmachemie B.V. v. Barr Laboratories, Inc.,*
    276 F.3d 627 (D.C. Cir. 2002)...........................................................................17

*\*Purepac Pharm. Co. v. Friedman,*
    162 F.3d 1201 (D.C. Cir. 1998).....................................1, 11, 15, 16, 20, 22, 23, 28, 35, 36

*Purepac Pharm. Co. v. Thompson,*
    354 F.3d 877 (D.C. Cir. 2004)...........................................................................7

*Purepac Pharm. Co. v. Thompson,*
    238 F. Supp. 2d 191 (D.D.C. 2002)...........................................................................27

*Roche Prod., Inc. v. Bolar Pharm. Co.,*
    733 F.2d 858 (Fed. Cir. 1984)...........................................................................3, 4

*Serono Labs., Inc. v. Shalala,*
    158 F.3d 1313 (D.C. Cir. 1998)...........................................................................5

*Telectronics Pacing Sys., Inc. v. Ventritex, Inc.,*
    982 F.2d 1520 (Fed. Cir 1992)...........................................................................4

*Teva Pharms. USA, Inc. v. Pfizer, Inc.,*
    395 F.3d 1324 (Fed. Cir. 2005)...........................................................................7

*Teva Pharms. USA, Inc. v. U.S. FDA,*
    182 F.3d 1003 (D.C. Cir. 1999)...........................................................................7, 24

*Thomas Jefferson Univ. v. Shalala*,
    512 U.S. 504 (1994)...............................................................................22

*Torpharm, Inc. v. FDA*,
    No. 03-2401, 2004 U.S. Dist. LEXIS 524 (D.D.C. Jan. 8, 2004)....................................26

*Torpharm, Inc. v. Thompson*,
    260 F. Supp. 2d 69 (D.D.C. 2003).....................................................20, 34

*United States v. Mead Corp.*,
    533 U.S. 218 (2001)...............................................................................32

*Warner-Lambert Co. v. Apotex Corp.*,
    316 F.3d 1348 (Fed. Cir. 2002).....................................................3, 4, 5, 6

*Watson Pharm., Inc. v. Henney*,
    194 F. Supp. 2d 442 (D. Md. 2001).....................................................28

*Yamanouchi Pharm. Co., Ltd v. Danbury Pharmacal, Inc.*,
    21 F.Supp.2d 366 (S.D.N.Y 1998).....................................................4, 5


**Statutes**

21 U.S.C. § 355(b)...............................................................................3, 6

21 U.S.C. § 355(j)...............................................................1, 5, 7-9, 11, 13, 22, 24, 25

21 C.F.R. § 314(c)...............................................................................5

21 C.F.R. § 314.50...............................................................................3, 6

21 C.F.R. § 314.53...............................................................................6, 7, 17, 27

21 C.F.R. § 314.54...............................................................................35

21 C.F.R. § 314.94...............................................................5, 7, 10, 13-16, 24, 34

21 C.F.R. § 314.107...............................................................7-11, 13, 14, 22, 24, 34, 35

Hatch-Waxman Act,
    Pub. L. 98-417, 98 Stat. 1585 (1984) .......................................................... passim

Medicare Modernization Act,
    Pub. L. 108-173, __ Stat. __ (2003) ...............................................................................9

iv

**Other Authorities**

Abbreviated New Drug Application Regulations; Patent and Exclusivity Provisions,
        59 Fed. Reg. 50338 (Oct. 3, 1994) ........................................................................10, 33, 34

*Guidance for Industry: 180-Day Generic Drug Exclusivity Under the Hatch-Waxman*
*Amendments to the Federal Food, Drug, and Cosmetic Act* (June 1998) ........................23, 30, 31

180-day Generic Drug Exclusivity for Abbreviated New Drug Applications Interim Rule,
        63 Fed. Reg. 59710 (Nov. 5, 1998) .....................................................................................31

180-day Generic Drug Exclusivity for Abbreviated New Drug Applications,
        64 Fed. Reg. 42873 (August 6, 1999) ..........................................................................31, 32

67 Fed. Reg. 66593 (Nov. 1, 2002)....................................................................................................32

## PRELIMINARY STATEMENT

Plaintiff IVAX Pharmaceuticals, Inc. ("IVAX") submits this Memorandum in support of its motion for summary judgment against the four Food and Drug Administration ("FDA") defendants. In *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998), the D.C. Circuit invalidated an FDA regulation that conditioned a generic drug company's exclusivity rights under the Hatch-Waxman Act on the company's "successful defense" against a patent infringement suit. In this case, FDA has repeated its earlier error by applying regulations that were enacted prior to *Mova*, this time by holding that a generic drug company's exclusivity may be defeated by the patent holder requesting to delist its patent—unless the two parties are engaged in a patent infringement lawsuit. As *Mova* recognized, however, Congress did not condition the benefits of the Hatch-Waxman Act to the fact of litigation, and FDA has no discretion to import such a condition into the statute.

In the decision under review, FDA ruled that the agency would delist two patents claiming simvastatin from the Orange Book—merely because the patentee had not sued IVAX for patent infringement and IVAX had not successfully defended such a suit. By delisting the patent, the agency deprived IVAX of the 180-day generic exclusivity it would enjoy as the first company to file an abbreviated new drug application ("ANDA") challenging those two patents as invalid or not infringed pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV). The agency's action is arbitrary, capricious, otherwise unlawful, and contrary to the D.C. Circuit's decisions in *Mova* and *Purepac Pharm. Co. v. Friedman*, 162 F.3d 1201 (D.C. Cir. 1998).

Once again, FDA seeks to place the fate of the first applicant's exclusivity in the patentee's hands and further condition the statutory grant of exclusivity on the applicant's success in an infringement lawsuit initiated by the patentee. Indeed, FDA's sole rationale for delisting the patents and denying IVAX its 180 days of generic exclusivity is predicated on

regulations that FDA itself repealed following *Mova*. In so doing, however, FDA ignores the contribution that manufacturers such as IVAX make by submitting documentation to a patent holder which is so detailed and persuasive that the patent holder not only decides not to file a lawsuit, but concedes that its patents should not be enforced against ANDA applicants. Allowing the delisting of patents after a valid Paragraph IV certification has been submitted guts the very heart of the incentive structure carefully crafted by Congress in the Hatch-Waxman Act.

In any event, whatever the merits of FDA's arguments for permitting the delisting of patents from the Orange Book in the abstract, nothing in the Hatch-Waxman Act permits FDA to distinguish between those applicants who have been sued for patent infringement and those that have not—and with good reason. Simply put, there is no rational reason for distinguishing between such applicants and FDA's decision must be reversed. IVAX thus seeks declaratory and injunctive relief, prohibiting FDA from approving subsequent ANDAs for simvastatin except as consistent with IVAX's 180 days of exclusivity.

## BACKGROUND

IVAX is a manufacturer and distributor of generic prescription pharmaceuticals in the United States. IVAX's products are subject to the regulatory oversight of FDA, which is the agency within the United States Department of Health and Human Services charged with overseeing, *inter alia,* the human drug approval process under the authority of the Federal, Food, Drug, and Cosmetic Act ("FDCA"), as amended by the Drug Price Competition and Patent Term Restoration Act of 1984) (the "Hatch-Waxman Act").[1]

---

[1]    *See* Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984), codified as amended at 21 U.S.C. § 355.

1.    **The Operative Statutory Framework -- The Hatch-Waxman Act Encourages Generic Drug Companies To Assert Patent Challenges In Order To Bring Their Products To Market.**

This case involves provisions of the FDCA, its implementing regulations, and agency interpretations relating to ANDAs. The FDCA establishes the requirements for seeking and obtaining approval from FDA to market pharmaceutical products in the United States.

The FDCA requires a pioneer or brand name (i.e., non-generic) drug company seeking approval to market a new drug to file a complete New Drug Application ("NDA") that contains, among other things, extensive scientific and clinical data demonstrating the safety and effectiveness of the proposed new drug. 21 U.S.C. § 355(b)(1). *See also* 21 C.F.R. §314.50 (describing content requirements for an NDA). Prior to the 1984 enactment of the Hatch-Waxman Act, a company seeking to market a generic version of an already approved drug was required to file a new NDA, complete with its own clinical studies demonstrating the drug's safety and effectiveness. In conducting the clinical and pre-clinical development work necessary to support the generic drug application to be submitted to FDA, however, generic manufacturers were subject to potential claims of patent infringement from the brand company based upon that clinical development work. *See Roche Prod., Inc. v. Bolar Pharm. Co.*, 733 F.2d 858 (Fed. Cir.), *cert. denied*, 469 U.S. 856 (1984); *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1357 (Fed. Cir. 2002)(recognizing that prior to enactment of Hatch-Waxman, "conducting tests and developing the necessary information to apply for regulatory approval later on" could constitute infringement under *Bolar*);

The effect of the *Bolar* decision (as recognized by the *Bolar* court itself), was that potential generic applicants, in order to avoid patent infringement claims, were forced to wait until the expiration of the brand company's applicable patents before even beginning the pre-clinical and clinical development work necessary to compile and submit a generic drug

3

application to FDA. *See Bolar,* 733 F.2d at 864; *Telectronics Pacing Sys., Inc. v. Ventritex, Inc.,* 982 F.2d 1520, 1524-25 (Fed. Cir 1992)(recognizing that prior to Hatch-Waxman, "the process of obtaining FDA approval for the competing product could not be undertaken until the original patent expired."); *Yamanouchi Pharm. Co., Ltd v. Danbury Pharmacal, Inc.,* 21 F.Supp.2d 366, 368 (S.D.N.Y 1998)("... [G]eneric producers, in order to avoid infringement, were previously required to await a targeted drug's patent expiration before using a patented drug in any manner to acquire FDA approval for commercial purposes"). Given the amount of time needed to compile a complete drug dossier along with its supporting clinical studies, coupled with the additional time it would take FDA to review and finally approve the generic application after submission, the impact of the *Bolar* decision was to create a *de facto* patent extension for the brand company often extending years after the actual expiration date of the patent. *See Eli Lilly & Co. v. Medtronic, Inc.,* 496 U.S. 661, 670 (1990)(discussing *Bolar* and pre-Hatch-Waxman state of the law giving the brand manufacturer a "*de facto* monopoly [that] would continue for an often substantial period until regulatory approval was obtained."); *Warner-Lambert,* 316 F.3d at 1357 (recognizing, before the enactment of the Hatch-Waxman Act, that "it took a substantial amount of time for a second or subsequent manufacturer to obtain data and secure regulatory approval, requiring those manufacturers to wait until after the expiration of the patent to begin testing and other pre-approval activities result[ing] in a *de facto* extension of the patent term."); *Bolar,* 733 F.2d at 864 (brand company can gain "*de facto* monopoly of upwards of 2 years by enjoining FDA-required testing of a generic drug until the patent on the drug's active ingredient expires").

In 1984, however, Congress enacted the Hatch-Waxman Act, which established a streamlined procedure for approval of generic drugs in order to increase competition in the drug

industry and lower the cost of drugs to consumers. *See Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998) ("The purpose of the Hatch-Waxman Amendments was... 'to increase competition in the drug industry by facilitating the approval of generic copies of drugs.'") (*quoting Mead Johnson Pharm. Group v. Bowen*, 838 F.2d 1332, 1333 (D.C. Cir. 1988)). The Hatch-Waxman Act provides that an entity seeking to market a generic version of an already-approved drug is no longer required to file a complete NDA, but may instead file a more simplified document called an Abbreviated New Drug Application ("ANDA") which relies on the NDA holder's clinical studies and on FDA's prior determination that the NDA-approved drug is safe and effective. *See* 21 U.S.C. § 355(j); 21 C.F.R. § 314(c); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 32 (D.D.C. 2000). Under Hatch-Waxman, a generic applicant need not conduct its own independent clinical trials to demonstrate safety and efficacy in order for its ANDA to be approved, but instead it need only demonstrate, among other things, that the proposed generic drug is "bioequivalent" to the approved brand drug. *See* 21 U.S.C. § 355(j)(2)(A)(iv); 21 C.F.R. § 314.94(a)(7).

In enacting Hatch-Waxman, Congress also sought to cure the patent extension anomaly created by *Bolar. See Eli Lilly*, 496 U.S. at 670 ("The 1984 Act sought to eliminate this [patent term] distortion..."); *Warner-Lambert*, 316 F.3d at 1357 (same). It did so by setting up a statutory mechanism whereby issues of patent infringement and validity could be adjudicated before final FDA approval, but in a way so as to allow generic manufacturers to compile and submit generic drug applications to FDA (and have FDA begin the regulatory review process) without fear of being held liable for patent infringement damages. *See Yamanouchi*, 21 F.Supp.2d at 368 (After enactment of Hatch-Waxman, "now a generic producer may seek expedited FDA approval for generic marketing by submitting an Abbreviated New Drug Application (ANDA) prior to the

5

targeted drug's patent expiration."). In so doing, Congress sought to strike a balance between the patent rights of the brand manufacturers and the public's strong interest in having faster access to lower priced generic drugs. *See Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 809 (D.C. Cir. 2001) (stating congressional intent was "to get generic drugs into the hands of patients at reasonable prices--fast"); *see also In re Barr Labs.*, 930 F.2d 72, 76 (D.C. Cir. 1991).

To achieve this balance, Congress did a number of things. First, it amended the patent infringement statute, 35 U.S.C. § 271, to include a safe harbor for generic drug development. *See* 35 U.S.C. § 271(e)(1)(providing generic applicants with a safe harbor, free from claims of patent infringement, for otherwise infringing use if such use is in connection with the compilation and submission of an ANDA); *Eli Lilly*, 496 U.S. at 671 (*"*[Section 271(e)(1)] allows competitors, prior to the expiration of a patent, to engage in otherwise infringing activities necessary to obtain regulatory approval."); *Warner-Lambert*, 316 F.3d at 1358 ("Section 271(e)(1) thus partially eliminated ... the *de facto* unintended extension of the patent term, and enabled generic manufacturers to test and seek approval to market during the patent term.").

Congress simultaneously created certain statutory mechanisms and incentives for adjudicating claims of patent infringement and validity prior to the time FDA awarded final marketing approval to the proposed generic applicant. As a result of the Hatch-Waxman Act, an NDA submitted by a brand company must now contain information on any patent that claims the drug that is the subject of the NDA, or the method of using that drug, for which a patent infringement claim could reasonably be asserted against another party seeking to market a competitive product. 21 U.S.C. § 355(b)(1); 21 C.F.R. § 314.50(h); 21 C.F.R. § 314.53(b). FDA then publishes that information for potential generic applicants and others to rely upon, *see* 21 C.F.R. § 314.53(e), in a publication entitled "Approved Drug Products With Therapeutic

Equivalence Evaluations," commonly referred to as the "Orange Book." *See Teva Pharm. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1328 (Fed. Cir. 2005).

Any generic applicant who seeks approval to market a generic version of a brand drug for which a patent has been listed in the Orange Book must include, as part of its ANDA, one of four certifications with respect to each patent listed in the Orange Book by the NDA holder. 21 U.S.C. § 355(j)(2)(A)(vii)(I-IV); 21 C.F.R. § 314.94(a)(12)(i)(A)(1-4). The certification at issue here - - known as a "paragraph IV" certification - - informs the FDA that the ANDA applicant seeks to market its proposed generic product before the patent expires, because the ANDA applicant believes the patent is invalid, unenforceable or will not be infringed by the proposed generic drug product. *See* 21 U.S.C. § 355(j)(2)(A)(vii)(IV); 21 C.F.R. § 314.94(a)(12)(i)(A)(4); 21 C.F.R § 314.107(b)(3); *see also Mylan Pharm. Inc. v. Thompson*, 268 F.3d 1323, 1332 (Fed. Cir. 2001); *Teva Pharms., USA, Inc. v. FDA*, 182 F.3d 1003, 1009 (D.C. Cir. 1999).[2] If the ANDA applicant challenges the validity or enforceability of a listed patent or patents, or claims that its proposed product will not infringe that patent or patents, it submits a "paragraph IV" certification to FDA, along with notice to the patent owner and NDA holder (usually, but not

---

[2]    The FDA "does not evaluate patent information that companies submit to it; it just passively publishes information it receives." *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 880 (D.C. Cir. 2004). Instead, the FDA exercises only a ministerial role in reviewing patents for inclusion in the Orange Book. *See Apotex, Inc. v. Thompson*, 347 F.3d 1335 (Fed. Cir. 2003); *aaiPharma Inc. v. Thompson*, 296 F.3d 227 (4th Cir. 2003); *Alphapharm PTY Ltd. v. Thompson*, 330 F. Supp. 2d 1 (D.D.C. 2004). Thus, regardless of whether an ANDA applicant believes the information is false or otherwise violates regulatory or statutory requirements for listing in the Orange Book, the applicant "***must***, if it submits an ANDA, treat the disputed patent as valid" and, if it wishes to challenge the patent, "***must*** include ... a paragraph IV certification." *Purepac*, 354 F.3d at 880 (emphasis added).

always, the same entity) explaining the basis for its certification. *See* 21 U.S.C. § 355(j)(2)(B)(i-ii); 21 C.F.R. § 314.94(a).

The filing of an ANDA containing a paragraph IV certification is deemed to constitute a statutory act of infringement, exposing the paragraph IV ANDA filer to a patent infringement lawsuit by the patent holder or NDA owner. *See Eli Lilly*, 496 U.S. at 678 (the submission of an ANDA containing a paragraph IV certification constitutes a technical act of infringement enabling the court to adjudicate patent issues raised by the generic application); *Mylan Pharms. v. Shalala*, 81 F.Supp.2d at 32 (Roberts, J.)("A generic drug manufacturer's filing of a so-called 'Paragraph IV' certification has important legal consequences. It automatically creates a cause of action for patent infringement.") The patent owner or NDA holder has 45 days upon receipt of the notice to bring such an action for patent infringement. 21 U.S.C. § 355(j)(5)(B)(iii); 21 C.F.R. § 314.107(b)(3).  If suit is brought, FDA may not approve the ANDA for the drug until 30 months from the date of the notice, unless a final decision is reached in the patent litigation or the court orders a longer or shorter time.  *See* 21 U.S.C. § 355(j)(5)(B)(iii); 21 C.F.R. § 314.107(b)(3). If no such suit is brought, FDA may approve the paragraph IV ANDA upon determining that the ANDA is for a drug that contains the same active ingredient and is bioequivalent to the NDA–approved drug, and that it meets the other statutory requirements for approval.

## 2.    The Reward For Expeditiously Asserting Patent Challeges - - Hatch-Waxman's 180-Day Exclusivity Provisions

As evidenced by the above-discussed statutory scheme, the Hatch-Waxman Act, by design, encourages generic drug companies to challenge pharmaceutical patents in order to bring generic products to market faster. *See, e.g.*, *Andrx*, 276 F.3d at 1371.  The first generic drug company to challenge a patent bears research and legal costs in either designing around a patent

or challenging a patent on grounds of invalidity or unenforceability. Moreover, the first filer

runs the risk of substantial litigation costs.

Thus, in order to encourage generic drug companies to undertake these substantial costs

and risks, Congress created a critical incentive under the Hatch-Waxman Act to reward the first

generic manufacturer to file a Paragraph IV certification challenging a drug patent - - namely, a

180 day period of "exclusivity" during which no other generic version of the drug will be

approved. *See* 21 U.S.C. § 355(j)(5)(B)(iv); 21 C.F.R. § 314.107(c)(1). As this Court has

explained:

> In order to encourage generic drug makers to incur the potentially
> substantial litigation costs associated with challenging pioneer
> drug makers' patents, the Hatch-Waxman Amendments provide an
> added incentive for generic drug producers to file Paragraph IV
> certifications. The first manufacturer to file an ANDA containing a
> Paragraph IV certification with respect to a specific patent is
> awarded a 180-day period of exclusive marketing rights for a
> generic version of the drug claimed by that patent. In other words,
> no other ANDA for the same generic drug product will be
> approved during those 180 days.

*Mylan Pharms. v. Shalala*: 81 F.Supp.2d at 33 (Roberts, J.); *see also Mova*, 140 F.3d at 1064;

*Dr. Reddy's Labs. Ltd. v. Pfizer, Inc.*, No. 03-CV-726, 2003 WL 21638254, at *7 (D.N.J. July 8,

2003). The statute provides that this exclusivity period shall begin when the generic company

first commercially markets its product or, if earlier, if and when a court issues a decision

"holding the patent which is the subject of the certification to be invalid or not infringed."[3] *Id.*

Initially, FDA promulgated a regulation to require the "successful defense" of a patent

infringement lawsuit brought by the patentee against the first applicant in order for that applicant

---

[3]    The Medicare Modernization Act of 2003 ("MMA") amended the Hatch-Waxman Act
provisions governing exclusivity. However, those amendments do not apply here because Ivax's
ANDA was filed prior to the enactment of the 2003 Act. *See* Pub. L. No. 108-173 § 1102(b)(1).

to be eligible for 180 days of exclusivity.  As part of its comprehensive regulatory scheme implementing the "successful defense" approach to the Hatch-Waxman Act, FDA adopted 21 C.F.R. § 314.107(c) (1994), which required that "the applicant submitting the first application ha[ve] successfully defended against a suit for patent infringement brought within 45 days of the patent owner's receipt of notice" of the Paragraph IV certification before becoming eligible for 180 days of generic exclusivity.  *See* Abbreviated New Drug Application Regulations; Patent and Exclusivity Provisions, 59 Fed. Reg. 50338, 50367 (Oct. 3, 1994).  At the same time, the FDA adopted 21 C.F.R. § 314.94(a)(12)(viii)(B), which prohibited delisting whenever the first applicant might become eligible for exclusivity—which necessarily meant whenever the first applicant had been sued by the patentee within 45 days of filing its Paragraph IV certification. *See* 59 Fed. Reg. 50338 (Oct. 3, 1994).  The FDA reasoned that once there was litigation, and thus the potential for exclusivity, "[i]f a patent were removed from the list immediately upon a court decision that the patent is invalid or unenforceable, an applicant with a subsequently filed application might seek to certify that there is no relevant patent and seek an immediately effective approval," thereby nullifying the 180-day exclusivity period because of the first applicant's successful defense. *Id.* at 50348.  To ensure that this did not occur, "the agency … required that a patent remain on the list [pending litigation and] after being declared invalid or unenforceable until the end of any applicable 180-day exclusivity period." *Id.*

Because the Hatch-Waxman Act contains no "successful defense" requirement, however, the D.C. Circuit rejected it in *Mova*.[4]  Although the *Mova* court did not resolve the situation

---

[4]    In an unpublished decision issued a little over a week before *Mova* was decided, the Fourth Circuit reached the same conclusion, namely that FDA's successful defense requirement was inconsistent with the plain language of the exclusivity statute. See *Granutec, Inc. v. Shalala*, 139 F.3d 889, 1998 WL 153410 *7 (4th Cir. 1998)("Thus, we hold the 'successful defense'

(Continued...)

where the first applicant is never sued by the patentee, it "cautioned that 'Congress may have intended to reward the first … applicant for his enterprise whether or not he is later sued.'" *Purepac*, 162 F.3d at 1205 (quoting *Mova*, 140 F.3d at 1071 n.11).   The D.C. Circuit subsequently held that nothing in the statute conditions exclusivity on there being a lawsuit against the first applicant.   To the contrary, "Section 355(j)(5)(B)(iv) does not, on its face, require the first applicant to be sued in order to benefit from market exclusivity." *Purepac*, 162 F.3d at 1204.   The *Purepac* court thus held that "[t]here is nothing irrational in the FDA's giving first applicants the 180-day exclusivity period even if they have not been sued. ***On its face, the statute does the same***." *Id.* at 1205 (emphasis added).

**3.    IVAX Files The First ANDA For Four Dosages Of Simvastatin.**

Merck holds the approved NDA for simvastatin, No. 19-766, which it sells as Zocor®. Simvastatin is in a class of medications called HMG-CoA reductase inhibitors, also known as statins.   Statins slow the production of cholesterol in the body and, thus, are prescribed for those suffering from atherosclerosis.   Merck initially submitted one patent to the FDA as claiming Zocor®, U.S. Patent No. 4,444,784 (the '784 patent").   The '784 patent expires on June 23, 2006, but is not at issue in this litigation.   Merck later amended its NDA to list two additional patents, U.S. Patent Nos. RE 36481 ('481 patent) and RE 36520 ('520 patent).   All three patents were listed in the Orange Book as of December 14, 2000.

On December 14, 2000, IVAX filed ANDA 76-052, the first application containing a Paragraph IV certification with the FDA for approval of 5-mg, 10-mg, 20-mg, and 40-mg dosage strengths of generic simvastatin, asserting that the '481 patent and '520 patent were invalid or

---

requirement contained in 21 C.F.R. § 314.107(c)(1) to be an invalid addition to the statutory requirements for exclusivity. Genpharm, as the first ANDA filer, was therefore entitled to a period of exclusivity under the statute.").

not infringed. In the same ANDA, IVAX filed a Paragraph III certification with respect to the '784 patent. The Paragraph III certification means that IVAX does not challenge the validity of the '784 patent, and believes that its ANDA cannot receive final approval until the '784 patent expires on June 23, 2006.

Although filing an ANDA with a Paragraph IV certification as to the '481 and '520 patents constituted an act of patent infringement, Merck never sued IVAX to enforce those patents. As such, IVAX anticipates that FDA will grant final approval upon the expiration of the '784 patent in June 2006.

### 4. FDA Removes The '481 And '520 Patents From The Orange Book And Denies IVAX's Citizen Petition.

On October 10, 2003, Merck submitted a letter requesting that the '481 and '520 patents be removed from the list of patents claiming Zocor® in the Orange Book. Before IVAX ever had the opportunity to exercise its 180 days of exclusivity, in September 2004, FDA removed the '481 and '520 patents from the Orange Book, thereby, according to FDA, depriving IVAX of the exclusivity secured by the Hatch-Waxman Act. FDA never consulted with IVAX or gave it any opportunity to object or otherwise be heard before it delisted the patents.

After learning of FDA's delisting, IVAX submitted a citizen petition to FDA on January 12, 2005, pursuant to 21 C.F.R. § 10.30 and Section 505 of the FDCA, requesting that FDA not approve subsequent ANDAs for simvastatin tablets for 180 days from the date of first commercial marketing of simvastatin under IVAX's ANDA No. 76-052, and that FDA reinstate the '481 and '520 patents in the Orange Book (thus requiring subsequent ANDAs for simvastatin tablets to contain certifications to the '481 and '520 patents). *See* FDA Docket No. 2005P-0008/CP1. Similarly, on February 1, 2005, Ranbaxy Laboratories Ltd. ("Ranbaxy")—which

alleges it filed the first Paragraph IV certification for 80-mg simvastatin—also filed a citizen petition seeking the reinstatement of the two patents.[5] *See* FDA Docket No. 2005P-0046/CP1.

On October 24, 2005, in a letter from Steven K. Galson, Director, Center for Drug Evaluation and Research, FDA denied both citizen petitions[6]. The agency observed that the statutory provisions applicable to patent listings in the Orange Book did not specifically address the delisting of patents, *see* 10/24/05 Letter at 5, and that the agency "could refuse to delist a patent once a paragraph IV certification has been submitted, thus permitting the first challenger to remain eligible for exclusivity," *id.* at 8. It also acknowledged that the "180-day period of marketing exclusivity acts as an incentive and reward to a generic drug manufacturer that exposes itself to the risk of patent litigation by being the first applicant to submit a paragraph IV certification to a patent." *Id.* at 6. And it further acknowledged that an "applicant's eligibility for exclusivity is not contingent on successfully defending patent litigation, or even upon being sued as a result of the paragraph IV certification." *Id.* at 7. Despite these concessions, however, FDA adopted a rule under which it will "withdraw the patent in some circumstances, but not in others," and determined that the relevant "circumstance[]" was "when the [Paragraph IV] patent challenge has resulted in litigation." *Id.* at 8.

FDA reached its decision by relying on 21 C.F.R. § 314.94(a)(12)(viii)(B), a pre-*Mova* regulation, which provides that "[a] patent that is the subject of a lawsuit under § 314.107(c) shall not be removed from the list until FDA determines that no delay in effective dates of approval is required under that section as a result of the lawsuit [because of a first applicant's

---

[5]    Under the Hatch-Waxman Act, different dosages of a particular compound constitute distinct drugs. *See* 21 U.S.C. § 355(j)(2)(A)(iii).

[6]    A copy of FDA's 10/24/05 letter ruling is attached as Exhibit 1.

exclusivity], that the patent has expired, or that any such period of delays in effective dates of approval is ended." 21 C.F.R. § 314.94(a)(12)(viii)(B); *see* 10/24/05 Letter at 11-12. However, not just any lawsuit would do. The agency "interpret[ed] the reference to 'lawsuit under § 314.107(c)' to be a lawsuit … as described in 21 C.F.R. 314.107 *before it was amended*." 10/24/05 Letter at 12 n.17 (emphasis added). Even though the "regulation at 21 C.F.R. 314.107(c) was amended after *Mova* to remove reference to the 'successful defense' requirement," FDA ruled that only lawsuits described in the pre-*Mova* version of the regulation—*i.e.*, those brought *by the patentee against the first applicant* within 45 days of receiving notice of the Paragraph IV certification—would preclude delisting patents from the Orange Book, *id.*, and not lawsuits brought against subsequent applicants or declaratory judgment lawsuits brought by an applicant against the patentee.

The agency was concerned "if an ANDA applicant were *successful in challenging a patent*, withdrawing the patent from the list immediately would destroy any exclusivity benefit by permitting all other ANDAs for the drug product to be approved immediately." *Id.* at 12 (emphasis added). Thus, to "appropriately maintain the patent listing *when there is litigation*, against the possibility that the ANDA applicant will *prevail*," the agency prohibited delisting whenever there was litigation. *Id.* (emphasis added). FDA asserted that "[e]ven though successful defense of a patent infringement lawsuit is not a factor in eligibility for exclusivity" after *Mova*, it was reasonable to decide when exclusivity would remain and when it would be extinguished solely on the basis of whether a lawsuit was filed by the patentee against the first applicant. *Id.* at 13. FDA conceded that it was giving the patentee the power to decide whether 180-day exclusivity would be awarded whenever it has not litigated the claims made in the Paragraph IV certification. *See id.* at 15.

14

Based on FDA's act of delisting the '481 and '520 patents, Ranbaxy filed suit against the agency on September 16, 2005.  *See* D.D.C. No. 05-1838 (RWR).  IVAX filed this parallel action on November 7, 2005, and filed an unopposed motion to have it consolidated with the Ranbaxy action and briefed in accordance with the Ranbaxy briefing schedule.  This motion for summary judgment follows.

## ARGUMENT

### FDA'S DELISTING OF PATENTS FROM THE ORANGE BOOK AFTER A PARAGRAPH IV CERTIFICATION CHALLENGING THOSE PATENTS WAS FILED IS ARBITRARY, CAPRICIOUS, AND CONTRARY TO LAW.

FDA's decision to delist the '481 and '520 patents and thereby deny IVAX the 180 days of exclusivity to which it was otherwise entitled as the first ANDA applicant to file a Paragraph IV certification (with respect to 5-mg, 10-mg, 20-mg, and 40-mg simvastatin), is a thinly veiled attempt to resuscitate the successful defense requirement repudiated by the D.C. Circuit in *Mova*. After *Mova*, the FDA was supposed "to go back to the drawing board." *Purepac*, 162 F.3d at 1205.  Yet, in its 10/24/05 letter ruling, FDA stubbornly adheres to the successful defense requirement, denying IVAX its statutory right to exclusivity *solely* because it was not sued in response to its first-filed paragraph IV ANDA.

In this case, there is no dispute that the FDA delisting regulation was once part and parcel of the "successful defense" requirement.  Yet although FDA has repealed that requirement as a condition on exclusivity,  FDA insists on defending the same litigation distinction drawn in its pre-*Mova* regulation governing the delisting of patents from the Orange Book. *See* 21 C.F.R. § 314.94(a)(12)(viii)(B).  FDA's arguments, however, are not coherent because they are really nothing more than post-hoc rationalizations to defend the vestigial column of the house that *Mova* knocked down.  Prior to *Mova*, the FDA regulation permitted delisting of patents except where an ANDA applicant could become eligible for exclusivity, because the old scheme

15

required that, before the first applicant could become eligible for exclusivity, it had to be sued by the patentee within 45 days of giving notice of its Paragraph IV certification. In a strained effort to make sense of its regulation's litigation requirement, FDA is forced to rely on the pre-*Mova* version of § 314.94(c), which expressly required a suit by the patentee against the first applicant as a precondition to exclusivity. That requirement, of course, was obliterated by *Mova*.

Indeed, as the D.C. Circuit clearly held, nothing in the statute requires that the first applicant be sued in order to benefit from market exclusivity. *Purepac*, 162 F.3d at 1204. With the theoretical underpinnings for its litigation distinction gone, there is simply no rational reason for FDA to distinguish between those Paragraph IV applicants who are sued for infringement and those who are not in awarding exclusivity. As explained below FDA's interpretation of 21 C.F.R. § 314.94(a)(12)(viii)(B) and the Hatch-Waxman Act as permitting the delisting of patents from the Orange Book after a patent has been challenged through a Paragraph IV certification, except where the patentee has filed suit, is arbitrary, capricious, and not in accordance with governing caselaw.

## A.    FDA's Litigation Distinction Is Arbitrary And Capricious.

In denying the citizen petitions, FDA purports to create a blanket rule permitting all NDA-holders to delist patents at will, regardless of whether a Paragraph IV certification has been filed—thereby potentially depriving an ANDA applicant of 180 days of generic exclusivity—subject only to "one limited exception ... which is to maintain the listing of such a patent when a paragraph IV patent challenge has resulted in litigation." 10/24/05 Letter at 2. This, of course, is not a "limited exception," as it is characterized by FDA, but a pervasive one that penalizes those first applicants who are not sued. Whatever the merits of FDA's arguments for permitting the delisting of patents from the Orange Book in the abstract, nothing in those arguments permits FDA to distinguish between those applicants who have been sued for patent infringement and

those that have not.  Indeed, the FDA's various justifications for permitting the delisting of patents generally do not support the litigation distinction FDA has drawn.  Simply put, following *Mova* and *Purepac*, applicants who are sued and those who are not are similarly situated when it comes to their eligibility for exclusivity.[7]  In both situations, the applicants risked litigation by filing a paragraph IV certification.  Thus, there is no justification for distinguishing ANDAs that provoke litigation and those that do not, and FDA's approach cannot withstand scrutiny.

FDA contends that delisting is appropriate because "[i]f a patent remains listed, any applicant submitting an ANDA for the drug product after the NDA holder requests delisting must nonetheless comply with the patent certification requirements of section 505(j)(2)," and that "[a]ll of these steps would need to be undertaken if the patent remains listed, even though the NDA holder has represented (by requesting the delisting) that the patent does not meet the listing criteria under section 505(b)(1) or (c)(2) and 21 CFR 314.53."  10/24/05 Letter at 14-15.  Yet, that would be equally true if, following the commencement of litigation against the first applicant, the NDA holder had a change of heart—perhaps in response to the arguments presented—and sought to delist its patents.  Nonetheless, under FDA's decision, the first applicant would retain exclusivity in the latter case, merely because of the fact that it was sued.

This result highlights the irrationality of FDA's "must be sued" position.  FDA fails to explain what litigation qualifies to prevent patent delisting.  Under the pre-*Mova* successful defense requirement, an ANDA applicant had to successfully defend a suit brought against it to

---

[7]    The only difference being is that an applicant who is sued may ultimately lose and be forced to convert its Paragraph IV certification to a Paragraph III certification, which does not entitle it to exclusivity.  *See, e.g., Mylan Pharms., Inc. v. Henney*, 94 F. Supp. 2d 36 (D.D.C. 2000), *vacated as moot sub nom. Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627 (D.C. Cir. 2002).

qualify for exclusivity. Therefore, a suit that was voluntarily dismissed by the plaintiff or a settlement that did not result in a finding of invalidity, non-infringement, or unenforceability did not qualify. The D.C. Circuit ruled that this position found no support in the statute or in FDA's regulations.

The illogic of FDA's position is further demonstrated by the following scenario. Assume that Merck had sued IVAX but not Ranbaxy and then dismissed its lawsuit against IVAX. Under these facts, FDA would not permit Merck to delist the two patents with respect to the 5, 10, 20 and 40 mg strengths on which IVAX filed the first paragraph IV certification. Because Ranbaxy apparently filed the first paragraph IV certification on the 80 mg strength and was not sued, Merck would be permitted to delist the patents with respect to that strength. The converse would result if Merck sued Ranbaxy but not IVAX. Merck would be able to delist the patents as they apply to the 80 mg strength but not the four other strengths. The absurdity of this result is obvious.

FDA also contends that "delisting a patent at the NDA holder's request is likely to speed approval of generic drugs." *Id.* at 15. If there is any general truth to that statement it is only because FDA will be depriving the first applicant of its 180 days of statutorily provided generic exclusivity. Here, for example, IVAX has done *everything* the Hatch-Waxman Act contemplates to bring its product to market as soon as possible. IVAX would have been "*entitled* to 180-days of exclusive marketing after the forty-five days … passed" from giving notice of its Paragraph IV certification to Merck, *Mylan Pharms.*, 94 F. Supp. 2d at 51 (emphasis added), except for the happenstance that a blocking patent remained. And with the expiration of that blocking patent in June 2006, IVAX expects to begin marketing generic simvastatin.

Eviscerating IVAX's exclusivity will not bring any generic simvastatin product to market sooner.

Indeed, FDA's arguments about speeding approval of generic drugs in the event that the first applicant is "unable to obtain approval for its ANDA or fails to being marketing of an approved drug" when eligible—neither of which have occurred here—has been repeatedly and consistently rejected by every court to consider it. *See, e.g., Mova*, 140 F.3d at 1067; *Mova v. Pharm. Corp. v. Shalala*, 955 F. Supp. 128, 130-31 (D.D.C. 1997); *Inwood Labs., Inc. v. Young*, 723 F. Supp. 1523, 1527 (D.D.C. 1989) (noting that the "last possibility is not likely because of the clear economic incentives to get the product on the market and begin enjoying the period of exclusivity as soon as possible"), *appeal dismissed*, 43 F.3d 712 (D.C. Cir. 1994) (Table). Moreover, as the D.C. Circuit noted in *Mova*, FDA itself previously recognized that "'the applicant's decision not to market the drug deserves to be protected because a delay in marketing serves the public interest.'" 140 F.3d at 1070 (quoting 54 Fed. Reg. 28872, 28894 (1989)). In any event, if accepted, FDA's rationale would apply equally if a delisting request were made while litigation were pending, and thus it provides no support for distinguishing between Paragraph IV certifications that lead to litigation and those that do not.

At bottom, FDA's reasoning "ignores the contribution that manufacturers ... make by submitting documentation to a patent holder which is so detailed and persuasive that the patent holder decides not to file a lawsuit. Such a contribution is equally valuable in terms of opening up the market to generic competition." *Inwood*, 723 F. Supp. at 1526. All the more so here where the patentee concedes its patent is inapplicable. The statute recognizes the first applicant's contribution ***regardless*** of whether its Paragraph IV certification provokes litigation.

19

*See, e.g., Purepac*, 162 F.3d at 1204-05.  Thus, there is no basis for FDA to distinguish whether the exclusivity award will be granted solely because an applicant was or was not sued.

It is no answer to suggest, as FDA does, that exclusivity should not be awarded to the first Paragraph IV filer merely because the patentee concedes its patent was improperly listed in the Orange Book.  Once a patent is listed, an applicant "***must***, if it submits an ANDA, treat the disputed patent as valid" and include a Paragraph IV certification if it wishes to challenge the patent—regardless of whether it is improperly listed.  *Purepac*, 354 F.3d at 880.  Under the FDA's hands-off approach to Orange Book listings, there is no other way to seek to market a generic product before the listed patent expires.  Yet, if an applicant makes the investment to design around that patent, and takes the risk of being a first filer, it will obtain no exclusivity reward if the patent is subsequently delisted—perhaps for the very reasons articulated by the applicant.  Ironically, however, if the patentee first files suit and then sees the error of its ways, the applicant will retain exclusivity under FDA's irrational position, regardless of whether the patent was improperly listed.

Indeed, that was the very issue in *Torpharm, Inc. v. Thompson*, 260 F. Supp. 2d 69 (D.D.C. 2003), *aff'd sub nom. Purepac*, 354 F.3d 877.  There, while it was beyond dispute that the patent had been improperly listed, FDA would not have permitted delisting if the result was that the first applicant would lose its exclusivity.  Only after the agency concluded that the party first filing a Paragraph IV certification was not eligible for exclusivity (because it should have filed a section viii statement rather than a Paragraph IV certification), did FDA, the district court, and ultimately the D.C. Circuit permit delisting.  So too here where IVAX otherwise remains eligible for its exclusivity.

In sum, there is no legal basis for distinguishing between IVAX and an applicant who happens to be sued. The reasons offered by the FDA for permitting delisting and stripping IVAX of its exclusivity would apply equally well even if litigation had been commenced. Such "[i]nternally inconsistent reasoning by a government agency is not entitled to any deference by the courts, and is inherently arbitrary and capricious." *Mylan*, 94 F. Supp. 2d at 48. Because FDA cannot offer a justification for awarding exclusivity where the first applicant is sued, but not where it is not (other than one rejected by every court to consider it, as discussed below), FDA's denial of IVAX's exclusivity cannot stand.

### B. FDA's Litigation Distinction Has Been Rejected By Caselaw And Is Not Entitled To *Chevron* Deference.

FDA's sole justification for distinguishing between those cases "when a paragraph IV patent challenge has resulted in litigation," 10/24/05 Letter at 2, and those when it has not, is to preserve exclusivity in the event "that the ANDA applicant will *prevail* and the patent will be found invalid or not infringed," *id.* at 12. However, this distinction simply makes no sense in a post-*Mova*, post-*Purepac* world, where exclusivity does not hinge on a lawsuit against the first applicant (or any other applicant, for that matter). The rejection of the "successful defense" requirement, and indeed, the rejection of any litigation requirement whatsoever, eviscerates FDA's only plausible justification for distinguishing between first applicants who are sued and those who are not when considering delisting, and thus requires that FDA's decision be vacated. Indeed, because it is predicated on a distinction rejected by the D.C. Circuit, FDA's interpretation of the Hatch-Waxman Act to permit delisting in the absence of litigation is simply not entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). The D.C. Circuit already found that the regulatory provision on which FDA ultimately relies (21 C.F.R. § 314.107(c)) could not survive the first step of *Chevron. See*

*Mova*, 140 F.3d at 1069. Moreover, as explained below, FDA's distinction between lawsuits initiated by the patentee and other lawsuits further founders on *Chevron* step one, because it is inconsistent with the plain, unambiguous text of 21 U.S.C. § 355(j)(5)(B)(iii). *See Chevron*, 467 U.S. at 842. When a statute is clear, "consideration of administrative interpretation contrary to such language is inappropriate; the agency cannot by its interpretation, override the congressional will as memorialized in the statutory language." *Inwood*, 723 F. Supp. at 1526. Further, should the Court reach *Chevron* Step Two, FDA's approach to delisting is unreasonable because it is inconsistent with the statutory text, structure, and purpose and because it is internally inconsistent and arbitrary. *See Chevron*, 467 U.S. at 837; *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *Mylan*, 94 F. Supp. 2d at 48. It is, thus, entitled to no deference.

Prior to *Mova*, FDA interpreted 21 U.S.C. § 355(j)(5)(B)(iv) as providing that only "the applicant submitting the first application [and who] has successful defended against a suit for patent infringement brought within 45 days of the patent owner's receipt of notice" was eligible for 180 days of generic exclusivity. 21 C.F.R. § 314.107(c)(1) (1994) (quoted text subsequently deleted in 1998 following *Mova*). Litigation was, thus, a necessary component of obtaining exclusivity. After *Mova*, litigation became irrelevant to obtaining exclusivity. As the district court in *Mova* observed, the Hatch-Waxman Act "does not include a 'successful defense' requirement, and indeed it does not even require the institution of patent litigation." *Mova*, 955 F. Supp. at 130. Rather, it is the ***applicant's*** "first filing of an ANDA ... under paragraph IV, and not [the patentee's] infringement suit that required FDA to withhold approval from subsequent paragraph IV filers." *Id.* Similarly, in *Purepac*, the D.C. Circuit observed that "Section 355(j)(5)(B)(iv) ***does not, on its face require the first applicant to be sued in order to***

22

*benefit from market exclusivity*." 162 F.3d at 1204 (emphasis added). Indeed, the *Purepac* court plainly held that there was "nothing irrational in … giving first applicants the 180-day exclusivity period even if they have not been sued," because "*[o]n its face, the statute does the same*." *Id.* at 1205 (emphasis added). While the court-decision trigger commencing the 180-day exclusivity period "presupposes a lawsuit," the commercial-marketing trigger "does not." *Id.* at 1204. Thus, in its post-*Mova Guidance for Industry*, FDA acknowledged that exclusivity should not depend on whether a party is sued. Rather, "180 days of marketing exclusivity should be granted to the first ANDA applicant who files a paragraph IV certification, *regardless of whether the applicant is subsequently sued* for patent infringement." *Guidance for Industry: 180-Day Generic Drug Exclusivity Under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act* 3 (June 1998) (emphasis added) *available at* http://www.fda.gov/cder/guidance/2576fnl.pdf (last visited Nov. 7, 2005). And the FDA's determination to "giv[e] first applicants the 180-day exclusivity period even if they have not been sued" was upheld against challenge in *Purepac* because "*the statute does the same*." *Purepac*, 162 F.3d at 1205 (emphasis added).

Now, however, because litigation (much less success in litigation) is irrelevant to whether an applicant is eligible for exclusivity, FDA's insistence on retaining a litigation requirement as a prerequisite to prohibiting the delisting of a patent (which would eviscerate the first applicant's exclusivity), is simply absurd. It finds no support in the text of the statute, and FDA has offered no policy justification or rational reason for this distinction. To the contrary, FDA's contorted attempt to preserve its pre-*Mova* regulation necessarily conflicts with the statute and prevailing caselaw.

23

In a strained effort to make sense of the litigation reference in 21 C.F.R. § 314.94(a)(12)(viii), FDA contends that it refers back to the *pre-Mova version* of 21 C.F.R. § 314.107(c)—which granted exclusivity only when "the applicant submitting the first application has successfully defended against a suit for patent infringement brought within 45 days of the patent owner's receipt of notice." 10/24/05 Letter at 12 n.17 (internal quotations omitted). It is telling that the only way FDA could make sense of its own regulation was to read it as referencing a provision that FDA repealed in the wake of *Mova*. Thus, under FDA's approach to 21 C.F.R. § 314.94(a)(12)(viii), the only kind of "lawsuit" that is sufficient to preclude delisting a patent is a "'suit for patent infringement'" brought by the patentee "'within 45 days of the patent owner's receipt of notice,'" against "'the applicant submitting the first application.'" 10/24/05 Letter at 12 n.17 (quoting 21 C.F.R. § 314.107(c) (prior to revision following *Mova*)).

Such a limitation simply cannot be squared with the plain text of the statute. In describing lawsuits brought following a Paragraph IV challenge, Congress expressly contemplated that the applicant might file an action for a declaratory judgment, or that the patentee might, for whatever reason, file suit against applicants other than the first applicant. *See* 21 U.S.C. § 355(j)(5)(B)(iii). Indeed, the D.C. Circuit has squarely held that suits brought against subsequent applicants (or by any applicant against the patentee) are sufficient to satisfy Section 355(j)(5)(B)(iii)'s court-decision trigger. *See, e.g., Teva*, 182 F.3d at 1010; *see also Mova*, 140 F.3d at 1072-73; *Minnesota Mining & Mfg.*, 289 F.3d at 780. It follows that FDA's distinction between lawsuits brought by the patentee against the first applicant within 45 days of notice of the Paragraph IV challenge and lawsuits brought by the first applicant against the patentee after 45 days (as expressly provided for in 21 U.S.C. § 355(j)(5)(B)(iii)), fails under the

plain text of the statute.  And, of course, the only reason for FDA's utterly bizarre distinction between types of lawsuits is its insistence on interpreting the Hatch-Waxman Act in accordance with a pre-*Mova* regulation that it has actually repealed.

Once it is conceded that FDA cannot lawfully distinguish between the types of lawsuits expressly contemplated by 21 U.S.C. § 355(j)(5)(B)(iii) as a basis for not delisting patents and, thus, awarding exclusivity, it becomes even more clear that there is no permissible rationale for distinguishing between Paragraph IV challenges that are subject to litigation and those that are not.  Perversely, FDA's approach would actually encourage parties who are not sued within 45 days of filing their Paragraph IV certifications to file declaratory judgment actions and seek stipulated dismissals solely to prevent delisting and, thus, preserve their exclusivity.  The only justification the FDA can muster in support of its distinction is to preserve the opportunity for a legally irrelevant "victory."

Worse, "FDA's interpretation places the decision as to whether a generic manufacturer will be entitled to exclusivity entirely in the hands of the patent holder."  *Mylan*, 94 F. Supp. 2d at 54.  Indeed, the FDA concedes as much.  *See* 10/24/05 Letter at 15 (noting that the "Agency will be giving the NDA holder the power to decide whether 180-day exclusivity will be awarded … when the NDA holder has not litigated the claims made in the paragraph IV certification.") Yet, as with FDA's ill-fated successful defense requirement, "[u]nder the FDA's interpretation, if the patent holder chooses to sue only the second, the third, or the fifth applicant," and subsequently requests to delist its patent, "the rather bizarre result will be that no one is entitled to exclusivity although one applicant bore the burden of filing a section IV certification and another that of defending against [a] patent infringement suit."  *Inwood*, 723 F. Supp. at 1527. Here, no less than in the "successful defense" context, "[b]y subjecting the exclusivity

entitlement to the caprices of the patent holder, FDA's interpretation would seem to affect adversely the incentives that Congress sought to create in providing for 180 days of exclusivity for the manufacturers of generic drugs." *Id.*

Indeed, this Court has squarely rejected FDA's previous attempts to limit a first filer's right to exclusivity based upon a brand company's attempts to alter its Orange Book patent listings subsequent to the first filed paragraph IV ANDA. Just last year, in *Torpharm, Inc. v. FDA,* No. 03-2401, 2004 U.S. Dist. LEXIS 524 (D.D.C. Jan. 8, 2004)(Roberts, J.), this Court entered summary judgment against FDA, holding that FDA acted contrary to the plain language of the exclusivity provisions of the Hatch-Waxman Act when it refused to grant Torpharm exclusivity based on Glaxo's listing of additional patents relating to the drug paroxetine, which patent listings occurred subsequent to Torpharm's filing of the first ANDA containing a paragraph IV certification directed to the sole paroxetine patent listed at the time of the ANDA filing. In its January 2, 2004 oral ruling from the bench (which ruling was incorporated in the January 8, 2004 summary judgment order cited above), this Court began by recognizing that "Torpharm ... responded to the incentive that Congress crafted ... [and] moved before all the others and filed to take advantage of that exclusive 180-day marketing period for the generic drug." *See* Transcript of Ruling, at 56.[8] The Court then proceeded to conclude that such exclusivity could not be limited or taken away from Torpharm as a result of the brand company's post-ANDA filing conduct in listing additional patents in the Orange Book -- which subsequent patent listings created an opportunity for other ANDA applicants to certify against first -- because "[i]t would be ironic if Congress meant to give the drug innovators such power when its

---

[8]    A copy of the January 2, 2004 transcript of the Court's oral ruling, as well as the Court's subsequent January 8, 2004 written summary judgment order, are attached hereto as Exhibit 2.

aim was to get more and cheaper generics on the market" and that "[t]he plain language of the statute grants one first applicant exclusivity in marketing the new generic drug." *Id.* at 56-57.

The same result should follow here. Merck's Orange Book listing activity (in this case a de-listing as opposed to listing), undertaken after IVAX, like Torpharm, had already "responded to the incentive that Congress crafted ... [and] moved before all the others and filed to take advantage of that exclusive 180-day marketing period for the generic drug," cannot lawfully deprive IVAX of its status as the first paragraph IV filer or its right to exclusivity under the statute. IVAX certainly cannot be deprived of that statutory right on the basis that no litigation was filed against it - - as FDA decided in this case - - when the settled law in this Circuit and others forbids the application of such a distinction to exclusivity decisions as flatly contrary to the exclusivity statute.

It is no answer to say, as FDA does, that "the statute gives an NDA holder no discretion to list or delist a patent"[9] when the FDA itself prohibits delisting under certain circumstances.

---

[9] The absurdity of this statement can hardly be understated. In one breath, FDA defends its position by declaring that "an NDA holder has no discretion to list or delist a patent; if the patent falls within the scope of listable patents described in section 505(b)(1) and (c)(2) and 21 CFR 314.53, the patent must be listed; if it falls outside the scope, it must not be listed." *See* 10/24/05 Letter at 15-16. Yet in the same letter, FDA openly acknowledges that "[t]he Agency has consistently maintained that that it has neither the resources nor the expertise to review patent listings to determine whether they meet the statutory criteria for listing." *Id.* at 4. Moreover, it is well-established that there is no private right of action for any generic drug manufacturer to challenge a NDA holder's decision to list or delist a patent, *see Mylan Pharms. v. Thompson*, 268 F.3d 1323 (Fed. Cir. 2001), and the only regulatory mechanism adopted by FDA to address challenges to the propriety of a patent listing ultimately leaves that decision *entirely* in the hands of the brand manufacturer. *See* 21 CFR § 314.53(f) (unless the NDA holder voluntarily withdraws or amends its patent information in response to a challenge, "the agency will not change the patent information in the list."); *see also aaiPharma*, 296 F.3d at 243 (recognizing FDA's "purely ministerial approach to the Orange Book listing process"); *American Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2002) ("[FDA] administers the Hatch-Waxman Amendments in a ministerial fashion simply following the intent of the parties that list patents."); *Purepac Pharm. Co. v. Thompson*, 238 F. Supp. 2d 191, 193-94 (D.D.C.
(Continued...)

10/24/05 Letter at 15.  Nor is it an answer that FDA's approach only marginally adversely affects the incentives to file Paragraph IV challenges to patents.  *See id.* at 16.  FDA does not dispute that permitting delisting under the circumstances here will decrease generic companies' incentives to challenge brand name patents—rather it merely notes that "patent delistings are relatively uncommon," and thus any adverse affects will be minor.  *Id.*  That is not a principled reason to support FDA's decision.

Instead, FDA argues that "should a paragraph IV certification prompt a delisting, the threat of litigation has been defused and the need for any continuing exclusivity incentive has been obviated."  *Id.* at 17.  That sort of *ex post* reasoning is simply nonsensical.  To be sure, if a patent is delisted *before* a Paragraph IV certification is filed, the need for an exclusivity incentive to challenge a patent and bring a product to market may have been largely "obviated."  But in that case, no generic filer has made the investment in designing around a listed patent or, more importantly, assumed the risk of litigation, there is no party harmed by delisting.

Moreover, that was simply not the case here.  The '481 and '520 patents were in the Orange Book as an obstacle to approval when IVAX submitted its ANDA.  There was no avoiding them.  *See Purepac*, 354 F.3d at 880.  At the time IVAX submitted its ANDA, it could not know that Merck would not enforce them, much less subsequently request to delist them.  The promise of 180 days of exclusivity was an incentive for IVAX to incur the costs to analyze

2002), *aff'd*, 354 F.3d 877 (D.C. Cir. 2004) (recognizing that the duty to ensure that only patents that actually claim approved drugs or methods of use are listed in the Orange Book lies solely with the NDA holders); *Watson Pharm., Inc. v. Henney*, 194 F. Supp. 2d 442, 445 (D. Md. 2001) (FDA relies entirely upon patent holder's declaration as to propriety of patent listing). Consequently, FDA's position that an NDA holder has no discretion to decide to list or delist a patent is demonstrably untrue, and is simply reflective of the flawed reasoning employed by the Agency in the 10/24/05 letter decision.

them, attempt to engineer around them, and ultimately challenge them and assume the risks of potential litigation by filing a Paragraph IV certification. Whether or not the patentee sues or later requests to delist its patents, the first generic drug company to challenge a patent bears research and legal costs in either designing around a patent or challenging a patent on grounds of invalidity or unenforceability.

The Hatch-Waxman Act recognizes the costs faced by the first generic drug manufacturer that invests in identifying a potentially vulnerable patent and then exposing itself to risky and expensive patent litigation. Even if the Paragraph IV challenge is successful and the patent is invalidated or the patentee effectively concedes non-infringement by not enforcing the patent, that manufacturer will soon face competition from other generic companies that have not run the risks of being the first filer. As the D.C. Circuit has held, the Hatch-Waxman Act thus "provide[s] a reward, in the form of an exclusivity period, to generic drug companies that are the first to file paragraph IV ANDAs" and thereby "challenge pioneer drug companies' patents." *Mova*, 140 F.3d at 1075; *see also Minnesota Mining & Mfg.*, 289 F.3d at 778 ("[Section 355(j)(5)(B)(iv)] is designed to provide an incentive, in the form of a 180-day period of marketing exclusivity, to [the first] ANDA filer."); *Dr. Reddy's*, 2003 WL 21638254, at *7 (noting exclusivity is a "statutory benefit given as an incentive for generic companies who take the greatest risk of being the first generic entrant on the market."). If the first filer's challenge is successful, subsequent ANDA applicants can take advantage of that success without paying any portion of the cost of that success. That is exactly what occurred here. IVAX's challenge, Merck's decision not to sue in light of that challenge, and Merck's subsequent request for delisting, have opened the door for generic competition. IVAX should not be denied its statutory award for making the investment and taking the risk that opened that very door.

At bottom, the sole rationale permeating FDA's decision here is a not-so-subtle suggestion that because IVAX was not sued, it has not earned its exclusivity, and it is therefore okay to delist the patents and deprive IVAX of exclusivity. The D.C. Circuit has expressly rejected that logic and it has no place in a post-*Mova* world.[10]

## C.    FDA's Position Here Is Flatly Inconsistent With Prior Positions Taken By The Agency

Not only does FDA's current attempt to return to a litigation requirement for exclusivity violate *Mova*, but it also directly contradicts FDA's own interpretation of the statute. Today, FDA states that IVAX is not entitled to exclusivity because it was not sued after undertaking the risk of expensive patent litigation by filing paragraph IV certifications to the '481 and '520 patents. Immediately following *Mova*, and indeed throughout the subsequent years, FDA has expressed precisely the opposite view.

Beginning with its first post-*Mova Guidance for Industry*, FDA acknowledged—both in its view and in that of the courts—that exclusivity is not governed by whether a party is sued by stating, "[t]he district courts in both *Inwood* and *Mova* held that 180 days of marketing exclusivity should be granted to the first ANDA applicant who files a paragraph IV certification, *regardless of whether the applicant is subsequently sued* for patent infringement." *Guidance*

---

[10]    FDA seriously misreads *Mova* in its October 24, 2005 decision. According to FDA, "[t]he *Mova* court held that FDA's then-prevailing 'win first' successful defense approach to awarding exclusivity was inconsistent with the plain statutory language because it effectively wrote the commercial marketing trigger out of existence..." 10/24/05 Letter at 14. While the *Mova* court **secondarily** concluded that the successful defense requirement could not be reconciled with the commercial marketing trigger as a practical matter, *see Mova*, 140 F.3d at 1069 ("The win-first rule **also** infringes on the statutory scheme in a **second**, subtler way: its practical effect is to write the commercial-marketing trigger out of the statute.") (emphasis added), its **primary** reason for rejecting the successful defense requirement was that it was inconsistent with the explicit language of the statute itself. *Id.* ("The successful-defense requirement is inconsistent with the literal language of the statute.").

*for Industry:  180-Day Generic Drug Exclusivity Under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act* 3 (June 1998) (the "1998 Guidance")  (emphasis added). Indeed, the 1998 Guidance continues to state that a first applicant to submit an ANDA with a paragraph IV certification, but who was not sued, would receive a letter from FDA containing the following language:  "Although you were not sued as a result of the notice you provided to the holder of the NDA and the patent owner, you are nonetheless eligible for 180 days of market exclusivity."  *Id.* at 5.  By so stating, FDA adopted the explicit position that, post-*Mova*, a first-filer need not be sued to be entitled to exclusivity.  FDA not only considered the issue but developed a position on the issue that is directly contrary to that it is espousing today.

In November 1998, FDA release an interim rule which officially withdrew the "successful defense" requirement that had been struck down in *Mova* and repeated its earlier finding that "[t]he district courts in both *Inwood* and *Mova* held that 180 days of marketing exclusivity should be granted to the first ANDA applicant who files a paragraph IV certification, regardless of whether the applicant is subsequently sued for patent infringement."  180-day Generic Drug Exclusivity for Abbreviated New Drug Applications Interim Rule, 63 Fed. Reg. 59710, 59711 (Nov. 5, 1998).  FDA further promised to issue a formal proposed rule reflecting this finding.

As promised in its 1998 interim rule, FDA circulated a proposed new rule in August 1999.  180-day Generic Drug Exclusivity for Abbreviated New Drug Applications, 64 Fed. Reg. 42873 (proposed August 6, 1999) (to be codified at 21 C.F.R. pt. 314) (the "Proposed Rule").  In the Proposed Rule, FDA backed away from its unequivocal statements in the 1998 Guidance and Interim Rule that various courts held that exclusivity does not depend on having been sued. Rather, FDA then stated that,

31

> [I]n light of the removal of the "successful defense" requirement and subsequent reconsideration of the statutory language, the agency proposes that an applicant would be eligible for 180-day exclusivity *even if it is not sued* by a patent owner or NDA holder."

*Id.* at 42876 (emphasis added). FDA noted that this interpretation is "consistent with the policy established in FDA's June 1998 guidance," as well as the *Purepac* decision, "in which the court noted that section 505(j)(5)(B)(iv) of the act does not require the first applicant to be sued to be eligible for exclusivity." *Id.* In other words, FDA stated that allowing a first-filer that had not been sued, like IVAX, to maintain its right to 180-days of exclusivity was entirely consistent with the Hatch-Waxman Act, relevant court decisions and all agency guidance and rulemaking since the *Mova* decision.

Although FDA subsequently withdrew the Proposed Rule, *see* 67 Fed. Reg. 66593 (Nov. 1, 2002), that withdrawal was made for reasons wholly unrelated to that at issue here. FDA withdrew the Proposed Rule due to subsequent federal court rulings regarding FDA's interpretation of the phrase "court decisions" in the Act. The withdrawal notes, "[i]n light of these decisions, FDA is withdrawing the August 1999 proposed rule and will reevaluate its interpretation of the act." *Id.* Moreover, the withdrawal contains no statement that the 1998 Guidance, and its clear statement that a first-filer is entitled to exclusivity without regard to its being sued, was being withdrawn.[11] It is only FDA's current statements that are contrary to court precedent and FDA's own, repeatedly expressed views. This is the very epitome of arbitrary and capricious decision making. *See United States v. Mead Corp.*, 533 U.S. 218, 229-35 (2001) (denying *Chevron* deference due to lack of care, consistency and authority in administrative

---

[11]    To the contrary, the withdrawal repeated FDA's position that various courts had "held that 180 days of marketing exclusivity should be granted to the first ANDA applicant that files a paragraph IV certification, regardless of whether the applicant is subsequently sued for patent infringement." 67 Fed. Reg. 66593 (Nov. 1, 2002).

decisions); *Bush-Quayle '92 Primary Comm., Inc. v. Fed. Election Comm'n*, 104 F.3d 448, 453-

54 (D.C. Cir. 1997) (refusing *Chevron* deference when agency inconsistently interprets the

statute and fails to explain its departure from prior precedent); *Columbia Broad. Sys. v. FCC*,

454 F.2d 1018, 1026 (D.C. Cir. 1971) (finding that "when an agency decides to reverse its

course, it must provide an opinion or analysis indicating that the standard is being changed and

not ignored, and assuring that it is faithful and not indifferent to the rule of law").

Similarly, FDA has consistently recognized that removing patents from the Orange Book

creates the potential for nullification of a first-filer's statutory right to 180-day exclusivity. In

the preamble to its 1994 regulations, FDA stated that such an interpretation would undermine

180-day exclusivity and should not be tolerated:

> ***The agency agrees that the protection offered by 180-day exclusivity should not
> be undermined by changes from paragraph IV certification or by the filing of
> original certifications other than paragraph IV certifications.*** If a patent were
> removed from the list immediately upon a court decision that the patent is invalid
> or unenforceable, an applicant with a subsequently filed application might seek to
> certify that there is no relevant patent and seek an immediately effective approval.

Abbreviated New Drug Application Regulations; Patent and Exclusivity Provisions, 59 Fed. Reg.

50338, 50348 (Oct. 3, 1994). From the earliest possible moment, FDA correctly recognized that

a first-filer's exclusivity must be preserved in this circumstance, not only because of the clear

command of the statute, but also because exclusivity serves the fundamental purposes of the

statute by encouraging potential generic competitors to challenge patents. To prevent this

nullification, FDA originally interpreted the statute to preclude the delisting of a patent until the

end of the applicable 180-day exclusivity period:

> To ensure that [withdrawal of a paragraph IV certification upon delisting] does
> not occur, the agency has required that a patent remain on the list after being
> declared invalid or unenforceable until the end of any applicable 180-day
> exclusivity period. This means that a patent is deemed to be relevant under §
> 314.94(a)(12)(ii) until the end of the term of the patent or applicable 180-day
> exclusivity period, whichever occurs first. Thus where there is a patent that has

been challenged by a paragraph IV applicant, a subsequent applicant will not be able to file a certification that there is no relevant patent or seek an immediately effective approval until either the patent or the 180-day exclusivity period expires.

*Id.*

Despite advocating for more than a decade that nullification of a first-filer's statutory right to 180-day exclusivity should be avoided, FDA now provides no basis for its about-face decision to abandon its prior interpretation. Such fickle agency interpretations are simply not entitled to deference.

###### D.    The Only Reasonable Approach Is To Prohibit Delisting Once A Paragraph IV Certification Has Been Filed.

Following *Mova* and *Purepac*, the only sensible approach to the delisting issue is to prohibit delisting where an ANDA applicant otherwise remains eligible for 180 days of exclusivity. As written, 21 C.F.R. § 314.94(a)(12)(viii)(B) provides in relevant part that "[a] patent that is the subject of *a lawsuit under § 314.107(c)* shall not be removed from the list until FDA determines either that no delay in effective dates of approval is required under that section as a result of the lawsuit, that the patent has expired, or that any such period of delay in effective dates of approval is ended." (emphasis added). Such a lawsuit by the patentee against the ANDA applicant within 45 days of giving notice of the Paragraph IV certification could obviously only be filed *after a Paragraph IV certification was filed*. As noted above, this provision—and its reference to "a lawsuit under § 314.107(c)"—was adopted when such a lawsuit (and ultimately success in such a lawsuit) was a prerequisite to exclusivity. Now that it is not, following *Mova* and *Purepac*, the only thing required to make the first Paragraph IV ANDA applicant eligible for exclusivity is the filing of a valid Paragraph IV certification. *Cf. Torpharm*, 260 F. Supp. 2d at 85 (deeming a Paragraph IV certification improper and therefore permitting delisting). Thus, delisting should only be permitted when "no delay in effective dates

34

of approval is required under" Section 314.107(c) as *now written*, not as it was drafted prior to

*Mova*. Section 107(c), as revised following *Mova*, now requires a 180 day delay in the effective

date of approval for subsequent ANDAs if there is a "previously submitted [ANDA] containing a

certification that the same patent was invalid, unenforceable, or would not be infringed," *i.e.*, a

Paragraph IV certification. 21 C.F.R. § 314.107(c). In other words, the filing of a Paragraph IV

certification that otherwise entitles an applicant to exclusivity is enough to prohibit delisting.

Such an approach is, as FDA itself concedes, consistent with the statutory text, *see* 10/24/05

Letter at 8, and would provide a clear, bright-line rule, consistent with the incentive structure

devised by Congress.

    FDA's suggestion that such an approach is untenable merely because it would leave little

use for FDA's *regulatory* provision in which parties may request that a patent be removed from

the Orange Book, *see* 21 C.F.R. § 314.54(f), is utterly irrelevant. *See* 10/24/05 Letter at 15.

FDA asserts that "often very little time passes between the submission to FDA of a patent for an

approved drug and the submission of ANDAs containing paragraph IV certifications to the

patent," and thus, "[i]f ... once an ANDA applicant has submitted the first paragraph IV

certification to a patent the patent cannot be removed from the list for any reason, there could be

little, if any, time for meaningful use of the patent challenge process." 10/24/05 Letter at 15. If

*Mova* stands for anything, however, it is that perceived regulatory harmony cannot trump

congressional intent. "After all," here, "*Congress may have intended to reward the first ANDA*

*applicant for his enterprise whether or not he is later sued.*" *Mova*, 140 F.3d at 1071 n.11.

Indeed, Congress said so on the "face" of the statute. *Purepac* 162 F.3d at 1205. In any event,

this very case belies the notion that Section 314.54(f) would be rendered a practical nullity.

While the '481 and '520 patents were listed in the Orange Book for 80-mg simvastatin as of

35

December 14, 2000 (and presumably much earlier as they were issued on January 4, 2000, and January 18, 2000, respectively), the first Paragraph IV certification for 80-mg simvastatin was allegedly filed by Ranbaxy in November 2001—*at least eleven months after listing*.

In sum, there is no statutory or regulatory reason not to give IVAX the 180 days of exclusivity Congress intended for it as the first filer of an ANDA with a Paragraph IV certification for the '481 and '520 patents. Prohibiting the delisting of patents in order to preserve an applicant's eligibility for 180 days of exclusivity is the only reasonable approach the agency may take to patent delistings following *Mova* and *Purepac*.

## CONCLUSION

For the foregoing reasons, IVAX respectfully requests that the Court grant its motion for summary judgment and enjoin the FDA from approving ANDAs filed subsequent to IVAX's for 5-mg, 10-mg, 20-mg, and 40-mg simvastatin except as consistent with IVAX's 180-day exclusivity.

Respectfully submitted,

HYMAN, PHELPS & MCNAMARA, P.C.
700 Thirteenth St. N.W., Suite 1200
Washington, D.C. 20005
202-737-5600
Robert A. Dormer, Bar no. 267641
Douglas B. Farquhar, Bar no. 386573

Dated: November 7, 2005                By: *Douglas B. Farquhar* (by John R. Fleder)
                                            Douglas B. Farquhar

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
150 West Flagler Street, Suite 2200
Miami, FL 33130
(305) 789-3200
Jay B. Shapiro (*pro hac vice* motion forthcoming)
Samuel O. Patmore (same)

36



DEPARTMENT OF HEALTH & HUMAN SERVICES

OCT 2 4 2005

Food and Drug Administration<br/>Rockville MD 20857

Monte R. Browder
Intellectual Property Counsel
Ivax Pharmaceuticals, Inc.
4400 Biscayne Boulevard
Miami, FL 33137

Kate C. Beardsley
Carmen M. Shepard
Buc & Beardsley
919 Eighteenth St., NW
Suite 600
Washington, DC 20006

Re: Docket Nos. 2005P-0008/CP1 and 2005P-0046/CP1

Dear Mr. Browder, Ms. Beardsley, and Ms. Shepard:

This is a response to citizen petition (petition) 2005P-0008/CP1 filed by Ivax Pharmaceuticals, Inc. (Ivax) on January 12, 2005, and petition 2005P-0046/CP1 filed by Buc & Beardsley, on behalf of Ranbaxy Laboratories Ltd. (Ranbaxy), on February 1, 2005.[1] Both petitions address 180-day exclusivity under section 505(j)(5)(B)(iv) of the Federal Food, Drug, and Cosmetic Act (the Act or FDCA) (21 U.S.C. 355(j)(5)(B)(iv)) for various strengths of simvastatin.[2] For the reasons that follow, the petitions are denied.

## I.    ISSUE PRESENTED

Your petitions raise patent listing issues that have implications for 180-day marketing exclusivity for the first generic version of Merck & Co.'s (Merck's) Zocor (simvastatin). This exclusivity period may provide abbreviated new drug application (ANDA) applicants the opportunity to market a generic drug product for 180 days without competition from any other product approved in an ANDA under section 505(j) of the Act. Eligibility for exclusivity depends upon an ANDA applicant filing a so-called "paragraph IV" patent challenge to the patents an innovator

---

[1] The Food and Drug Administration (FDA) has also reviewed and considered the following comments submitted to Docket No. 2005P-0008 and Docket No. 2005P-0046: Federal Trade Commission (FTC), April 5, 2005; Ivax, April 11, 2005; Ivax, May 6, 2005; Ranbaxy, May 20, 2005; Ivax, May 23, 2005; Teva Pharmaceuticals, USA, June 8, 2005; Ranbaxy, July 1, 2005; and Ivax, July 5, 2005.

[2] Amendments made to section 505(j)(5)(B)(iv) of the FDCA by Title XI (Access to Affordable Pharmaceuticals) of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Public Law 108-173) (MMA) amended the provisions related to 180-day exclusivity. The relevant Title XI provisions concerning 180-day exclusivity apply only to drug products for which the first ANDA containing a paragraph IV certification to a listed patent was submitted after December 8, 2003. See MMA, Pub. L. No. 108-173, section 1102(b)(1), 117 Stat. 2066, 2460 (2003). Except if otherwise noted, this response refers to the pre-MMA version of the statute.

<strong>Exhibit 1</strong>

Docket Nos. 2005P-0008/CP1 and 2005P-0046/CP1

drug company has submitted to its new drug application (NDA) for listing as claiming the approved innovator product. The petitions address whether an ANDA applicant's eligibility for this exclusivity survives an NDA holder's request to FDA that the patent be withdrawn from the list of patents that protect the innovator product.

Petitioners' position is that, even if an innovator drug company notifies FDA that its patent should be withdrawn from the list of patents claiming the approved drug product, FDA may not remove the patent from the list and extinguish eligibility for 180-day exclusivity for the first ANDA applicant to have submitted a paragraph IV challenge to the patent. FDA disagrees. We do not interpret the statute to require that an ANDA applicant who has submitted the first paragraph IV certification to a patent always remain eligible for 180-day exclusivity as to that patent even if the NDA holder has asked that the patent be delisted. We believe it is consistent with the language and purposes of the statute generally to delist a patent when the NDA holder requests that we do so and thus to remove the basis for exclusivity as to that patent. FDA's regulations recognize one limited exception to this approach, which is to maintain the listing of such a patent when a paragraph IV patent challenge has resulted in litigation. In that case, the first applicant will remain eligible for exclusivity with respect to a patent the innovator has asked be withdrawn, so that victory in the patent litigation by the ANDA applicant — and a resulting delisting of the patent — would not result in loss of the exclusivity reward. We believe this approach is consistent with the statutory language and policy considerations. The basis for our position is discussed below.

## II.    FACTUAL BACKGROUND

Merck holds the approved NDA for Zocor (simvastatin) Tablets, 5 milligrams (mg), 10 mg, 20 mg, 40 mg, and 80 mg. Merck submitted to its NDA patents that Merck claimed covered the approved drug or its use (section 505(b)(1) and (c)(2) of the Act). These include U.S. Patent No. 4,444,784 ('784 patent), which was listed at the time the NDA was approved in 1991, and U.S. Patents No. RE 36481 ('481 patent) and RE 36520 ('520 patent), which were submitted to FDA by Merck in 2000 and are at issue in this dispute. FDA published these patents in *Approved Drug Products with Therapeutic Equivalence Ratings* (the Orange Book).

According to Ivax's petition, on December 14, 2000, Ivax submitted ANDA 76-052 for the 5-mg, 10-mg, 20-mg, and 40-mg strengths of simvastatin. Ivax believes its ANDA contained the first paragraph IV certifications pursuant to section 505(j)(2)(A)(vii)(IV) to the '481 and '520 patents with respect to the 5-mg, 10-mg, 20-mg, and 40-mg strengths of simvastatin. Ranbaxy's petition states that Ranbaxy submitted ANDA 76-285 in November 2001 for various strengths of simvastatin, including 80 mg. Ranbaxy believes that it submitted the first paragraph IV certifications to the '481 and '520 patents with respect to the 80-mg strength. The applicants state that they provided notice of the paragraph IV certifications to the NDA holder and patent owner, as required by section 505(j)(2)(B). Merck has not sued any ANDA applicant for infringement as a result of a paragraph IV certification to the '481 or '520 patent.

On October 10, 2003, Merck submitted a letter to FDA requesting that the '481 and the '520 patents be removed from the list of patents claiming Zocor (NDA 19-766) in the Orange Book. On November 3, 2003, the Agency received a letter from a law firm stating that pursuant to the

Docket Nos. 2005P-0008/CP1 and 2005P-0046/CP1

patent challenge provisions of FDA's regulations at 21 CFR 314.53(f), the '481 and '520 patents should be withdrawn from the Orange Book and briefly describing that the patents do not meet the requirements for listing because they claim metabolites of simvastatin. Consistent with FDA practice, this challenge was forwarded to Merck on November 21, 2003. Merck, by letter of December 19, 2003, confirmed that it had already requested that the '481 and '520 patents be withdrawn from the Orange Book. FDA received another letter from a law firm on June 14, 2004, requesting that the '481 and '520 patents be withdrawn from the Orange Book. In September 2004, in response to Merck's request, FDA removed the '481 and '520 patents from the Orange Book. Ivax's and Ranbaxy's petitions of January and February 2005 challenge the delisting of these patents and loss of associated 180-day exclusivity.

On July 5, 2005, counsel for Ranbaxy requested correction of the patent listings for Zocor through the process described at 21 CFR 314.53(f). Ranbaxy believes the '481 and '520 should be relisted in the Orange Book, and requested that FDA ask Merck to do so. FDA forwarded this request to Merck on September 22, 2005, and has not been asked by Merck to relist the patent.

Ivax petitions FDA to (1) refuse to approve subsequent ANDAs for simvastatin tablets for 180 days from the date that Ivax first commercially markets simvastatin under ANDA 76-052 and (2) reinstate the '481 and '520 patents in the Orange Book and require subsequent ANDAs for simvastatin tablets to contain certifications to the '481 and '520 patents. Ranbaxy similarly petitions FDA to (1) refrain from approving any ANDA for simvastatin 80-mg tablets until Ranbaxy's claimed 180-day exclusivity has expired, (2) confirm that Ranbaxy's right to 180-day exclusivity for 80-mg simvastatin has not been affected by the delisting of the '481 and '520 patents, and (3) reinstate those two patents in the Orange Book until Ranbaxy's claimed 180-day exclusivity expires.

The Agency has not yet approved any ANDA referencing Zocor and anticipates that no ANDA will be eligible for final approval until at least June 23, 2006, when the '784 patent and associated pediatric exclusivity expire.

## III.  LEGAL BACKGROUND: THE HATCH-WAXMAN AMENDMENTS AND FDA REGULATIONS

The Agency has developed its approach to patent delistings and 180-day exclusivity in these circumstances by reference to the relevant provisions of the FDCA, FDA regulations, and related policy considerations.

### A.  Patent Listings for NDAs

The 1984 Drug Price Competition and Patent Term Restoration Act (the Hatch-Waxman Amendments) amended the Act and established a process for approval of ANDAs for generic versions of approved innovator drug products (section 505(j) of the Act). The timing of approval

Docket Nos. 2005P-0008/CP1 and 2005P-0046/CP1

of ANDAs will depend in part on patent protections for the approved innovator drug, known as the *listed drug*.[3]  Under section 505(b)(1) of the Act (or a similar provision in section 505(c)(2)), an innovator pharmaceutical company must submit to FDA

> the patent number and the expiration date of any patent which claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug.

FDA publishes this patent information in the Orange Book.

The Agency believes the statutory provisions governing patent listings assign control over patent submissions to the NDA holder (section 505(b)(1) and (c)(2)).  FDA has interpreted the statute to allocate to FDA only a ministerial role in the patent listing process.  The Agency has consistently maintained that it has neither the resources nor the expertise to review patents to determine whether they meet the statutory criteria for listing.[4]  In lieu of reviewing patents, FDA has established the challenge process described in the regulations at 21 CFR 314.53(f), by which an outside party can convey its doubts about the accuracy of a patent listing to the NDA holder through FDA, and the NDA holder may correct patent listings.[5]  The Agency's approach to patent listings has been sustained by the courts against challenges that it accords to the NDA holder too much control over the patent-related timing of ANDA approvals.  *Apotex, Inc. v. Thompson,* 347 F.3d 1335 (Fed. Cir. 2003); *aaiPharma Inc. v. Thompson,* 296 F.3d 227 (4th Cir. 2003); *Alphapharm PTY Ltd. v. Thompson,* 330 F. Supp. 2d 1 (D.D.C. 2004).

---

[3] In 21 CFR 314.3(b), *listed drug* is defined as
> a new drug product that has an effective approval under section 505(c) of the act for safety and effectiveness or under section 505(j) of the act, which has not been withdrawn or suspended under section 505(e)(1) through (e)(5) or (j)(5) of the act, and which has not been withdrawn from sale for what FDA has determined are reasons of safety or effectiveness.  Listed drug status is evidenced by the drug product's identification as a drug with an effective approval in the current edition of FDA's "Approved Drug Products with Therapeutic Equivalence Evaluations" (the list) or any current supplement thereto, as a drug with an effective approval.

[4] Petitioners and others devote considerable ink to the question of whether Merck was justified in delisting the '481 and '520 patents on the grounds that the patents claim metabolites of simvastatin and thus are not among the types of patents permitted to be listed (Ranbaxy petition at 2; Ranbaxy May 20, 2005 comment at 4-5; and Teva June 8, 2005 comment at 2).  In keeping with the Agency's role, FDA expresses no opinion as to the merits of these claims.

[5] FDA has taken additional steps to ensure that patents submitted to NDAs for listing in the Orange Book meet the criteria set out in section 505(b)(1) and (c)(2) of the Act.  In June 2003, the Agency issued new regulations at 21 CFR 314.53 describing very specifically what types of patents must and must not be submitted to FDA (68 FR 36703, June 18, 2003).  These regulations were precipitated in part by publication of the 2002 FTC study, *Generic Drug Entry Prior to Patent Expiration: An FTC Study* (2002 FTC Study), describing concerns about patent listings and delays in ANDA approvals.

Docket Nos. 2005P-0008/CP1 and 2005P-0046/CP1

The statutory provisions applicable to patent listings do not specifically address the delisting of patents, either generally or when 180-day exclusivity is at issue.[6] The Agency's view is that the general rule of deference to the NDA holder's views on the scope and effect of a patent should apply equally to the decision to list a patent and to delist a patent. We note that FDA's regulation states that an NDA holder may, as a result of a patent listing challenge, "amend[] or withdraw[] its patent information" (21 CFR 314.53(f)). FDA further believes that deference to the NDA holder's decision to delist a patent is warranted whether it is the result of a third party challenge via the FDA challenge mechanism or is the result of other factors that may influence patent listing decisions. We have established one narrow exception to such deference, to accommodate statutory exclusivity considerations, and that is described at 21 CFR 314.94(a)(12)(viii).

The Agency does not require an applicant to state the basis for requesting that a patent be delisted. If an NDA holder requests that a patent be delisted, it is reasonable for the Agency to assume that it is because the NDA holder no longer believes the patent meets the standard for listing described in section 505(b)(1) and (c)(2) of the Act and at 21 CFR 314.53. We are aware that some delistings have occurred as a result of settlements with the FTC. *See* FTC comment at 7-8. We also understand that, after publication of FDA's new regulations on patent listings (68 FR 36703-36705), certain NDA holders may have requested that patents be removed from listing because the patents were not of the type permitted to be listed. *See, e.g.,* July 1, 2003, letter from GlaxoSmithKline delisting patents for paroxetine hydrochloride.

### B.   Generic Drug 180-Day Exclusivity

Patent listings for an approved innovator drug product play a pivotal role in the approval of generic versions of the drug. An applicant seeking approval of an ANDA must submit, among other things, a certification for each patent in the Orange Book that claims the listed drug the ANDA references. Section 505(j)(2)(A)(vii) of the Act provides that an ANDA applicant must submit

> a certification, in the opinion of the applicant and to the best of his knowledge, with respect to each patent which claims the listed drug referred to in clause (i) or which claims a use for such listed drug for which the applicant is seeking approval under this subsection and for which information is required to be filed under subsection (b) or (c) [of section 505] —
>
> > (I) that such patent information has not been filed,
> > (II) that such patent has expired,
> > (III) of the date on which such patent will expire, or
> > (IV) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted . . . .

---

[6] New provisions of the FDCA at section 505(j)(5)(B)(iv) and (j)(5)(D) added by the MMA address the delisting of patents in the context of 180-day exclusivity. The new provisions do not apply to the ANDAs at issue here and provide no persuasive insight into Congress' views on the relationship between patent delisting and 180-day exclusivity under the pre-MMA statutory provisions. Similarly, the Agency interpretation of the pre-MMA statutory language has no bearing on how the Agency would interpret the specific forfeiture provision of the MMA related to patent withdrawal (see section 505(j)(5)(D)(i)(I)(bb)(CC)).

Docket Nos. 2005P-0008/CP1 and 2005P-0046/CP1

A certification under section 505(j)(2)(A)(vii)(IV) asserts that the patent is invalid, unenforceable, or not infringed (21 CFR 314.94(a)(12)(i)(A)(4)). An applicant submitting a paragraph IV certification is required to give notice of the filing of the ANDA to the patent owner and the NDA holder for the listed drug. This notice must include a detailed statement of the factual and legal bases for the ANDA applicant's opinion that the patent is invalid, unenforceable, or will not be infringed (section 505(j)(2)(B), 21 CFR 314.95).[7] If the NDA holder or patent owner sues the ANDA applicant within 45 days of notice, FDA will stay approval of the ANDA for 30 months from that date, unless a court orders otherwise.

The Hatch Waxman Amendments included the provision at section 505(j)(5)(B)(iv), which makes certain ANDA applicants eligible for 180-day exclusivity as a result of these paragraph IV patent challenges. As interpreted by FDA, this provision makes an ANDA applicant eligible for 180-day exclusivity if the applicant is the first to submit a paragraph IV certification to a listed patent.[8] The "exclusivity" for which an applicant becomes eligible is a statutory delay in approval of any ANDA that contains a paragraph IV certification to the listed patent, where such certification was submitted after the first applicant's certification. This 180-day period of marketing exclusivity acts as an incentive and reward to a generic drug manufacturer that exposes itself to the risk of patent litigation by being the first applicant to submit a paragraph IV certification to a patent (section 505(j)(5)(B)(iv)). *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1064 (D.C. Cir. 1998); *Mylan Pharm., Inc. v. Henney*, 94 F. Supp. 2d 36, 40 (D.D.C. 2000), *vacated as moot sub nom. Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627 (D.C. Cir. 2002). Any 180-day exclusivity thus depends on the existence of a patent to which such certification may be made, and the submission of two or more ANDAs for the listed drug that contain appropriate paragraph IV certifications.

The statutory provision governing 180-day exclusivity, section 505(j)(5)(B)(iv), provides:

> If the application contains a certification described in subclause IV of paragraph [(j)](2)(A)(vii) and is for a drug for which a previous application has been submitted under this subsection [containing] such a certification, the application shall be made effective not earlier than one hundred and eighty days after —
>
> > (I) the date the Secretary receives notice from the applicant under the previous application of first commercial marketing of the drug under the previous application, or

---

[7] An applicant whose ANDA is pending when additional patents are listed must certify to the new patents, unless the additional patents are submitted more than 30 days after they were issued (21 CFR 314.94(a)(12)(vi)).

[8] In determining which applicant submitted the first paragraph IV certification for a listed patent, FDA will consider a number of factors, including whether an ANDA was substantially complete when submitted, whether the paragraph IV certification was submitted in an original ANDA or as part of an amendment, and the date notice was sent to the NDA holder and patent owner. *See Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 888-89 (D.C. Cir. 2004).

Docket Nos. 2005P-0008/CP1 and 2005P-0046/CP1

> (II) the date of a decision of a court in an action described in clause (ii) holding
> the patent which is the subject of the certification to be invalid or not infringed,
> whichever is earlier.

FDA's regulation implementing this provision is at 21 CFR 314.107(c)(1) and (c)(2).[9]

FDA interprets the statute to provide for exclusivity on a patent-by-patent basis.[10] Thus, an ANDA applicant that is first to challenge a particular patent for a particular drug product[11] may enjoy a 180-day period during which it can market its product while approvals of other ANDAs for the same product are held in abeyance. This exclusivity period is triggered either by the ANDA applicant's first commercial marketing of the drug or by a decision of a court finding the patent at issue invalid, unenforceable, or not infringed, whichever occurs earlier (section 505(j)(5)(B)(iv), 21 CFR 314.107(c)(1) and (c)(2)).

The requirements for 180-day exclusivity have changed over the years as the courts have reviewed FDA's implementation of the statute. FDA's original regulations implementing section 505(j)(5)(B)(iv) stated that, to be eligible for 180-day exclusivity, an ANDA applicant was required to submit the first paragraph IV certification to the patent, be sued by the innovator as a result, and win the patent infringement litigation (See 21 CFR 314.107(c)(1998)). With the decision in *Mova*, 140 F.3d 1060, an ANDA applicant could become eligible for 180-day exclusivity solely by being first to submit a substantially complete ANDA containing a paragraph IV certification to the patent. An applicant's eligibility for exclusivity is not contingent on successfully defending patent litigation, or even upon being sued as a result of the paragraph IV certification. *Mova; Granutec v. Shalala*, 139 F.3d 889, 1998 WL 153410 (4th Cir. 1998) (unpublished opinion); *Purepac Pharm. Co. v. Friedman*, 162 F.3d 1201 (D.C. Cir. 1998). This change in eligibility resulted in many more applicants qualifying for 180-day exclusivity.[12] Currently, the initial question in determining eligibility for 180-day exclusivity is whether the ANDA was the first application to contain a paragraph IV certification to a patent. The Agency then must assess whether, at the time when an applicant's eligibility for exclusivity could delay approval of another ANDA for the drug product, the application appropriately maintains its paragraph IV certification.

---

[9] Petitioners note correctly that the drug products referenced in these petitions are subject to section 505(j)(5)(B)(iv) as it appeared prior to passage of the MMA in 2003 (See section 1101(b)(2) of the MMA). FDA's response to these citizen petitions addresses withdrawn patents with respect to pre-MMA 180-day exclusivity only.

[10] FDA's interpretation is currently being challenged in *Apotex v. FDA*, CA 05-123 (D.D.C. filed Jan. 19, 2005).

[11] Each strength of a drug is a separate drug product potentially eligible for exclusivity. *Apotex v. Shalala*, 53 F. Supp. 2d 454 (D.D.C. 1999). Therefore, each strength of simvastatin may be subject to its own period of exclusivity.

[12] From 1984 to 1998, only three ANDA applicants qualified for 180-day exclusivity. Since the *Mova* decision, there have been over 110 periods of 180-day exclusivity.

Docket Nos. 2005P-0008/CP1 and 2005P-0046/CP1

IV.    **RESPONSE TO PETITIONERS' ARGUMENTS**

Petitioners' specific concern is that Merck's request to delist the '481 and '520 patents for Zocor will deprive them of exclusivity they believed they earned for their generic simvastatin products by being the first to submit paragraph IV certifications to these patents when they were listed. The basic arguments raised by Ivax and Ranbaxy are that their right to exclusivity became vested with submission of the first paragraph IV certifications to the '481 and '520 patents, and that *Mova* gives FDA no discretion in assessing eligibility for exclusivity. Ranbaxy also raised a number of other points, which are discussed below. We find none of the petitioners' arguments persuasive.

The effect of a withdrawn patent on 180-day exclusivity is not addressed in the statute. This silence in the statute permits FDA to adopt an interpretation that fills the gap, as long as the Agency's approach is consistent with relevant statutory language and with congressional policy goals. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Thus, the Agency could address the relationship between patent delisting requests and eligibility for exclusivity in any number of ways:

- FDA could refuse to delist a patent once a paragraph IV certification has been submitted, thus permitting the first challenger to remain eligible for exclusivity;
- the Agency could delist the patent immediately, thus extinguishing any right to exclusivity regardless of the status of any litigation; or
- the Agency could withdraw the patent in some circumstances, but not in others.

Petitioners support the first approach, and contend that once a patent has been listed for an approved drug and paragraph IV certifications to that patent have been submitted, the patent must remain listed and, most importantly, the first applicant to submit a paragraph IV certification to the patent must remain eligible for 180-day exclusivity. They argue that, for purposes of exclusivity, it is irrelevant whether the NDA holder has requested that the patent be delisted or whether any litigation was filed as a result of the first paragraph IV certification. They contend that exclusivity rights vest when the first paragraph IV certification to a listed patent is submitted and, thus, FDA should refuse to withdraw a patent from listing once such a certification is submitted.[13]

We disagree with petitioners' view. The Agency's position is that it is fully consistent with both the relevant statutory language and with applicable policy goals for FDA to delist a patent and remove it as a basis for exclusivity, except when the patent challenge has resulted in litigation.

---

[13] Petitioners also have advanced the position that FDA may both delist the patents and maintain an applicant's eligibility for exclusivity. This argument is discussed below.

Docket Nos. 2005P-0008/CP1 and 2005P-0046/CP1

### A. Eligibility for Exclusivity Does Not *Vest* With a Patent Challenge

Petitioners assert that submitting the first paragraph IV certification essentially creates a vested exclusivity that withdrawal of the target patent cannot extinguish.[14] That is not our interpretation of the statute. It is not the case that if an ANDA once contained the first paragraph IV certification to a patent, it will forever be eligible for exclusivity as to that patent regardless of changes in circumstances. An applicant's paragraph IV certification to a patent will only serve to delay approval of other ANDAs pursuant to section 505(j)(5)((B)(iv) if, at the time another ANDA is eligible for final approval but for any exclusivity, the application that contained the first paragraph IV certification to the patent still appropriately contains that paragraph IV certification.

An applicant with a pending ANDA is required to maintain accurate patent certifications until its application is approved. FDA's regulations at 21 CFR 314.94(a)(12)(viii) describe when a patent certification must be amended. Thus, there are a number of situations in which an ANDA applicant that was first to file a paragraph IV certification to a listed patent may, as a result of the passage of time or a change in circumstances, be required to amend its certification to something other than the paragraph IV certification upon which exclusivity depends.

An ANDA applicant with a paragraph IV certification must change its certification if the listed patent expires before the ANDA is approved. The correct patent certification in that situation is a paragraph II stating that the patent has expired (section 505(j)(2)(A)(vii)(II), 21 CFR 314.94(a)(12)(i)(A)(2)). *Ranbaxy Labs. Ltd. v. FDA*, 307 F. Supp. 2d 15 (D.D.C.), *aff'd*, 2004 WL 886333 (D.C. Cir. 2004); *Mylan Labs., Inc. v. Thompson*, 389 F.3d 1272 (D.C. Cir. 2004); *see also Dr. Reddy's Labs., Inc. v. Thompson*, 302 F. Supp. 2d 340, 350-58 (D.N.J. 2003) (conversion of paragraph IV certification to paragraph II certification required when patent expires and can be deemed to have occurred even if no amendment is submitted).

An unsuccessful patent challenge also will require a patent certification change. An ANDA applicant that originally filed a paragraph IV certification and then was unsuccessful in defending a patent infringement suit must change its patent certification to a paragraph III, which states the date the patent expires and signals that the applicant does not seek approval of the ANDA until that date (21 CFR 314.94(a)(12)(viii)(A)). *Mylan Pharm., Inc. v. Henney*, 94 F. Supp. 2d 36 (D.D.C. 2000), *vacated as moot sub nom. Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627 (D.C. Cir. 2002). The delisting of a patent will also require an ANDA applicant to amend its certification, with the one exception that is discussed below (21 CFR 314.94(a)(12)(viii)(B)). Finally, a patent certification must also be amended if for any other reason the original certification is no longer accurate (21 CFR 314.94(a)(12)(viii)(C)). Once an applicant amends its certification, the application will no longer be considered to contain the prior certification (21 CFR 314.94(a)(12)(viii)).

---

[14] *See, e.g.*, Ivax petition at 15 ("statutory right"), 16 ("entitled"), 23 ("right under subsection (B)(iv)"); Ranbaxy petition at 1 ("rights to 180-day exclusivity"), 2 ("entitled"), 3 ("statutory right"). We do not need to address the distinction made in the submissions between a reward and a right. FTC comment at 9-11. Exclusivity has been recognized as an incentive and reward for challenging a patent, but, as is discussed above, it is not an entitlement that vests with the submission of a paragraph IV certification.

Docket Nos. 2005P-0008/CP1 and 2005P-0046/CP1

Even if an ANDA originally contained a paragraph IV certification to a patent, once an applicant amends its ANDA to no longer contain a paragraph IV certification, the applicant will lose its eligibility for exclusivity. For example, when an applicant must change its certification to a paragraph II because the patent has expired, the applicant will lose eligibility for 180-day exclusivity. *Dr. Reddy's Labs., Inc. v. Thompson*, 302 F. Supp. 2d 340, 354-55 (D.N.J. 2003). Also, if an ANDA applicant changes its certification for the patent to a paragraph III, it is no longer eligible for exclusivity under section 505(j)(5)(B)(iv) as to that patent, *Mylan Pharm., Inc. v. Henney*, 94 F. Supp. 2d 36, 54 (D.D.C. 2000), *vacated as moot sub nom. Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627 (D.C. Cir. 2002).

In each of these situations, the fact that an ANDA applicant may have undertaken some risk and incurred certain costs in challenging a patent is not an adequate basis for maintaining eligibility for exclusivity for which the applicant may once have qualified by being the first to challenge the patent. The court in *Dr. Reddy's Labs* rejected the argument that the statute "requires the award of exclusivity if the ANDA applicant is the first applicant to file a paragraph IV certification on a patent, without more, because at that time the ANDA applicant exposes itself to patent litigation by providing the requisite notice of the certification" (302 F. Supp. 2d at 351). The court found it reasonable for FDA to conclude that eligibility for exclusivity expired with the patent, even though the ANDA sponsor was the first to challenge the patent and had been sued by the NDA holder, thus incurring the cost of litigation (*Id.* at 355).[15] Similarly, the court rejected the argument that failing to grant exclusivity based on expiration of the patent was somehow unfair. The court found that[16]

> the purpose of the exclusivity period is to provide an incentive to challenge patents that block ANDA approval. . . . Once a listed patent expires, there is no longer a need to provide an incentive to challenge it in court. Consistent with this statutory purpose, the FDA construes the statute to award 180-day exclusivity based only upon paragraph IV certifications to unexpired patents. *See* 59 Fed. Reg. 50338, 50348. This construction makes sense in terms of the basic statutory objective of encouraging ANDA applicants to challenge listed patents that prevent final ANDA approval.

This reasoning and conclusion are equally applicable to a withdrawn patent, because a withdrawn patent no longer prevents approval of an ANDA.

It is thus FDA's position that even if an ANDA applicant once qualified for exclusivity because it was the first to submit a paragraph IV challenge to a listed patent, the applicant will lose its eligibility for 180-day exclusivity when its ANDA no longer contains a paragraph IV certification to the patent. As occurs with the expiration of a patent or an unsuccessful patent challenge, eligibility for 180-day exclusivity may be lost if the patent is removed from the Orange Book at the NDA holder's request.

---

[15] It is reasonable to assume that the court would be similarly unpersuaded that the cost of designing around a patent would make it "unfair" to deny exclusivity because of a change in the status of the patent. (Ranbaxy petition at 7).

[16] *Dr. Reddy's Labs*, 302 F. Supp. 2d at 354.

10

Docket Nos. 2005P-0008/CP1 and 2005P-0046/CP1

**B.  FDA Regulations Permit Delisting and Require Amended Certifications Except When a Patent Is Litigated**

FDA regulations state that with one exception, upon the delisting of a patent, an ANDA applicant must amend its certification (21 CFR 314.94(a)(12)(viii)(B)). The Agency's regulations on patent delisting, amended certifications, and 180-day exclusivity, which were promulgated in 1994, provide generally that if a patent is delisted, ANDA applicants who have certified to that patent must amend their certifications. Section 314.94(a)(12)(viii)(B) states:

> If a patent is removed from the list, any applicant with a pending application (including a tentatively approved application with a delayed effective date) who has made a certification with respect to such patent shall amend its certification. The applicant shall certify under paragraph (a)(12)(ii) of this section that no patents described in paragraph (a)(12)(i) of this section claim the drug, or if other relevant patents claim the drug, shall amend the certification to refer only to those relevant patents. In the amendment, the applicant shall state the reason for the change in certification (that the patent is or has been removed from the list).

The regulation further describes one exception to this general rule where the paragraph IV certification has resulted in litigation before the request to delist the patent was made. Section 314.94(a)(12)(viii)(B) continues:

> *A patent that is the subject of a lawsuit under §314.107(c) shall not be removed from the list until FDA determines either that no delay in effective dates of approval is required under that section as a result of the lawsuit, that the patent has expired, or that any such period of delay in effective dates of approval is ended.* An applicant shall submit an amended certification. Once an amendment or letter for the change has been submitted, the application will no longer be considered to be one containing a certification under paragraph (a)(12)(i)(A)(4) of this section. (emphasis added)

This regulation recognizes the general requirement that patent certifications be withdrawn when a patent is removed from the list, and describes the one case in which a patent will not be delisted. The reasons for this exception are described in the preambles from the rule-making that implemented the Hatch-Waxman Amendments. In 1989, in the preamble to the proposed rules, the Agency explained that

> [I]f after one or more applicants have made paragraph IV certifications on a patent, that patent has been removed from the list *for any reason other than because that patent has been declared invalid in a lawsuit brought by the patent owner within 45 days of receiving notice under § 314.95* any applicant with a pending application or delayed effective date who has made such a certification should submit an amended patent certification, certifying ... that no relevant patents claim the drug. If other relevant patents claim the

Docket Nos. 2005P-0008/CP1 and 2005P-0046/CP1

> drug, the applicant should instead submit a request to withdraw the paragraph IV certification. (54 FR 28872 at 28895-28896, July 10, 1989)(emphasis added)

*See also id.* at 28886. In the preamble to the final rule, the Agency responded to comments on the proposed rule and noted that

> the agency agrees that the protection offered by the 180-day exclusivity should not be undermined by changes from paragraph IV certifications or by the filing of original certifications other than paragraph IV certifications. If a patent were removed from the list immediately upon a court decision that the patent is invalid or unenforceable, an applicant with a subsequently filed application might seek to certify that there is no relevant patent and seek an immediately effective approval. To ensure that this does not occur, the agency has required that a patent remain on the list after being declared invalid or unenforceable until the end of the patent or the applicable exclusivity period, whichever occurs first. (59 FR 50338 at 50348, October 3, 1994)

The Agency's statements express a clear concern that if an ANDA applicant were successful in challenging a patent, withdrawing the patent from the list immediately would destroy any exclusivity benefit by permitting all other ANDAs for the drug product to be approved immediately. As one court has noted "it would be cruelly ironic, and quite perverse, to use an ANDA applicant's *success* in such an infringement action as the basis for *denying* exclusivity to that applicant" (*Torpharm, Inc. v. Thompson*, 260 F.2d 69, 83 n. 15 (D.D.C. 2003) (emphasis in original), *aff'd sub nom. Purepac Pharm. Co. v. Thompson*, 354 F.3d 877 (D.C. Cir. 2004)). To appropriately maintain the statutory reward, FDA's regulation at 21 CFR 314.94(a)(12)(viii) permits the Agency to maintain the patent listing when there is litigation, against the possibility that the ANDA applicant will prevail and the patent will be found invalid or not infringed.[17]

In contrast, under the same regulation, if the patent was not the subject of litigation as a result of a paragraph IV challenge, it will be removed from the Orange Book at the request of the NDA holder and ANDA applicants must amend their certifications accordingly. This approach removes the patent as a barrier to ANDA approval, and no applicant can maintain a paragraph IV certification that would render it eligible for 180-day exclusivity as to that patent.

---

[17] We note that 21 CFR 314.94(a)(12)(viii)(B) states that a patent "that is the subject of a lawsuit under § 314.107(c) shall not be removed from the list" for a certain period. The regulation at 21 CFR 314.107(c) was amended after *Mova* to remove reference to the "successful defense" requirement (63 FR 59710, November 5, 1998). The Agency interprets the reference to "lawsuit under § 314.107(c)" to be a lawsuit as a result of the first applicant's paragraph IV certification, as described in 21 CFR 314.107(c) before it was amended ("and the applicant submitting the first application has successfully defended against a suit for patent infringement brought within 45 days of the patent owner's receipt of notice"), rather than a lawsuit arising from any ANDA applicant's paragraph IV certification to the patent. Because no lawsuit was filed against any ANDA applicant submitting a paragraph IV certification to the '481 or '520 patent, the Agency's interpretation of this portion of the regulation is not at issue here.

Docket Nos. 2005P-0008/CP1 and 2005P-0046/CP1

C.    **FDA's Regulation Appropriately Fills a Gap in the Statute**

The Agency has rejected the position that it must maintain a patent listing even when no suit has been filed as a result of the first patent challenge.[18] Instead, to maintain the appropriate balance between competition and incentive, the Agency has determined that in making delisting decisions, it is appropriate to consider whether a paragraph IV certification resulted in patent infringement litigation.

The regulation at 21 CFR 314.94(a)(12)(viii)(B) was issued when FDA maintained a "successful defense" requirement for exclusivity, that is, before the decision in *Mova*.  FDA amended some of its regulations, including 21 CFR 314.107(c), as a result of the *Mova* decision to remove the provisions describing the successful defense requirement (63 FR 59710, November 5, 1998). The Agency did not address the effect of the *Mova* decision on the delisting regulation at 21 CFR 314.94(a)(12)(viii)(B).  The regulation retained the litigation element for determining whether a patent could be delisted and thus no longer serve as a basis for paragraph IV certification and resulting 180-day exclusivity.

Since the *Mova* decision, with its fundamental change in the relative ease with which an ANDA applicant may qualify for 180-day exclusivity (i.e., by submitting the first patent challenge versus by submitting the first patent challenge *and* successfully defending resulting patent litigation), the Agency has considered whether maintaining the litigation element in making patent delisting determinations is consistent with the Act, or whether the Agency is required to maintain — or to delist — a patent in response to a delisting request from the NDA holder, without regard to any additional factors.  Even though successful defense of a patent infringement lawsuit is not a factor in eligibility for exclusivity, the Agency believes it is reasonable to interpret the patent listing and 180-day exclusivity provisions of the Act to permit the Agency to leave a patent listed only when a lawsuit has been filed as a result of a paragraph IV certification.

D.    **FDA's Regulation Survives *Mova***

Petitioners argue that the *Mova* decision requires that the first applicant to challenge a patent must always receive exclusivity, and because a listed patent is a prerequisite to exclusivity, the Agency may not consider the status of any litigation in deciding whether to maintain a patent listing.  FDA agrees with petitioners that, following *Mova*, an ANDA applicant may be eligible for 180-day exclusivity as a result of submitting the first paragraph IV certification to a particular patent in an ANDA, even if that applicant is not sued as a result.  However, FDA does not agree that the first applicant is entitled to exclusivity regardless of subsequent events.  FDA also does not agree with petitioners' view of the relationship between eligibility for 180-day exclusivity

---

[18] The Agency likewise has not adopted an interpretation of the statute that would permit a patent to be immediately withdrawn upon the NDA holder's request and any eligibility for exclusivity extinguished, regardless of the status of any litigation.  We note, moreover, that none of the comments to the dockets propose that approach.  However, although such an interpretation could result in undermining the benefit to the ANDA applicant who successfully litigates an invalidity or non-infringement claim that results in a patent delisting, always delisting a patent immediately when requested by the NDA holder to do so would recognize the NDA holder's statutory role in determining which patents must and must not be listed with the Agency.

Docket Nos. 2005P-0008/CP1 and 2005P-0046/CP1

and the effect of withdrawal of a patent on continued eligibility for exclusivity. Petitioners reason that they are entitled to 180-day exclusivity on the grounds that *Mova* prohibited FDA from making 180-day exclusivity turn on litigation and that FDA's regulation is unlawful because FDA's regulation governing withdrawn patents refers to litigation. We disagree with petitioners' analysis.

The decision in *Mova* did not prohibit FDA from considering litigation in the context of patent withdrawal. The *Mova* court held that FDA's then-prevailing "win first" successful defense approach to awarding exclusivity was inconsistent with the plain statutory language because it effectively wrote the commercial marketing trigger out of existence; however, because the statutory language was ambiguous or silent, the court explicitly would have permitted FDA to adopt a "wait and see" approach to granting exclusivity (140 F.3d at 1069). Under "wait and see," if a first applicant did not trigger exclusivity with commercial marketing first, FDA would not approve a subsequent application until the end of the first applicant's litigation, when the applicant either won its litigation and thus retained exclusivity, or lost its patent litigation and lost its exclusivity (*Id*). The *Mova* court expressly did not address the question of exclusivity when the first applicant to submit a paragraph IV certification to a patent is not sued (*Id.* at 1070-1071 ("We begin by setting aside the problems of the first applicant who is never sued or who loses his lawsuit")). The *Mova* court noted that "Congress may have intended to reward the first ANDA applicant for his enterprise whether or not he is later sued … " (*Id.* at 1071 n.11).

In regulating directly from the statute, post-*Mova*, the Agency determined that an ANDA applicant could become eligible for exclusivity under section 505(j)(5)(B)(iv) by submitting the first paragraph IV certification to the patent; eligibility did not require that the applicant be sued as a result. The FDA's approach was upheld as consistent with the statutory language in *Purepac Pharmaceutical Co. v. Friedman* 162 F.3d 1201 (D.C.Cir. 1998), but the court did not find that such an outcome was required by the statute. Moreover, even if the Act were construed to require that an applicant become eligible for 180-day exclusivity solely by virtue of submitting the first paragraph IV certification to the patent, nothing in the cases cited by petitioners supports the proposition that once eligible for 180-day exclusivity, an applicant must remain eligible even if the patent is withdrawn or that the Agency cannot consider whether the paragraph IV certification resulted in litigation in determining whether to maintain a patent listing in the face of the NDA holder's request to delist.

### E.    FDA Appropriately Considered the Effects of Maintaining or Delisting a Patent

Among the factors the Agency has considered in interpreting the regulation at 21 CFR 314.94(a)(12)(viii)(B) post-*Mova* are the effects on generic drug approvals of maintaining or removing a listed patent when an NDA holder requests that the patent be delisted. These effects may be substantial and thus are an important factor in considering how to implement the regulation appropriately.

Listed patents are barriers to approval of generic drugs. If a patent remains listed, any applicant submitting an ANDA for the drug product after the NDA holder requests delisting must nonetheless comply with the patent certification requirements of section 505(j)(2). These

Docket Nos. 2005P-0008/CP1 and 2005P-0046/CP1

include analysis of whether the sponsor wishes to challenge the patent as invalid or not infringed, submission of the patent certification to FDA, notification of the NDA holder and patent owner if the certification submitted is a paragraph IV, including a description of the basis for the patent challenge, and the defense of any patent litigation that may result. All of these steps would need to be undertaken if the patent remains listed, even though the NDA holder has represented (by requesting the delisting) that the patent does not meet the listing criteria under section 505(b)(1) or (c)(2) and 21 CFR 314.53.

We note that to avoid the regulatory hurdles imposed by patent listings, many ANDA applicants have used the procedure described in 21 CFR 314.53(f) to request that a patent be removed from the Orange Book. See, for example, *Apotex v. Thompson*, 347 F.3d 1335 (Fed.Cir. 2003) (delisting of patents for paroxetine hydrochloride) and the correspondence in this matter described above in section II of this response seeking delisting of the '481 and '520 simvastatin patents. However, the positions taken by petitioners could render this patent challenge process largely ineffective. Because of the value under section 505(j)(5)(B)(iv) of being first to challenge a patent, often very little time passes between the submission to FDA of a patent for an approved drug and the submission of ANDAs containing paragraph IV certifications to the patent. *See Guidance for Industry 180-Day Exclusivity When Multiple ANDAs Are Submitted on the Same Day* (July 2003) at 4. If, as petitioners assert, once an ANDA applicant has submitted the first paragraph IV certification to a patent, the patent cannot be removed from the list for any reason, there could be little, if any, time for meaningful use of the patent challenge process.

In contrast, if an NDA holder requests that a patent be delisted and the patent is removed from the list, ANDAs for the drug product will not be required to contain a certification to that patent. There will be no delay of any ANDA approval for the drug product arising from a 30-month stay, nor will approval of any ANDA be delayed by the time required to give effect to an applicant's 180-day exclusivity as to that patent. It is FDA's experience that not only may approval of subsequent ANDAs be delayed during the 180-day period of exclusivity, approval of any ANDA for the listed drug may be delayed substantially if the applicant eligible for 180-day exclusivity is unable to obtain approval for its ANDA or fails to begin marketing of an approved drug, or if there is no court decision that triggers exclusivity under section 505(j)(5)(B)(iv)(II). For these reasons, delisting a patent at the NDA holder's request is likely to speed approval of generic drugs.

We note two additional arguments made by Ranbaxy that relate to the balance between incentives and competition. First, Ranbaxy asserts that if FDA interprets its regulation and the statute to permit an NDA holder to withdraw a patent and extinguish exclusivity, the Agency will be giving the NDA holder the power to decide whether 180-day exclusivity will be awarded (Ranbaxy petition at 8).[19] Although the withdrawal of a patent would have such effect when the NDA holder has not litigated the claims made in the paragraph IV certification, we do not believe that FDA's approach would result in NDA holders abusing the patent withdrawal process. We note that the statute gives an NDA holder no discretion to list or delist a patent: if the patent falls within the scope of listable patents described in section 505(b)(1) and (c)(2) and

---

[19] We note that the statute already gives complete control (if no discretion) to the NDA holder for listing a patent, which inherently gives NDA holders control over the possibility of 180-day exclusivity.

Docket Nos. 2005P-0008/CP1 and 2005P-0046/CP1

21 CFR 314.53, the patent must be listed; if it falls outside that scope, it must not be listed. In addition, an NDA holder that delists a patent removes that patent as a barrier to ANDA approval, in that it will no longer give rise to patent certification obligations, 30-month stays, or delays in approval of multiple ANDAs as a result of 180-day exclusivity. Notwithstanding Ranbaxy's fears, it seems unlikely that an NDA holder would withdraw an otherwise listable patent merely to deprive an ANDA applicant of eligibility for exclusivity, where such act would expose the NDA holder to the risk of earlier and more extensive competition from multiple generic products.

Ranbaxy also argues that if exclusivity does not continue to apply to all challenged patents that an NDA holder seeks to delist, NDA holders will have an incentive to use the litigation element as a "bargaining chip" and to enter into anticompetitive agreements with generic drug companies, a practice that has drawn FTC scrutiny (Ranbaxy petition at 8). In reality, the Agency's position advances FTC's competitive goals. FTC's April 14, 2005, comment to the dockets for these petitions expressly states that to prevent delays in the availability of generic drugs, it is important that the NDA holder have the ability to delist a patent, either as a result of its own decision that the patent is incorrectly listed or as a result of an FTC or court order (FTC comment at 8-9).

### F.    FDA's Approach Maintains Reasonable Incentives for ANDA Applicants

The 180-day exclusivity period is intended to provide an incentive and reward to encourage prompt challenges to patents that act as barriers to ANDA approvals. When an NDA holder requests that a patent be withdrawn from the list of patents protecting an approved drug and FDA removes the patent, that patent no longer acts as a barrier to ANDA approval, and it also may no longer serve as a basis for 180-day exclusivity. In contrast, when the patent remains listed to protect an applicant's exclusivity, it continues to act as a barrier to approval of generic drugs. The question for the Agency in interpreting and applying 21 CFR 314.94(a)(12)(viii)(B), then, is whether the benefit derived from continuing to provide an exclusivity incentive as to a patent justifies the delay in generic drug approvals arising from maintaining the patent listing in the face of a NDA holder's request to delist.

FDA has determined that as a general rule, the benefit derived from maintaining exclusivity does not justify the delay in generic drug approvals that would arise from leaving a patent listed when the NDA holder has requested that the patent be withdrawn. Termination of exclusivity in these circumstances would not appear to undermine the effectiveness of exclusivity as an incentive to challenge patents. An ANDA applicant that challenges a patent with a paragraph IV certification already does so with the knowledge that if the patent expires or the challenge is unsuccessful, it will forfeit eligibility for exclusivity. Moreover, because patent delistings are relatively uncommon, the possibility that a challenged patent might someday be removed from the Orange Book would not appear to cast enough doubt on the value of being first to discourage prompt paragraph IV certifications. Delays — possibly substantial — in the approval of generic drugs to maintain exclusivity when a patent is withdrawn thus seem unwarranted.

In contrast, delays in approval of generic drugs do not seem a high price to pay to maintain exclusivity as an incentive to challenge and litigate the validity or non-infringement of a listed patent. For example, if an ANDA applicant eligible for 180-day exclusivity knew that its

Docket Nos. 2005P-0008/CP1 and 2005P-0046/CP1

successful challenge to the validity of a listed patent could lead to the patent being removed from the Orange Book upon a finding of invalidity — and the concomitant loss of exclusivity — the incentive to challenge patent validity would be seriously weakened. This outcome would be inconsistent with the incentive scheme established in the Hatch-Waxman Amendments.

Ranbaxy argues that the principles justifying retaining the listing of a patent when it is the subject of a lawsuit are "equally applicable" when the paragraph IV certification causes the NDA holder to change its mind about the appropriateness of the patent listing (Ranbaxy petition at 3, 7). FDA disagrees. The narrow exception applicable when the patent has been the subject of a lawsuit serves to continue to provide an incentive to the first applicant to pursue its patent litigation by assuring the applicant that the exclusivity reward will not be extinguished if the patent is removed from the Orange Book as a result of success in that litigation. In contrast, should a paragraph IV certification prompt a delisting, the threat of litigation has been defused and the need for any continuing exclusivity incentive has been obviated. Nor is it at all clear why the patents in this case were delisted; FDA does not inquire into the reasons, and it would be entirely impractical to have a delisting decision depend upon an ANDA applicant's characterization of why the delisting was sought.[20]

Therefore, the Agency interprets 21 CFR 314.94(a)(12)(viii) to mean that if a paragraph IV certification to a patent has not resulted in litigation, FDA will remove a patent from the Orange Book at the NDA holder's request and require all pending ANDA applicants to withdraw their certifications to that patent. FDA may approve ANDAs for the drug product with reference only to the remaining listed patents and the corresponding certifications (section 505(j)(5)(B), 21 CFR 314.107). Only if the listed patent has been the subject of a paragraph IV certification that resulted in a lawsuit will FDA not remove that patent until (1) the first ANDA applicant loses the lawsuit and changes its certification to a paragraph III (thus disqualifying it from exclusivity), (2) the patent expires, or (3) the exclusivity has been triggered either by commercial marketing or by a court decision finding the patent invalid or not infringed and the 180-day period has run. The Agency believes that this approach is both a reasonable interpretation of the statute and maintains an appropriate balance between preserving incentives and removing barriers to ANDA approvals.

Finally, if the regulation at 21 CFR 314.94(a)(12)(viii)(B) were considered to have been so closely linked to the Agency's successful defense requirement articulated in 21 CFR 314.107(c)(1998) that the delisting regulation did not survive the amendment to 21 CFR 314.107(c) to remove the successful defense provision, then the Agency would be required to regulate directly from the FDCA in determining how to address the relationship between patent delistings and eligibility for 180-day exclusivity. As the discussion in this response indicates, the statute does not directly address this issue and the Agency believes that the most appropriate response to this statutory gap is to delist a patent when requested to do so by the NDA holder except when there has been litigation as a result of a paragraph IV certification to that patent.

---

[20] We do note that because the Ivax and Ranbaxy ANDAs for simvastatin were submitted in late 2000 and 2001, and Merck did not seek to delist the '481 and '520 patents until late 2003, it seems unlikely on its face that the notices of the paragraph IV certifications provided to Merck as required under section 505(j)(2)(B) prompted Merck's request to delist the patents.

Docket Nos. 2005P-0008/CP1 and 2005P-0046/CP1

### G.    Petitioners' Proposed Approaches

Petitioners offer two alternatives for addressing 180-day exclusivity when an NDA holder has sought to have a patent delisted and there are paragraph IV certifications to those patents, but no resulting litigation (Ranbaxy May 20, 2005, comment at 3). First, petitioners suggest that FDA remove the patent from the list, but maintain the applicant's eligibility for exclusivity by refusing to approve any other ANDA for the drug product until 180 days after the eligible applicant begins to market its product. Second, Ranbaxy suggests that FDA maintain the patent listing only until the exclusivity expires. Neither of these alternatives is acceptable.

As described above, 180-day exclusivity depends upon both a listed patent as to which an applicant may submit a certification and the submission of two or more ANDAs containing paragraph IV certifications to the patent (section 505(j)(5)(B)(iv)). The statute at section 505(j)(2)(A)(vii) provides that an ANDA must contain

> a certification, in the opinion of the applicant and to the best of his knowledge, with respect to each patent which claims the listed drug ... or which claims a use for such listed drug for which the applicant is seeking approval under this subsection *and for which information is required to be filed under [section 505(b) or (c)]*.  (emphasis added)

If a patent is not listed for the referenced drug, an ANDA may not contain a paragraph IV certification to the patent. *Alphapharm PTY Ltd. v. Thompson*, 330 F. Supp. 2d 1 (D.D.C. 2004). This is true whether an applicant never submits the patent to FDA, or has submitted and later withdraws the patent. Further, if there can be no paragraph IV certifications to a patent, there is no basis under section 505(j)(5)(B)(iv), or elsewhere in the statute, for delaying subsequent approvals to protect 180-day exclusivity. Thus, the Agency may not both delist the '481 and '520 patents and delay approval of other ANDAs for the drug product because of 180-day exclusivity.

Likewise, the Agency does not believe that leaving all "delisted" patents as to which an applicant has submitted a paragraph IV certification in the Orange Book only until the exclusivity expires is an acceptable way to reconcile delisting and exclusivity. When there is no patent infringement litigation that will result in a triggering court decision under section 505(j)(5)(B)(iv)(II) and the ANDA applicant does not trigger exclusivity with marketing (e.g., because the applicant cannot obtain approval of its ANDA, another patent blocks approval of the ANDA, or the applicant declines to market its product for other reasons), the patent may have to remain in the Orange Book for many years until the exclusivity expires, all the while acting as a barrier to ANDA approvals.

### H.    The Agency's Treatment of Other Patent Delisting Requests

FDA has been consistent in its treatment of patent delistings under the regulations. For example, the Agency has delisted patents for Paxil (paroxetine hydrochloride), Serzone (nefazadone), Zyprexa (olanzapine), and Detrol (tolterodine) on the grounds that, although paragraph IV

Docket Nos. 2005P-0008/CP1 and 2005P-0046/CP1

certifications had been submitted to the patents, those certifications did not result in litigation.[21] GlaxoSmithKline (Glaxo), by letter of July 1, 2003, requested that FDA delist U.S. Patents No. 6,063,927, No. 6,080,759, and No. 6,172,233 for Paxil (paroxetine hydrochloride), as a result of FDA's new regulations describing permissible patent listings. FDA informed Glaxo by letter of July 18, 2003, that it would delist the patents as provided in 21 CFR 314.94(a)(12)(viii)(B). As FDA explained in a July 30, 2003, letter to Apotex regarding 180-day exclusivity for paroxetine hydrochloride, the Agency delisted one of the patents pursuant to 21 CFR 314.94(a)(12)(viii)(B) because there had been no relevant litigation, but retained the listing of two other patents because there was litigation (Letter at 7). FDA later delisted these two patents when exclusivity expired.

Bristol-Myers Squibb likewise requested the delisting of U.S. Patent No. 5,256,664 for Serzone (nefazodone) on April 4, 2003.[22] In July of 2003, counsel for two ANDA applicants requested that FDA delist the patent because the NDA holder had not sued any ANDA applicant for infringement of that patent. FDA withdrew the patent from the Orange Book and notified the ANDA applicants seeking approval for nefazadone drug products accordingly on July 31, 2003.

Lilly requested by letter of May 21, 2002, that FDA delist eight patents from the Orange Book listings for Zyprexa Tablets (olanzapine) and Zyprexa Zydis (olanzapine) Orally Disintegrating Tablets. These patents were removed from the Orange Book because no ANDA applicant who had submitted a paragraph IV certification to any of these patents was sued. In September 2004, Pfizer requested that FDA remove U.S. Patent No. 5,559,269 for the listing for Detrol and Detrol LA (tolterodine). Consistent with the approach described in 21 CFR 314.94(a)(12)(viii)(B), the Agency delisted these patents.

Ivax cites the Agency's treatment of patents for mirtazapine and brimonidine as precedent for maintaining a patent listing to preserve exclusivity. In both of these instances, referred to in the Ivax petition at 9-11, FDA continued to list a withdrawn patent in the Orange Book because that patent had been the subject of litigation, as per the regulation. In the February 24, 2003, letter to Tim Gilbert and the May 28, 2003, letter to Daniel J. Tomasch submitted as attachments B and C respectively, to the Ivax petition, FDA made clear that "[i]t would be unreasonable and contrary to FDA regulations and practice to either remove challenged patents from the Orange Book or require a change from paragraph IV certification to section viii statement for the ANDA applicants on the basis of a district court decision of non-infringement, where that decision was the result of the ANDA applicant's submission of a paragraph IV certification and successful litigation of a paragraph IV certification and successful litigation of the patent claim. To do so would vitiate the 180-day exclusivity" (*See* attachment C to Ivax petition at 4). This statement is consistent with the regulation at 21 CFR 314.94(a)(12)(viii)(B). These attachments expressly

---

[21] Since the issues raised in these petitions were first brought to the Agency's attention in correspondence from counsel for Ranbaxy in October 2004, FDA has received a request from the NDA holder to delist U.S. Patents No. 5,863,559 and No. 6,368,627 for Imitrex (sumatriptan succinate). In light of the questions raised in the petitions, and to avoid any further disputes over eligibility for exclusivity arising from delisting and relisting patents, FDA — after determining that it will have no immediate effect on the timing of ANDA approvals — has refrained from delisting these patents until the issues raised in these petitions are resolved.

[22] The other drug products for which Bristol-Myers Squibb sought to have patents delisted (Buspar, Platinol, Lyophilized Cytoxan, and Taxol) no longer had unapproved ANDAs that had been eligible for exclusivity.

Docket Nos. 2005P-0008/CP1 and 2005P-0046/CP1

contradict Ivax's assertion, Ivax petition at 11, that "FDA's decisions were not based on the existence of patent infringement lawsuits."

The third example cited by Ivax was a patent for gabapentin that was at issue in *Purepac Pharm Co. v. Thompson*, 354 F.3d 877 (D.C. Cir. 2004). As Ivax notes, the dispute over the '479 patent involved unique circumstances (Ivax Petition at 20). In that case, FDA had withdrawn, at the request of the NDA holder, a patent that had been the subject of paragraph IV induced litigation. However, the court had determined that FDA could not require certifications to the '479 patent and had ordered the Agency to accept a so-called "section viii" statement under section 505(j)(2)(A)(viii) instead (354 F.3d at 885). Because of the availability of section viii statements to the '479 patent, FDA concluded that no ANDA applicant could maintain a paragraph IV certification to the patent, and thus there could be no 180-day exclusivity under section 505(j)(5)(B)(iv) (*Id.* at 886-888). FDA's treatment of the '479 patent is fully consistent with the Agency's interpretation of 21 CFR 314.94(a)(12)(viii)(B) — that the Agency will not delist a patent at the NDA holder's request when there are paragraph IV certifications to the patent and resulting litigation — because, in the case of the '479 patent, there could no longer be any paragraph IV certifications. Finally, the court was untroubled by FDA's delisting of the '479 gabapentin patent and the loss of any related exclusivity, thus supporting the Agency's position that exclusivity does not vest with the initial submission of the first paragraph IV certification to the patent, but can be lost as a result of subsequent changes in the status of the patent (*See id.* at 888).

## V.    CONCLUSION

The Agency's treatment of patent delistings described in 21 CFR 314. 94(a)(12)(viii)(B) reconciles the statutory provisions governing patent listings and 180-day exclusivity, and is consistent with the policy considerations underlying the Hatch-Waxman Amendments. This approach requires appropriate ministerial deference to an NDA holder's request that a patent be delisted. At the same time, it recognizes one exception to patent delisting to give effect to the 180-day exclusivity benefit when a paragraph IV certification results in litigation, and the litigation results in the NDA holder requesting withdrawal of the patent. By adopting this approach, FDA has maintained a reasonable balance between allowing NDA applicants to correct patent listings and protecting the incentive for ANDA applicants to challenge listed patents.

Consistent with this conclusion, the Agency will not relist the '481 and '520 patents for Zocor, no applicant will be eligible for 180-day exclusivity as to these patents, and FDA will approve ANDAs for all strengths of simvastatin when they are otherwise eligible for approval under section 505(j) of the Act. The citizen petitions are denied.

Sincerely,

Steven K. Galson, M.D., M.P.H.
Director
Center for Drug Evaluation and Research

1 of 1 DOCUMENT

**TORPHARM, INC., Plaintiff, v. FOOD AND DRUG ADMINISTRATION, TOMMY G. THOMPSON, Secretary of Health and Human Services, and MARK B. MCCLELLAN, Commissioner, Food and Drug Administration, Defendants, and ALPHAPHARM PTY., LTD., Intervenor-Defendant.**

Civil Action No. 03-2401 (RWR)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

*2004 U.S. Dist. LEXIS 524*

January 8, 2004, Decided

**SUBSEQUENT HISTORY:** Motion denied by *Torpharm, Inc. v. FDA, 2004 U.S. App. LEXIS 4292 (D.C. Cir., Mar. 4, 2004)*

**DISPOSITION:** [*1] Judgment entered for Plaintiff and against Defendant. Injunction granted.

**COUNSEL:** For TORPHARM, INC., Plaintiff: Arthur Y. Tsien, LEAD ATTORNEY, OLSSON, FRANK AND WEED A, P.C., Washington, DC.

For FOOD AND DRUG ADMINISTRATION, TOMMY G. THOMPSON, MARK B. MCCLELLAN, Defendants: Douglas William Stearn, LEAD ATTORNEY, U.S. DEPARTMENT OF JUSTICE, Washington, DC.

For ALPHAPHARM PTY LIMITED, Interested Party: Charles J. Raubicheck, LEAD ATTORNEY, FROMMER LAWRENCE & HAUG LLP, New York, NY.

**JUDGES:** RICHARD W. ROBERTS, United States District Judge.

**OPINIONBY:** RICHARD W. ROBERTS

**OPINION:**

FINAL ORDER

On January 2, 2004, this Court heard oral arguments of counsel on Plaintiff TorPharm, Inc.'s ("TorPharm's") motion for a preliminary injunction. Having fully considered the submissions of the parties and arguments of counsel, the Court issued an oral order and final judgment for the reasons stated on the record on January 2, 2004. This written order memorializes the oral order and final judgment issued and made effective on January 2, 2004.

The Court finds that there is no genuine dispute of material fact, and therefore, under *Fed. R. Civ. P. 65(a)(2)*, TorPharm's [*2] preliminary injunction motion is, without objection from any party, hereby consolidated with a final decision on the merits.

As to the first claim for relief in TorPharm's Amended Complaint, the Court enters a judgment for TorPharm declaring that (a) the Food and Drug Administration's ("FDA's") letter ruling of July 30, 2003 awarding shared 180-day exclusivity to multiple ANDA applicants for generic paroxetine hydrochloride 10 mg, 20 mg, 30 mg, and 40 mg tablets was contrary to the plain language of the Federal Food, Drug and Cosmetic Act, *21 U.S.C. § 355(j)(5)(B)(iv)*, and (b) TorPharm is entitled to sole 180-day exclusivity for generic paroxetine hydrochloride 10 mg, 20 mg, 30 mg, and 40 mg tablets.

The Court further permanently enjoins and prohibits the FDA, Tommy G. Thompson (in his official capacity as Secretary of Health and Human Services), and Mark B. McClellan (in his official capacity as Commissioner of Food and Drugs), and their agents, servants, employees and attorneys, and all persons in active concert with them, from issuing final approval of Alphapharm's ANDA No. 75-716, or the ANDA of any other applicants for paroxetine hydrochloride 10 mg, 20 [*3] mg, 30 mg, and 40 mg tablets, until the expiration

**Exhibit 2**

2004 U.S. Dist. LEXIS 524, *

of TorPharm's 180-day exclusivity period for those products under ANDA No. 75-356.

The Court hereby enters final judgment for TorPharm and against the Defendants on the first claim for relief in TorPharm's Amended Complaint. The Court dismisses the second and third claims of TorPharm's Amended Complaint as moot. This is a final, appealable order.

SIGNED this 8th day of January, 2004.

RICHARD W. ROBERTS

United States District Judge

1

1             UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLUMBIA

2

3   TORPHARM, INC.,             )
                          )

4         Plaintiff,      )  Docket No. CA 03-2401
                          )

5         v.                 )
                          )

6   FDA,                  )  Washington, D.C.
                          )  Friday, January 2, 2004

7       Defendant.      )

8      TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING

9       BEFORE THE HONORABLE RICHARD W. ROBERTS
           UNITED STATES DISTRICT JUDGE

10

11   APPEARANCES:

12     For the Plaintiff:     OLSSON, FRANK AND WEEDA
                     Arthur Y. Tsien, Esq.

13                      1400 Sixteenth Street, N.W.
                     Washington, D.C.  20036-2220

14                      202.518.6318

15                      LORD, BISSELL & BROOK
                     Deanne M. Mazzochi, Esq.

16                      Hugh S. Balsam, Esq.
                     115 S. LaSalle Street

17                      Chicago, IL  60603-3901
                     312.443.0700

18

19     For the Defendant:     UNITED STATES DEPARTMENT OF JUSTICE
                     Douglas Stearn, Trial Attorney

20                      P.O. Box 386
                     Washington, D.C.  20044

21                      202.307.0061

22                      U.S. DEPARTMENT OF HEALTH AND HUMAN
                     SERVICES

23                      Marc L. Caden, Associate Chief
                     Counsel

24                      5600 Fishers Lane, GCF-1
                     Rockville, MD  20857

25                      301.827.7141
            Scott L. Wallace, RDR, CRR
             Official Court Reporter

---

2

1     APPEARANCES:  Cont.

2     Intervening           FROMMER, LAWRENCE & HAUG, LLP
    Defendant:            Charles J. Raubicheck, Esq.

3     (Alphapharm)          745 Fifth Avenue
                     New York, NY  10151

4                      212.588.0800

5     Court Reporter:        Scott L. Wallace, RDR, CRR
                     Official Court Reporter

6                      Room 6814, U.S. Courthouse
                     Washington, D.C. 20001

7                      202.326.0566

8

   Proceedings reported by machine shorthand, transcript produced

9  by computer-aided transcription

10

```
11
12
13
14
15
16
17
18
19
20
21
22
23
24          Scott L. Wallace, RDR, CRR
25             Official Court Reporter
```

3

```
            P R O C E E D I N G S
 1
 2      THE DEPUTY CLERK:  This is civil action 03-2401, Torpharm,
 3  Inc. versus FDA; intervening defendant, Alphapharm.
 4      Counsel, would you kindly step up to the podium and
 5  introduce yourself to the judge.
 6      MR. TSIEN:  Good afternoon, Your Honor.  Arthur Tsien from
 7  Olsson, Frank and Weeda for Plaintiff Torpharm.
 8      Torpharm would like Deanne Mazzochi from Lord, Bissell &
 9  Brook in Chicago to represent it here today.  Your Honor granted
10  her motion to appear pro hac vice on a provisional basis
11  Wednesday.  We cured a defect by submitting a supplemental
12  declaration Wednesday.
13      THE COURT:  All right.  I'm not sure that I've seen it,
14  but I will trust that you added the number of times, I think,
15  that was missing?
16      MR. TSIEN:  I would be pleased to hand up a copy, Your
17  Honor.
18      THE COURT:  All right.  Well, just tell me what the number
19  was.  Was there a number?
20      MS. MAZZOCHI:  It was zero, in fact.
21      THE COURT:  Zero times.  Well, I will convert my
22  provisional ruling to a final ruling.  You are admitted pro hac
23  vice and welcome to the Court.
24      MS. MAZZOCHI:  Thank you, Your Honor.
25      THE COURT:  All right.
```

4

```
 1      MS. MAZZOCHI:  And would you like me to proceed or do you
 2  need to have defense --
 3      THE COURT:  Well, you can introduce yourself just for the
 4  record.
 5      MS. MAZZOCHI:  That's fine.  My name is Deanne Mazzochi
 6  and I'm an attorney with Lord, Bissel & Brook in Chicago, acting
 7  on behalf of Torpharm.
 8      THE COURT:  Very well.
 9      MR. STEARN:  Good afternoon, Your Honor.  My name is
10  Douglas Stearn.  I'm here with the Department of Justice on
11  behalf of the federal defendants, the Food and Drug
12  Administration, Secretary Thompson and Commissioner McClellan.
13      With me is Marc Caden with the Office of Chief Counsel at
14  FDA.
15      THE COURT:  All right, good afternoon.
16      MR. RAUBICHECK:  And excuse me, Your Honor.  My name is
```

17  Charles Raubicheck.  I'm with the firm of Frommer, Lawrence &
18  Haug, representing the intervening defendant, Alphapharm, Pty,
19  Limited.
20      THE COURT:  All right.  Good afternoon to all of you.
21      I want to take up first the suggestion in the papers that
22  this matter be treated as summary judgment papers or the
23  preliminary injunction hearing be consolidated on the merits
24  under Rule 65.
25      I've looked at the papers and I have not found any genuine

5

1   dispute in your papers about material facts, so I do propose to
2   proceed that way unless there is some objection to that.
3       Now, with respect to argument, what if I give each side
4   roughly a half hour?  Now, maybe the FDA and Alphapharm might
5   want to divide that up any way you want to; Torpharm, if you want
6   to reserve some of your time for rebuttal, you can do that.
7       But had you all discussed some alternative way of
8   proceeding or some alternative schedule?  If not, why don't we
9   just proceed in that fashion and invite Torpharm to go first.
10      MS. MAZZOCHI:  Thank you, Your Honor.  If I may, I would
11  like to reserve approximately ten minutes of rebuttal time.
12      THE COURT:  All right.
13      MS. MAZZOCHI:  And just to begin, I would like to thank
14  the Court very much for taking the time to hear us today.  We
15  understand with the holidays and the urgency involved, that
16  additional efforts are required.
17      As this Court is aware, this case involves 180-day
18  exclusivity periods under the Hatch-Waxman Act, which the D.C.
19  Circuit has recognized in Mova v. Shalala is a very powerful
20  incentive for generic companies to invite patent challenges years
21  before market entry is possible.
22      There's no dispute here amongst the parties that Torpharm
23  is, in fact, the first ANDA applicant to file an ANDA with a
24  paragraph IV certification.
25      THE COURT REPORTER:  Slow down just a little bit.

6

1       MS. MAZZOCHI:  Sure.  I apologize.
2       Torpharm is the first ANDA applicant to submit to FDA an
3   ANDA which contained a paragraph IV certification for the patent
4   that was then listed in the FDA publication known as the Orange
5   Book, U.S. patent number 4,721,723.
6       And our understanding is that as of tomorrow, FDA is
7   planning to deny Torpharm its exclusivity rights as a result of
8   that filing, and that --
9       THE COURT:  You mean sole exclusivity rights?
10      MS. MAZZOCHI:  Sole exclusivity rights.
11      And that FDA is in fact planning on awarding a shared
12  exclusivity right to Alphapharm.  We believe that this denial of
13  Torpharm's ability to fully exploit its 180-day exclusivity
14  period represents arbitrary and capricious agency action for
15  several reasons.
16      First, we believe that the statute on its face creates a
17  sole exclusivity right by requiring FDA to delay approval of
18  rival ANDAs until the expiration of 180 days after certain
19  triggering events in the statute, which everyone agrees here was
20  Torpharm's first commercial marketing date, which was
21  September 8th of 2003.
22      180 days from that period would be approximately March 6th

```
23  of 2004.
24          THE COURT:  Did you say that was the first commercial
25  marketing date or the date on which the secretary is notified of
```

```
 1  the first commercial marketing?
 2          MS. MAZZOCHI:  It was -- we believe that the notice did,
 3  in fact, occur simultaneously, so there may be a day or two
 4  leeway one way or the other.  But I believe the parties are in
 5  agreement that the end of the exclusivity period comes at about
 6  March 6th of 2004.
 7          Nowhere in the statute does it set forth any type of
 8  regime where exclusivity can be shared simultaneously amongst
 9  ANDA applicants.  FDA has invented this concept in a series of
10  ad hoc letter rulings against a background of administrative
11  positions which have involved several flip flops as to what FDA
12  considers to be an appropriate way to award and consider who has
13  entitlement to 180-day exclusivity periods.
14          THE COURT:  Well, forgive me for interrupting.  Can I ask
15  you two questions on that argument?
16          MS. MAZZOCHI:  Sure.
17          THE COURT:  How does that argument support your advancing
18  the argument that this cascading or rolling exclusivity may be an
19  appropriate interpretation of the statute where the statute has
20  no such reference to that either?
21          MS. MAZZOCHI:  We -- FDA has taken the position that the
22  statute authorizes it to analyze exclusivity on a, quote/unquote,
23  patent-by-patent basis.  We obviously believe that the
24  one-first-applicant approach is the correct approach.  However,
25  if there is some perception that FDA believes there needs to be a
```

```
 1  way in which it can reconcile conducting a patent-by-patent
 2  approach to exclusivity with the statute, we believe that, at the
 3  very least, ensuring that the first 180-day exclusivity period is
 4  not devalued by nature of having to be shared amongst one or, I
 5  believe here for Paroxetine, there are now over ten ANDA
 6  applicants who have gotten ANDA applications on file, the
 7  cascading approach would allow you to, at the very least, keep
 8  the first ANDA applicant's exclusivity period fully in place and
 9  would allow the first applicant to fully enjoy the fruits of
10  their litigation labors, if you will.
11          And if FDA truly believes that there are policy advantages
12  to taking the patent-by-patent based approach, which would
13  encourage other generic applicants to challenge late-listed
14  patents, we believe that having the cascading approach would,
15  again, ensure that you've got some type of incentive that is
16  fixed, that is readily discernible and that can actually be
17  counted on in terms of proceeding forward with litigation and,
18  you know, up front making the decision as to whether it's even
19  worth the time to submit a paragraph IV certification in the
20  first instance.
21          THE COURT:  Well, would you concede that I can't even
22  reach the question about cascading exclusivity until and unless I
23  decide that the statute is ambiguous?  And if there is some
24  ambiguity, then we have to march into whether the FDA's
25  interpretation of it was permissible and reasonable?
```

1   MS. MAZZOCHI:  I think that -- Torpharm believes that what
2   the statute requires is that there be one ANDA applicant, notably
3   the first filler, who fully enjoys their 180-day exclusivity
4   period.
5       As to which approach is deemed the most proper one by the
6   Court, we are willing to leave that to the Court to decide.  We
7   believe that the first applicant approach is the correct one, but
8   under either approach, Torpharm still comes out of this with its
9   180-day exclusivity period intact and FDA still cannot approve
10  Alphapharm's ANDA until after -- on or after about March 6th,
11  2004.
12      THE COURT:  Well, that answers the result.  I was asking
13  about process.  I take it you don't disagree that, absent the
14  language in the statute about cascading, I'd have to find some
15  ambiguity that would allow me to go in and then determine whether
16  the FDA's interpretation was permissible or reasonable?
17      MS. MAZZOCHI:  I believe that the statute discusses having
18  a previous application and we believe that that previous
19  application refers to a first ANDA applicant.  You can still have
20  a first ANDA applicant under the cascading approach as well.
21      The question is whether you're going to give -- you're
22  going to consider subsequent applicants who are filing a newly
23  listed patent to constitute a new ANDA application that has a
24  paragraph IV certification for which there was no prior paragraph
25  IV certification as to that same patent.

1   We disagree that FDA should -- how do I put this the right
2   way?
3       We believe that the statute only allows -- allows for one
4   applicant to have a full 180-day exclusivity period.  Whether a
5   later applicant can have an additional exclusivity period by
6   virtue of the nature of the filing that they're making -- if in
7   fact a patent-by-patent approach is imported into that part of
8   the analysis -- that that's sort of a step two to the analysis.
9       I think that no matter what, the ANDA applicant who is the
10  first filer gets their 180-day exclusivity period.  Then the
11  question becomes:  Do you want to say that a later-in-time
12  applicant can get a 180-day exclusivity period of their own?
13      But what the statute does not allow for is that the
14  180-day exclusivity period can be split simultaneously and shared
15  by multiple applicants.  That is the point that Torpharm says is
16  nowhere found in the statute.
17      THE COURT:  I was just wondering:  When you mention the
18  FDA's flip flops, is your current argument somewhat of a flip
19  flop for Torpharm?  Hasn't Torpharm argued something differently
20  in another case?
21      MS. MAZZOCHI:  That might be the case if we'd actually
22  been prevailing on those cases, Your Honor.
23      THE COURT:  Go ahead.  I didn't mean to prolong it on that
24  point.
25      MS. MAZZOCHI:  Oh, no, that's fine.

1   One thing that, with respect to FDA's flip flopping, FDA
2   has in fact indicated that the first filer approach is one that
3   is supported by the statute.
4       To the extent FDA has engaged in these series of letter

5  rulings, the methodology that they are putting forth and the
6  results that they are obtaining, that in and of itself, prior to
7  their decision here, was never the subject of notice and comment
8  rule making.  And we believe that it's because of that, because
9  there is no set standard, that we're starting to lead to the
10  arbitrary and capricious results that we're seeing here.
11       Ultimately, Torpharm's position is that, under the first
12  filer approach, this Court should enjoin any other ANDA approval
13  that's going to encroach on Torpharm's unfettered exclusivity.
14  And, you know, the result is going to be the same, irrespective
15  of which approach, weather it's the cascading approach or the
16  first filer approach.
17       Now the question becomes:  What happens if you were to
18  accept FDA's approach?  And for the reasons stated in our briefs,
19  we obviously do not believe that FDA's approach here is the
20  correct one.
21       But we don't believe that even under FDA's current
22  rulings, that FDA is allowed to give multiple exclusivity rights
23  to multiple ANDA applicants, particularly Alphapharm here.  The
24  reason why is because of the specific nature of the -- or the
25  identity of the patent, which we discovered after we finally

12

1  received the administrative record from FDA.
2       And as we raised in our reply briefs, FDA is basing its
3  decision to award a shared exclusivity to Alphapharm, based on
4  Alphapharm's alleged first filer status in connection with the
5  '449 patent.  And that's the only patent that FDA is using to, if
6  you will, invite Alphapharm to share in the exclusivity table.
7       In our reply brief, we explain why the '449 patent is a
8  fairly unique patent here in view of the additional patents that
9  have been listed in the Orange Book, because the '449 patent --
10  it's actually not a GSK patent.
11       The '449 patent is a patent that relates to a method of
12  using Paroxetine -- I believe it's PMS -- to alleviate symptoms.
13  That patent was listed; Alphapharm managed to -- or FDA asserts
14  that Alphapharm certified to it.  And FDA has taken the position
15  that there are -- there is an additional first filer who has
16  certified to that patent.
17       FDA has also taken the position that Alphapharm's
18  activities with respect to the '449 patent can be used somehow to
19  block Torpharm's ability to enjoy its 180-day exclusivity period.
20       We have two problems with this.  First, under the existing
21  regulations, Torpharm did not have to certify to the '449 patent.
22  The reason why is because this patent was late-listed after 30
23  days, after our ANDA was already on file.  So as a result, under
24  FDA's regulations, for the reasons I believe we explained in
25  greater detail in our reply brief, we did not have to certify to

13

1  the '449 patent.
2       Now, FDA's entire shared exclusivity regime arose out of
3  the concept that you are going to have ANDA applicants who are
4  going to be going head to head, mutually blocking one another,
5  such that no one would ever be able to get on the market absent
6  some type of shared exclusivity.  And I believe they first
7  started this with the Cisplatin letter.
8       The problem here is that Alphapharm is not blocking
9  Torpharm's ability to enter the market because, even if you
10  wanted to interpret the statute the way that FDA is suggesting

```
11   that it be read, by saying that Alphapharm, by being the first
12   filer on the '449 patent, is able to gain some type of
13   exclusivity rights, that can -- you can only have the 180-day
14   blocking scenario if Alphapharm is keeping Torpharm from entering
15   the market by virtue of the '449 patent.  But since Torpharm
16   hasn't certified to the '449, there is no mutual blocking
17   scenario.
18         Now, FDA is trying to take its ad hoc rulings one step
19   further and saying, well, Torpharm, because you are blocked by
20   Geneva on some other patents and Geneva is blocked by you on some
21   other patents, we're going to let Alphapharm take advantage of
22   the fact that Geneva -- and I believe they're referred to as
23   Company X in FDA's brief -- we're going to allow Alphapharm to
24   take advantage of Geneva's ability to block you in order to block
25   you; and now that you're blocked, you have to share with
```

14

```
1   Alphapharm.
2         We believe that this type of interpretation is starting to
3   get so far afield and attenuated that this, too, amounts to
4   arbitrary and capricious agency action.  Making matters worse,
5   the -- to the extent Alphapharm was, in fact, a first filer in
6   connection with the '449 patent, it was only on a narrow number
7   of dosages, not even the full number of approved doses.
8         It's not clear to us whether FDA is planning on giving
9   Alphapharm full approval for all of the dosage ranges, which
10   include 10, 20, 30, and 40 milligram doses, but here Alphapharm
11   only has a first filer status on the 10, 20, and 30 milligram
12   doses.  The other company, Company Y, which we believe to be
13   Zenith Pharmaceuticals, was apparently first on this 40 milligram
14   tablet.
15         So now we have the situation where Apotex is going to be
16   required to share the entire Paroxetine market with Alphapharm
17   when Alphapharm didn't even make it to the patent office first on
18   all of the available doses; Alphapharm isn't even blocking
19   Torpharm directly.  And the FDA says well, but that's still okay
20   because Alphapharm is blocking Geneva, Geneva is blocking you, so
21   we're going to let you all share.
22         Well, the problem that we have with that is -- and again,
23   this is based on -- this is information that we didn't find out
24   until FDA's submission of the surreply brief and Alphapharm's
25   submission of their surreply brief.
```

15

```
1         The problem with all of this is that if Geneva is the
2   company who is being relied upon by FDA to try to block
3   Torpharm -- or, you know, by proxy, Alphapharm, via Geneva, is
4   used to block Torpharm -- based on the current administrative
5   record, Geneva didn't actually perfect their notice of a
6   paragraph IV certification for the '449 patent itself.
7         And we submitted to the Court today, and I believe we have
8   an additional copy for the Court if you would like it, explaining
9   this in a bit more detail.  And we would ask that the Court
10   accept it because we do think that it helps to explain the
11   nuances of this, but --
12         THE COURT:  Well, on that point, let me just ask if there
13   is any objection to accepting this --
14         MS. MAZZOCHI:  I'm sure there will be.
15         THE COURT:  -- filing today, the motion for leave to file
16   response to the surreply?
```

17        MR. STEARN:  We would object, Your Honor.  I got this
18 motion literally as I walked into court today.  And further, Your
19 Honor, we really don't think -- this is just going to keep this
20 thing going because, you know, from our perspective, Your
21 Honor --
22        THE COURT:  Let me invite you up to the microphone.
23        MR. STEARN:  Sure, Your Honor.
24        From our perspective, Your Honor, we put forth the fact of
25 which certifications were out there.  This is a challenge to try

16

 1 to get underneath the certification itself and challenge it.  And
 2 you know, they're going to say something about that.  I imagine
 3 there may be a response to that.
 4        The fact is that this is their motion and it's their
 5 burden; it's their burden to bring forth facts.  They did not, in
 6 their citizen petition, bring forth -- base their challenge on
 7 this fact, just as they didn't in their initial papers.
 8        Now, if they want to continue -- now, if the Court reaches
 9 that fact, then, you know, perhaps there could be additional
10 litigation about it.  But there's no basis for accepting this in
11 terms of a preliminary injunction motion.
12        Further, Your Honor, we put forth in the record the fact
13 there have been other first filers; we put forth the letters that
14 were sent.  Now, they've been redacted because it's contrary to
15 FDA regulation to have the names put forth, but we've put forth
16 the letters to those other first filers, showing that they've
17 established first filer status on those other patents.
18        And really, what we're getting now is we're trying to get
19 more digging into the underlying facts and there is just no basis
20 for it at this 11th hour.
21        THE COURT:  I'll reserve ruling on the motion for leave to
22 file, but you can continue.
23        I'm sorry.  You're welcome to --
24        MR. RAUBICHECK:  Your Honor, on behalf of Alphapharm, I
25 would also like to oppose this --

17

 1        THE COURT:  All right.
 2        MR. RAUBICHECK:  -- not only because it's an 11th hour
 3 filing with which we were just served literally as we came in,
 4 but also because what it is going to invite is it's going to
 5 invite bringing a whole new party into this case and digging with
 6 respect to facts that aren't even in the administrative record of
 7 this case, because this issue wasn't raised by any party until
 8 this afternoon.
 9        FDA would be required to go back, if Your Honor wanted
10 more delving into this, find out what the administrative record
11 contains with respect to a whole separate ANDA, which is
12 Geneva's, and they're not even a party to this action.
13        It seems to me we ought to focus on the facts here.
14 That's Alphapharm's position.
15        THE COURT:  Thank you.
16        MS. MAZZOCHI:  And, Your Honor, if I may respond.
17        Part of the reason why we've been somewhat hampered in
18 this is because FDA does in fact keep all of the notice letters
19 confidential.  They did not identify the companies who were
20 involved in this and we've been getting the record in dribs and
21 drabs.  And as soon as we identified this as -- as soon as we
22 were able to identify that Geneva was in fact the company that

23  was at issue with respect to the '449 patent, which we only found
24  out in FDA's surreply brief, we immediately brought this to the
25  attention of the Court.

18

1           And if I may, I'd like to explain in a bit more detail,
2   first, as to why the present administrative record, as it
3   currently stands, does in fact indicate that the '449 patent
4   certification by Geneva is, in fact, not a paragraph IV
5   certification that is proper.  And I think that's critical
6   because --
7           THE COURT:  Well, forgive me for interrupting.  Do you
8   want to do that in support of this current motion for leave to
9   file or do you want to do that in support of the previous motions
10  filed?
11          MS. MAZZOCHI:  Personally, Your Honor, I think that they
12  both are essentially one and the same because --
13          THE COURT:  Because I'm going to reserve ruling on this
14  motion filed today.
15          MS. MAZZOCHI:  Right.
16          THE COURT:  So --
17          MS. MAZZOCHI:  That I understand.
18          THE COURT:  So your clock is still running.  But go ahead.
19          MS. MAZZOCHI:  That's fine.
20          The whole basis -- the whole rationale by FDA as to why
21  they think they're entitled to award Alphapharm with final
22  approval potentially tomorrow is because they said that
23  Alphapharm is, in fact, one of the four companies that's allowed
24  to engage in shared exclusivity status.
25          However, if in fact Alphapharm is not a first filer who

19

1   has blocked somebody else -- i.e., Geneva -- then Alphapharm
2   should not be awarded any shared exclusivity at all.
3           And if I may, Your Honor, I've prepared a couple of
4   demonstrative exhibits just to explain why this is in fact the
5   case.  And if I may, I'd like to provide the Court with a copy.
6           The first illustration that I've provided you sort of goes
7   through what FDA considers to be its mutual blocking scenario.
8   And in particular, I would like to focus on the '449 patent.
9           Now, when FDA applies its shared exclusivity regime, what
10  FDA does is it says:  Who are all of the first filers?  The next
11  question that it asks is:  Are these first filers blocking any
12  other first filers?  If they are, then FDA invites them into the
13  fold and says, you know, we'll determine whether or not you can
14  all share.
15          Here the only patent that Alphapharm has any first filer
16  status for is the '449 patent.  And FDA has taken the position
17  that the 10, 20, and 30 milligram certification by Alphapharm is
18  blocking Geneva; i.e., Company X.  With respect to the 40
19  milligram dosage, Zenith is blocking Alphapharm.
20          If we go to the next page, then we get to what we consider
21  to be the blocking scenario, based on what facts are available in
22  the administrative record.  We believe that the administrative
23  record does not support a showing that Geneva did, in fact,
24  submit an appropriate paragraph IV certification with respect to
25  the '449 patent.

20

1    The reason why can be found both at administrative record
2  tab 23 as well as in Alphapharm's surreply; I believe it's
3  Mr. Raubicheck's Exhibit A, attached to his declaration.
4       Exhibit A attached to his declaration indicates that
5  Geneva believed that GSK was the owner of the '449 patent.
6  That's not the case.  The '449 patent is not owned by Glaxo and,
7  under the statute, in order for notice of a paragraph IV
8  certification to be effective -- and this is found at 21 U.S.C.
9  355(j)(2)(B)(i)(I) -- the applicant is required to give "each
10 owner of the patent which is the subject of the certification or
11 the representative of such owner designated to receive such
12 notice" proof that they have submitted -- or notice that they
13 have submitted a paragraph IV certification.
14      And the reason why this is important is because if, in
15 particular, validity issues are going to be involved in any
16 patent challenge, you want to -- and someone is, you know, going
17 to, in theory, obtain a benefit by sticking their neck out to go
18 litigate, you want to make sure that the patent owner has been
19 provided with notice so that they can potentially come into the
20 fold.
21      Here, according to the notice letter that is attached to
22 Mr. Raubicheck's declaration, Geneva only sent their paragraph IV
23 notice to SmithKline.  Tab 23 of the administrative record is a
24 submission of the '449 patent to FDA.  In that submission, it is
25 the named inventor of the '449 patent, and I believe his name is

---

21

1  Dr. Norden, and his agent is also -- his agent or representative
2  is also identified, and I believe his name is Jeffrey Oster.
3  Neither of these people are affiliated or associated with
4  GlaxoSmithKline.
5       So the fact that Geneva may have sent some notice to
6  SmithKline is not capable of creating a true paragraph IV
7  certification that is proper and perfected under the statute.
8       And the significance of this, of course, is clear because
9  if -- well, hopefully I can make it clear -- because if Geneva
10 has not, in fact, certified for the '449 patent, Alphapharm
11 cannot block Geneva.
12      And Geneva was not even required to submit a paragraph IV
13 certification for the '449 patent for the same reason that
14 Torpharm was not required to submit a paragraph IV certification;
15 namely, because that patent was late-listed.
16      So Geneva wasn't required to submit a paragraph IV
17 certification for the '449 patent.  To the extent they may have
18 attempted it, it may not even be effective.  Based on the
19 administrative record, it appears to be wholly defective.
20      So if Geneva is out of the picture, then we get to the
21 blocking scenario that's present on the record, as we graphically
22 depict it here, which is that there is no first filer on the '449
23 patent who is blocking anyone on the 10, 20, 30 milligram dosage
24 forms.
25      To the extent that Zenith has prepared a 40 milligram

---

22

1  first -- or has obtained a 40 milligram first filer status, the
2  only person that they could be blocking would be Alphapharm, but
3  Alphapharm is no longer part of the equation because Alphapharm
4  doesn't have the true first filer status.

5    So what that ultimately means is that Alphapharm really
6  does not have a seat at the table. Alphapharm should not have
7  been entitled to any shared exclusivity in the first instance.
8    And in terms of, you know, which party is in the best
9  position to determine this, in theory, this should have been FDA.
10    As to whether FDA actually did go back to -- or when it
11  even awarded its shared exclusivity, whether FDA actually
12  confirmed that Geneva did in fact submit a true and proper
13  paragraph IV certification for the '449 patent, it appears that
14  the agency did not, in fact, consider it. Or if there was a
15  proper certification, evidence of that is not provided here in
16  the administrative record.
17    And if I can just direct your attention to the next
18  illustration that we provided you with, the only reason why FDA
19  says that Alphapharm is entitled to shared exclusivity, despite
20  the fact Alphapharm cannot block Torpharm, is because Alphapharm
21  on the '449 patent was blocking Geneva, who in turn was blocking
22  Torpharm.
23    If you take that arrow of the '449 patent out of the
24  equation, Alphapharm does not mutually block anybody. And the
25  entire purpose of the shared exclusivity regime, according to

23

1  FDA, was to ensure that people who were mutually blocking each
2  other, by sharing exclusivities, would no longer be mutually
3  blocking each other. Here, if Alphapharm is not mutually
4  blocking any of the other first filers, there's no reason for
5  Alphapharm to share in any 180-day exclusivity period.
6    So -- I believe I'm getting close in my time, so if I may
7  conclude, even if we wanted to accept the most far out
8  permutation of FDA's view as to why shared exclusivity directly
9  or indirectly applies to devalue Torpharm's 180-day exclusivity
10  period here, the facts are simply not present on this record to
11  permit final approval of Alphapharm's ANDA and certainly not for
12  all of the approved doses.
13    And, Your Honor, I know that several of these arguments do
14  involve some new permutations of the facts and for that I do
15  apologize. Again, we are somewhat hampered by our own ability to
16  gain access to the full administrative record before the FDA.
17    But ultimately, we believe that the law -- the first
18  applicant approach is the proper one. To the extent there is to
19  be any sort of equitable considerations or a patent-by-patent
20  approach with respect to later-listed patents, we believe that
21  the cascading approach is the only one that remains true to the
22  spirit of Hatch-Waxman by actually providing the required
23  incentive to go out and litigate and challenge later patents.
24    And with respect to the shared exclusivity regime that FDA
25  has proposed, we believe that it is not supported by the statute,

24

1  but even if it is to be followed, on the facts here, Alphapharm
2  still is not entitled to any shared exclusivity and final
3  approval of its ANDA should be postponed until on or about
4  March 6th, 2004.
5    Thank you.
6    THE COURT: All right. Thank you.
7    Mr. Stearn, do you want to go first?
8    MR. STEARN: Yes, Your Honor. Thank you, Your Honor.
9    Your Honor, the facts on this record right now are that
10  Torpharm filed first paragraph IV certifications with regard to

11  certain patents and that others filed -- including Alphapharm --
12  filed paragraph IV certifications as to other patents.
13       In our surreply brief, we put forward who were the first
14  filers.  It's not part of the administrative record because the
15  applications by law of other applicants are not disclosed and
16  it's not -- and furthermore, in the citizen petition process,
17  this is not something that -- anything that was raised by
18  Torpharm.
19       In fact, a lot of these arguments I'm hearing for the
20  first time today.  And it's entirely a new argument to say
21  that -- to start challenging the paragraph IV certifications.
22       With regard to the law, the statute and the regulations,
23  Your Honor, the statute, which we keep hearing is obvious, is not
24  really made much reference to by Torpharm.  What the statute
25  actually says -- it actually regards when FDA approves.

25

1        It does not grant this exclusivity right, which is
2  indivisible; rather, where there is a certification and there's a
3  previous certification regarding that patent, blocking applies.
4        Over and over again, the statute refers to these
5  certifications as patent-specific.  Specifically, the
6  certifications are "to each patent" under 355(j)(2)(A)(vii).  The
7  certifications must state that, quote, "such patent," unquote, is
8  not infringed.  Further, the exclusivity trigger is by a decision
9  on, quote, "the patent which is the subject of the
10  certification."
11        All right.  So by the actual words of the statute, the
12  actual word of the statute require a patent-by-a-patent approach.
13        Further, the regulation, which is even more direct, states
14  that where the application has a certification and there's a
15  previously submitted application containing a certification,
16  quote, "to the same patent," blocking applies.
17        Furthermore, the regulations actually define who is the
18  first applicant by saying, quote, "the applicant submitting the
19  first application," unquote, is the one that submits an
20  application and where that application contains a certification
21  to the specific patent at issue.
22        THE COURT:  Well, that assumes that the regulation
23  accurately and properly or permissibly interprets the statute, so
24  go back to the statute.
25        MR. STEARN:  I would be happy to go back to the statute,

26

1  Your Honor.
2        And in that statute, if I may, the statute states "if the
3  application contains a certification described in subclause (IV)
4  of paragraph (2)(A)(vii)" -- and that's the case here for
5  Torpharm's application as well as the other applicants, and it's
6  for a drug --
7        THE COURT:  The application referred to in the language
8  you had started to read from does not refer to Torpharm's
9  application; it refers to subsequent applications.
10        MR. STEARN:  Right.  Well, Your Honor, when it says the --
11  it says -- it must be for a drug for which a previous application
12  has been submitted --
13        THE COURT:  That's Torpharm.
14        MR. STEARN:  -- under this subsection containing such a
15  certification.
16        Torpharm's application contained such a certification at

17  the time that they amended these paragraph IV certifications.
18      THE COURT:  Well, where does the statute say at the time
19  it amended the paragraph IV certifications?
20      MR. STEARN:  Well, what the statute says is -- the statute
21  says where there is an application containing such a
22  certification, the application contain such a certification at
23  the time that the certification is filed.
24      THE COURT:  Right.
25      MR. STEARN:  Is that clear?  I just want to make sure I'm

27

1  making myself clear.
2      THE COURT:  Well, that sounds like a different time
3  reference from what you said a moment ago.  I thought you were
4  referring to a time in which Torpharm had filed amended paragraph
5  IVs after Glaxo had submitted these eight or nine additional
6  patents.
7      MR. STEARN:  Well, yes, Your Honor.  With regard to those
8  patent certifications, FDA's interpretation as well as the
9  wording of the statute says that the statute is -- is that if the
10 application contains a certification, okay -- which it does here;
11 it's a certification; and it does for Torpharm -- and it's for a
12 drug for which a previous application has been submitted
13 containing such a certification.
14     So the other applications -- for instance, Company X's, as
15 we call it -- was a previous application containing that
16 certification, because Torpharm's application only became such an
17 application at the time that they amended this -- these --
18     THE COURT:  "They" who?
19     MR. STEARN:  Torpharm's application only became an
20 application containing such a certification -- that is, these
21 late-listed patents -- at the time that they amended their
22 paragraph IV certification.
23     THE COURT:  Well, that's true, but where does this
24 language of the statute narrow us to a time at which Torpharm has
25 filed an amended ANDA to include certifications concerning the

28

1  late-listed patents?
2      MR. STEARN:  Well, Your Honor, when -- it does so
3  because -- first of all, it requires -- it requires an
4  approach -- every time that there's a certification, it requires
5  the FDA to look at it because, as I said, it's patent-specific.
6      So every certification must be looked at anew.  And when
7  there's an amendment -- that is, when there's a new paragraph IV
8  certification that's made -- until they make that paragraph IV
9  certification, Torpharm's application is not an application
10 containing that certification.
11     Is that -- am I making myself clear?
12     THE COURT:  I can't say I followed that one.
13     MR. STEARN:  Okay.  Your Honor, the point of all those --
14 that language that I've gone through over -- about all the
15 "patent-specific" is this:  It attaches to the patent itself.
16 That is, the Court must consider each patent as it comes and each
17 patent and whether or not there's been a previous certification
18 to that patent.
19     And, Your Honor, to the extent that this is unclear and to
20 the extent that it's ambiguous, the agency's interpretation must
21 govern.
22     Now, Torpharm admits --

23        THE COURT: Okay.  But before you get there, show me where
24  the statutory language makes clear some discussion about having
25  to look at patent certifications that are made for later-filed

1   patents.
2        MR. STEARN: Okay.  Well, Your Honor, I'd take exactly
3   what it says in the statute itself.  First, it says "if the
4   application contains a certification."  There's no time
5   limitation on that.  There's no -- it doesn't say "once this" --
6   you know, the first certification.  "When it contains a
7   certification, describe."
8        And the "describe" -- and what the reference is is to each
9   patent.  So -- thus it requires the FDA to look at those amended
10  certifications first, in the first instance, to determine whether
11  there's --
12       THE COURT:  You keep saying "amended certifications."
13       MR. STEARN:  Well, I should say -- I shouldn't say
14  "amended certifications," Your Honor.  I should say "a new
15  certification -- a new paragraph IV certification," which is a
16  change in their application.
17       THE COURT:  Well, the statute, at the point from which you
18  are beginning to read from it, says:  "If the application
19  contains a certification and is for a drug" -- and it goes on.
20       MR. STEARN:  Right.
21       THE COURT:  That application has to do with any ANDAs that
22  come after someone else has filed an ANDA, correct?
23       MR. STEARN:  Well, Your Honor, it says -- I'm not sure I
24  follow your question.  Let me make sure I understand your
25  question.

1        THE COURT:  To complete the language, it says:  "If the
2   application -- if the application contains a certification and is
3   for a drug for which a previous application has been submitted
4   under this section containing such a certification" --
5        MR. STEARN:  Right.
6        THE COURT:  Now, that clause contains two different
7   references to the word "application."
8        MR. STEARN:  Right.
9        THE COURT:  The first reference -- the second reference to
10  the word application is modified by "previous."
11       MR. STEARN:  Right.
12       THE COURT:  The second reference to application -- namely,
13  "previous application" -- must necessarily refer to one that had
14  been filed earlier than the application referred to in the
15  beginning of that quote, correct?
16       MR. STEARN:  Well, Your Honor, first, I'd say that
17  "application" is also modified by the clause "containing such a
18  certification."
19       THE COURT:  Assume that the previous application has a
20  certification under paragraph IV for a patent.
21       MR. STEARN:  Right.
22       THE COURT:  The beginning of that clause, then, would be:
23  "If the application," meaning a subsequent application, "contains
24  a certification under paragraph IV for the patent."
25       MR. STEARN:  Right.  That's correct.

31

1       THE COURT:  Okay.
2       MR. STEARN:  And, Your Honor, we submit that that is the
3  case with Torpharm's -- with certain of Torpharm's
4  certifications.
5       THE COURT:  Well, take the very first ANDA that it filed.
6       MR. STEARN:  Yes.
7       THE COURT:  It had a certification in that first -- in the
8  ANDA that it filed --
9       MR. STEARN:  Yes.
10      THE COURT:  -- back in March of '98 --
11      MR. STEARN:  Yes.
12      THE COURT:  -- for the '723 patent.
13      MR. STEARN:  Yes.  And by doing so, they had blocking
14  rights -- or I should say there was a block of other applicants;
15  but similarly, other applicants that filed the first paragraph IV
16  certifications to other patents had the ability -- and that's
17  what we call Company X and Company Y -- FDA was required to block
18  Torpharm's application as well.
19      THE COURT:  Well, let's try to find where in the statute
20  that result is required.  And let's look at it in terms of the
21  facts.
22      Torpharm files its ANDA with a paragraph IV
23  certification --
24      MR. STEARN:  Yes.
25      THE COURT:  -- for patent '723.

32

1       MR. STEARN:  Correct.
2       THE COURT:  We won't name them, but other companies --
3  Alphapharm and some other companies -- file ANDAs for Paroxetine
4  afterwards.
5       MR. STEARN:  Yes.
6       THE COURT:  Right?
7       MR. STEARN:  Correct.
8       THE COURT:  Do those ANDAs that the other companies filed
9  contain paragraph IV certifications about the '723 patent?
10      MR. STEARN:  Yes.
11      THE COURT:  All right.  Of what significance is that?
12      MR. STEARN:  Well, the significance of that first part
13  under our approach, Your Honor, is that for -- is that other
14  applicants can be blocked -- or I should say the agency blocks
15  the applications -- approval of these other applications that
16  have been filed, okay.
17      But what this case -- and I don't think anybody is saying
18  anything different about the '723 patent.
19      What this case is about at this point, Your Honor, I think
20  is these other patents.  And with these other patents -- that is,
21  Company X files an application; that's an application; and with
22  regard to that, the application of the statute -- the
23  certifications are patent-specific -- those applications --
24  there's previously filed applications containing the
25  certification before Torpharm.  That is, with regard to the other

33

1  patents that are at issue here, the '132 patent and so on.
2       In other words, there are previous applications containing
3  that certification that have been filed.
4       Is that clear?  At least our point, is that point clear?

```
 5          THE COURT:  Go ahead.
 6          MR. STEARN:  Your Honor, further, let me go on to the next
 7 point, which is that, to the extent it's ambiguous, the extent --
 8 whether or not this filing is an ambiguous term, then the Court
 9 must defer to FDA's interpretation and its regulation and --
10          THE COURT:  What if it's not?
11          MR. STEARN:  Well, Your Honor, if it's not ambiguous, the
12 question is -- the Court must apply it?
13          There's some restrictions in terms of the applications
14 straightforwardly.  For instance, if it produces an absurd
15 result, which -- or it's out -- the Court must consider other
16 provisions of the statute in terms of whether or not those --
17 that makes sense in terms of the statute.
18          But yes, that's the first step, to look at the statute.
19 We submit, Your Honor, that the interpretation that most closely
20 follows is the one that is patent-specific that covers the
21 patents.
22          THE COURT:  Torpharm has argued that the language is
23 unambiguous and that it requires a first filer drug-specific
24 approach.  What is the result -- what is the absurd result that
25 flows from that argument?
```

```
 1          MR. STEARN:  Well, Your Honor, I don't -- that's not -- I
 2 wouldn't -- I would say that the problem that we have -- we have
 3 multiple problems with that, but first is that by doing so, we
 4 would say that it's not an unambiguous -- that's not an
 5 unambiguous reading of the statute; in other words, that the
 6 statute does not call for that because the statute repeatedly
 7 refers to certifications as being specific.  It says there's --
 8 it requires, wherever there is "a certification."
 9          And just as this Court applied "a court," whether it's a
10 District Court or an appellate court, "a certification" applies
11 wherever there is a certification.  So we don't think that that
12 closely follows the statutory language.
13          We also would submit that it doesn't follow the overall
14 structure of Hatch-Waxman.  And we put forward arguments about
15 that in our briefs, Your Honor, in that it does deprive
16 incentives of other applicants to file and challenge those
17 late-listed patents, in the sense that by limiting it to one
18 first applicant, it takes away an incentive to challenge those
19 late-listed patents, which we think is inconsistent with
20 Hatch-Waxman.
21          I would add with regard to the ambiguity of the statute,
22 Your Honor, this District Court, in Dr. Reddy's opinion, page 27,
23 did call this provision ambiguous.  If I could quote from page
24 27, it says: "But considering section 355(j) as a whole, the
25 phrase, quote, 'a drug for which a previous application has been
```

```
 1 submitted containing such certification,' unquote, is ambiguous."
 2          That's the precedent I would submit to this Court.
 3          Further --
 4          THE COURT:  Is it binding?
 5          MR. STEARN:  -- Your Honor, on page 28 --
 6          THE COURT:  Is it binding?
 7          MR. STEARN:  I think it's one of the exhibits to our --
 8          THE COURT:  Is that precedent binding on me?
 9          MR. STEARN:  Well, Your Honor, I believe that it is in the
10 sense that this is a question -- I mean, in terms of considering
```

11    whether or not there's a -- the issue in that case was whether
12    the ANDA contained a paragraph IV certification on a patent at
13    the time of FDA's exclusivity decision.  So it was in terms of
14    the timing of the exclusivity decision.  So it was trying to
15    determine this issue about -- that Your Honor is asking me about.
16        And further, on page 28 of that same decision, it says
17    quote "when certifications are added post-submission, comma, the
18    ANDA was not, quote, 'submitted containing,' unquote, them."
19        So in other words, the -- Dr. Reddy's decision on page 28
20    talks about the filing time of these certifications as -- filing
21    times with regard to the exclusivity determination as being the
22    time of the filing of the paragraph IV certifications.
23        Very briefly, Your Honor -- I think I'm about out of
24    time -- but I would just add, very briefly, with regard to
25    deference, first, FDA did, in fact -- and we believe that at some

1    point this Court must address this question because we believe
2    that at some point, step 2 Chevron comes into account.
3        But FDA issued a regulation on this point.  On this issue,
4    the regulation is patent specific, and further, it says FDA's
5    interpretation of its own regulation is entitled to substantial
6    deference under Auer and Bristol-Myers.  Torpharm has never
7    responded to that argument.
8        Furthermore, case law, such as American Express versus
9    United States --
10        THE COURT REPORTER:  I'm sorry.  Please slow down.
11        MR. STEARN:  Further, there's case law, including American
12    Express versus the United States, 262 F.3d 1376; the Barnhart
13    case, which is cited in our brief, makes clear that this
14    continues despite Christensen.
15        Secondly, Mead, contrary to what Torpharm has cited, does
16    not stand for the proposition that there must be rule making, in
17    fact, to take out deference.  It says:  "Delegation of such
18    authority may be shown in a variety of ways, such as by an
19    agency's power to engage in adjudication," et cetera.
20        And FDA makes approval decisions in this case.  The
21    standard -- there's a standard under Federal Election Commission
22    versus NRA, 254 F.3d 173, which is applicable in this circuit,
23    which says:  "Where its actions are taken pursuant to a detailed
24    statutory procedure, fulfilling its statutory responsibilities
25    has the force of law.  The agency is entitled to deference."

1        And finally, we believe the agency is entitled to Skidmore
2    deference.
3        With that, Your Honor, I think my time is up, but I'm
4    happy to respond to any questions the Court has.
5        THE COURT:  All right.  Thank you.
6        Mr. Raubicheck.
7        MR. RAUBICHECK:  Thank you, Your Honor.
8        I'm going to try to focus on as many new points and not
9    repeat what other counsel have said, with the sole exception of
10    first addressing Your Honor's concern about the statutory
11    language.
12        If you focus on the statute that Your Honor was looking
13    at, 21 U.S.C. section 355(j)(5)(B)(iv), that is the 180-day
14    exclusivity provision in the statute.  As Your Honor was pointing
15    out, the statute says:  "If the application contains a
16    certification described in" -- and they refer to the

17  certification section of the statute -- "and is for a drug for
18  which a previous application has been submitted under this
19  section containing such a certification."
20      Just looking at those words, in Your Honor's example,
21  Torpharm, as the first ANDA applicant for Paroxetine, filed its
22  ANDA with a paragraph IV certification on the '723 patent.  At
23  that point in time, Torpharm was first to file with respect to
24  the '723 patent.
25      THE COURT:  And with respect to Paroxetine tablets.

38

1       MR. RAUBICHECK:  And with respect to Paroxetine tablets.
2       THE COURT:  Generic Paroxetine.
3       MR. RAUBICHECK:  Generic Paroxetine.  Correct.  Correct.
4       But fortunately or unfortunately, this world of
5  certifications against listed Orange Book patents isn't static.
6  That particular event, the first filer's certification against
7  the first listed Orange Book patent --
8       THE COURT:  The only listed Orange Book patent.
9       MR. RAUBICHECK:  At the time.  At the time.
10      THE COURT:  Yeah.
11      MR. RAUBICHECK:  Unfortunately, that situation is not
12  static.  It changes over the course of time.  In this particular
13  situation, SmithKline Beecham was able, subsequent to the listing
14  of the '732 patent, to obtain eight additional patents from the
15  U.S. Patent and Trademark office over a two-year span.  And what
16  FDA -- what the statute requires -- now let's flip back to the
17  reference.
18      And "if the application contains a certification described
19  in subclause (IV) of paragraph (j)(2)(A)(vii)" -- let's turn to
20  21 U.S.C. section 355(j)(2)(A)(vii); it says that "each ANDA must
21  contain a certification, in the opinion of the applicant and to
22  the best of his knowledge, with respect to each patent which
23  claims the listed drug or claims the use for which the applicant
24  is seeking approval, that such patent is invalid or will not be
25  infringed."

39

1       THE COURT:  And which patents claimed the Paroxetine drug
2  when Torpharm filed its answer?
3       MR. RAUBICHECK:  Just the '723.  But thereafter -- and
4  this has happened frequently over the course of Hatch-Waxman's
5  history -- brand name companies, in order to prolong their
6  monopolies, keep getting new patents.  That's part of the game.
7  They've wanted more 30-month stays.  Congress just recently
8  stepped in to stop that and said you only get -- now you only get
9  one 30-month stay.
10      But we're operating here under the former rules because
11  that's not retroactive.
12      SmithKline went ahead and got eight additional patents.
13  And the world wasn't static then either because you had
14  subsequent ANDA applicants like Alphapharm, like Geneva, like
15  Zenith that come along.  And as they file their ANDAs, they had
16  to certify against whatever patents were in the Orange Book as of
17  the time they filed their subsequent paragraph IV applications.
18      THE COURT:  Although isn't, really, Hatch-Waxman intended
19  to try to get these generic manufacturers to move as quickly as
20  they can to file?
21      MR. RAUBICHECK:  Absolutely.  But the statute slows them
22  down by "each patent" language.  The statute basically says,

23 okay, if the patent owner gets another patent later on and your
24 application is still pending at FDA, because it usually takes
25 about two years to get ANDA approval, then the statute says you

40

1 have to go back and amend your ANDA to certify against any newly
2 issued patent coming out of the PTO that is given to the FDA by
3 the brand that goes in the Orange Book.
4        THE COURT:  But where in the statute does it say that
5 that, therefore, eliminates the first filer's status as a first
6 filer?
7        MR. RAUBICHECK:  I'll tell you where it says that.  If you
8 go back to the exclusivity language that we were talking about in
9 section 355(j)(5)(B)(iv):  "If the application contains a
10 certification described in paragraph IV and is for a drug for
11 which a previous application has been submitted under this
12 section containing such a certification."
13        When Torpharm filed, they were the previous application
14 containing such a certification with respect to the patent that
15 was listed at the time, which was the '723 patent.  Later on,
16 however, as the '449 patent and these other patents started
17 getting listed in the Orange Book, and as other applicants came
18 to file, it came to pass that Torpharm wasn't as quick on the
19 trigger as they could have been.  In other words, they didn't
20 amend when those new patents got into the Orange Book right away.
21 For some inexplicable reason, they waited and these other
22 applicants got in there with their paragraph IV certifications
23 against these newly listed patents.
24        So that -- let's just take the -- another -- patent X, for
25 example.

41

1        THE COURT:  But those companies, when they filed their
2 ANDAs, for them to be complete ANDA's worthy of consideration --
3        MR. RAUBICHECK:  Right.
4        THE COURT:  -- they had to contain paragraph IV
5 certifications about the '723 patent.
6        MR. RAUBICHECK:  Correct.  But also against all the
7 others.
8        THE COURT:  And that eliminates the fact that Torpharm had
9 filed before everybody else on the '723 patent?
10        MR. RAUBICHECK:  No, it didn't eliminate that fact.
11 That's the whole purpose -- that's the whole hangup FDA has had
12 with these mutually blocking exclusivities.
13        Because let's take patent -- let's take a hypothetical
14 patent '123.  My client Alphapharm comes along and,
15 hypothetically, let's say, we're the second filer.  We file our
16 ANDA after Torpharm.  We're second on the '723 patent, but when
17 we file our ANDA, we see that there's the '123 patent in there as
18 well as the '723, so we have to certify against both.
19        Torpharm could have certified against the '123 because it
20 was in the Orange Book for a while, but for some reason, they
21 didn't.  They didn't amend, as the statute requires them to
22 certify against each patent.  And so on the '123 patent --
23        THE COURT:  Well, they didn't do it then.
24        MR. RAUBICHECK:  -- Alphapharm became --
25        I'm sorry, Your Honor.

42

1     THE COURT:  They didn't do it then.
2          MR. RAUBICHECK:  Correct.  Or before then.  Or before
3  then.
4          Under my example, Alphapharm's '123 application becomes
5  the previous application with a certification on the '123 patent.
6  And when Torpharm gets around to amending and filing, then
7  Torpharm is the subsequent application as to that patent.  That's
8  the way the system works.  That's the way FDA has been
9  interpreting it for ten years.
10         This patent-by-patent exclusivity regulation which spells
11 this out was part of the final ANDA regulations promulgated in
12 1994 and industry and FDA have been operating under this for some
13 time.
14         THE COURT:  Well, you're right.  Did --
15         MR. RAUBICHECK:  And nobody until this case -- because
16 let's be clear what Torpharm really wants here.  They're
17 basically saying, we're making 265 million dollars off our
18 180-day exclusivity, according to their own papers.  We want it
19 all.  We think we should have it all, even though we weren't
20 first to file on at least four or five subsequently listed
21 patents in the Orange Book.  And these other guys should get
22 nothing.
23         And what they're really fighting for is to be the sole
24 generic applicant into the marketplace for the full 180 days.
25 But according to the record, since September 8th, when they went

43

1  on the market, they've made 170 million dollars off this drug in
2  sales.
3          But -- so what they're trying to do is not only get that
4  extra 50 million bucks, but they're trying to take down with them
5  the whole patent-by-patent exclusivity regulation and scheme that
6  FDA set up ten years ago and they're trying to vitiate the whole
7  shared exclusivity principle that FDA derived from that scheme
8  when you have situations -- and this is the fourth one that's
9  occurred in the last three or so years -- they're trying to tear
10 that whole thing down just so they can get the extra 50 million
11 bucks.
12         And we -- you know, basically, it's our position, as is
13 the FDA's, that the patent-by-patent scheme is inherent in the
14 statutory language of "each patent" -- and the patent in the two
15 sections we've been talking about.
16         And if the first filer isn't the first to file on all, as
17 a matter of point in time, then that first filer becomes a
18 subsequent filer on subsequently issued patents on which it slept
19 on its opportunity, because these -- the brand company puts these
20 into FDA; they go into the Orange Book as soon as they come out
21 of the PTO.
22         If Torpharm had wanted to be first, they knew what FDA's
23 interpretation was.  As a matter of fact, and I'll point this out
24 because Your Honor mentioned it in the gabapentin litigation
25 that's in the D.C. circuit, in which one of my clients is

44

1  litigating against the same Torpharm.
2          THE COURT:  What case did you cite?
3          MR. RAUBICHECK:  It involves the drug gabapentin and the
4  name of the case is Purepac and Torpharm versus -- Purepac and

5   Torpharm versus FDA. They're consolidated actions.
6       In that case, Torpharm is taking the position we want a
7   share of exclusivity. That case was argued -- I argued that case
8   in this very building at the end of November and we're waiting
9   for a decision. It doesn't involve the validity of the shared
10  exclusivity principle, but that's what they're after in that case
11  because in that case, they say we're first to file on one patent;
12  these other guys are first to file on another. We should get a
13  share of the exclusivity.
14      Now they're here before this Court and saying we should
15  get it all because of this interpretation of the statute that
16  seeks to supplant what FDA has already decided. If you go to the
17  July 30th decision, where FDA takes eight to nine pages to spell
18  out for each of the applicants what the shared exclusivity
19  principle is in the mutually blocking context, which it did in
20  the Omeprazol situation a couple years ago, which it did in the
21  Cisplatin situation back in 1999, basically, FDA said the way the
22  statute reads, we have two choices: We can either do the
23  one-first-applicant approach that Torpharm advocates or we could
24  adopt a shared exclusivity approach, whereby we will award each
25  first filer when there are multiple patents that are listed and

---

45

1   different first filers.
2       And FDA made the choice that it would be more consistent
3   with the language of these statutes that are before you to adopt
4   a shared exclusivity approach. And as I'm sure Your Honor is
5   well aware, the Federal Courts will not disturb a rational choice
6   of an administrative agency if that choice is made under a
7   permissible construction of the statute.
8       You know, it's like going back to the old -- one of the
9   early FDA cases, actually, that was ever decided back in 1943 by
10  the U.S. Supreme Court. The industry wanted it one way; FDA
11  interpreted this particular statutory provision another way. The
12  Quaker Oats case; it's cited in our brief.
13      The high court said look, the company might be right.
14  Their interpretation might be reasonable under the statute. But
15  that's not the issue. The issue is whether the agency made a
16  permissible choice. And if so, the agency must be sustained.
17      This cascading approach that has been advanced, Your
18  Honor -- it's a red herring. FDA never even considered it. It's
19  not in the administrative record. This is something -- you want
20  to talk about invention, Torpharm made it up in their brief. It
21  doesn't deserve any consideration.
22      The question is: Is the FDA's interpretation rational?
23      THE COURT: Well, that's the second question.
24      MR. RAUBICHECK: What's the first?
25      THE COURT: What should it be under Chevron?

---

46

1       MR. RAUBICHECK: Well, under Chevron, yes. What should it
2   about under Chevron?
3       If the Court thinks that the statute is so clear that a
4   one-first-all-applicant approach is the only way to read the
5   statute, obviously, that's a matter of statutory construction for
6   the Court.
7       If, however, the Court believes that the statute is silent
8   or ambiguous on this point, then Chevron 2 comes into play, the
9   Mead case comes into play, the Barnhart case comes into play and
10  you must look at whether it's a permissible construction.

11        Now, one thing that I need to add, and I realize I'm
12   running out of time, but I should still address.  Your Honor has
13   a motion.  The motion effectively was argued by counsel so, it
14   seems to me, we ought to get the opportunity to speak.
15        What they have said is, in going through the surreply
16   briefs, this '449 patent that Alphapharm blocks Geneva on -- they
17   say it doesn't really block Geneva because the notice of Geneva's
18   paragraph IV certification was sent to the wrong guy.  That's
19   what they're saying.  It wasn't sent to each owner of the patent.
20        I don't even know what the truth of that allegation is
21   because we don't have FDA's administrative record on what Geneva
22   filed and who they sent it to.  The piece of paper that I put in
23   as Exhibit A to my supplemental declaration was Geneva's notice
24   letter on the '449 patent and other Paroxetine patents that
25   Geneva attached to its complaint against Alphapharm in an

1    infringement case that they sued against -- against my client.
2    And it's still ongoing so it's a matter of public record.
3         We wanted to give the Court everything we had on the '449
4    patent.  But that's not what really is important here.  It's not
5    when the notice was sent to the patent owner and the ANDA holder.
6    The issue is:  Did Alphapharm file its paragraph IV certification
7    with FDA before Geneva filed its paragraph IV certification with
8    FDA?  The filing of the notice with FDA is what's at issue, not
9    when they sent the notice to the patent owner and ANDA holder.
10        What we're concerned about is:  Who was first to file with
11   FDA?  And it's clear on the record that Alphapharm beats Geneva
12   by about two years on that patent.  So this, again, is a red
13   herring.
14        Now, counsel may argue, well, under -- you really have to
15   perfect the notice by filing -- perfect the certification by
16   filing the notice, but that -- they did perfect it.  They did
17   send the notice.  Now they want to attack the guys whom they sent
18   it to.
19        But that doesn't change the basic fact of when it was
20   filed with FDA.  Filing a paragraph IV certification with FDA as
21   part of your ANDA is the critical line of demarcation here; it's
22   the critical standard.  We beat them by two years.
23        That's all the court needs to know on that.
24        Thank you very much.
25        THE COURT:  All right.  Thank you.

1         MS. MAZZOCHI:  Your Honor, if I may briefly respond on a
2    few points.
3         First, with respect to the gabapentin situation, I would
4    like to note that Judge Huvelle did, in fact, suggest that Apotex
5    pursue a shared exclusivity claim in connection with the patents
6    that were at issue.  I further believe that under the first
7    applicant approach in that case, had it been applied, we would
8    have already triggered Purepac's exclusivity by now and could, in
9    fact, have been on the market.  As it stands right now under
10   FDA's patent-by-patent approach, we are being kept off the
11   market.
12        With respect to the statute itself, because we believe
13   that -- we agree with Your Honor that if you start with the
14   statute, in 355(j)(5)(B)(iv), the clause begins:  "If the
15   application contains a certification."  And the certification is
16   described in subclause (IV) of paragraph (2)(A)(vii).

17      Section (vii) states that the certification that is at
18  issue is the one that includes the -- that -- with respect to
19  each patent which claims the listed drug referred to in
20  clause (i) is the one that is at issue.  And when you look back
21  at clause (i), that says "an abbreviated application for a new
22  drug shall contain information to show that the conditions of
23  use," et cetera, et cetera, "have been previously approved."
24      To Torpharm, that indicates that it is the application
25  which matters.

49

1      And furthermore, going back to section (j)(5)(B)(iv), if
2  we are looking at when the later application shall be made
3  effective, because we are not dealing with a court decision here,
4  but we are dealing with the date of commercial marketing,
5  subclause (I) states that "the application shall be made
6  effective not earlier than the date the secretary receives notice
7  from the applicant under the previous application."
8      So that, too, indicates that we should be concerned with
9  an application-by-application basis, not a patent-by-patent
10  basis.  And if we are dealing with an application issue, then
11  this is Chevron step 1 and the Court is entitled to order FDA to
12  not approve Alphapharm's ANDA.
13      And that is true -- the Court doesn't even have to decide
14  whether it wishes to adopt the one-first-applicant approach or
15  whether Torpharm's cascading approach merits consideration in
16  order to conclude that Alphapharm should not be entitled to
17  secure final FDA approval under a shared exclusivity regime.
18      The other point I would like to address that FDA raised
19  which -- is the question of:  Is having a shared exclusivity
20  regime one that meets the policy goals of Hatch-Waxman?
21      We contend that under the facts here, it certainly does
22  not.  As we've seen here today, when you have the shared
23  exclusivity regime, FDA may not even reveal who is the first
24  filer of an ANDA that is entitled to an exclusivity period.  If
25  you're another generic, not even necessarily a first filer

50

1  operating in the marketplace, you're not even going to know who
2  you should try to go after, perhaps, if you want to trigger your
3  exclusivity by getting an early court decision of your own on one
4  of the relevant patents.
5      If you follow the one-first-applicant approach, there's
6  one applicant, a fixed number of patents and everyone in the
7  industry can figure out who they should be targeting if they want
8  to try to trigger their exclusivity period and which are the
9  patents that are at issue, because that is going to be readily
10  ascertainable and fixed in time.
11      So if FDA's goal is to ensure that there are not -- that
12  an -- that a 180-day exclusivity period does, in fact, eventually
13  get triggered so that other people can get on the marketplace --
14  other generics can get on the marketplace, having multiple
15  parties with exclusivity rights that the market can't even figure
16  out until -- you know, here we are five years after we filed our
17  first ANDA in 1998 and it wasn't until FDA's surreply brief that
18  we finally figured out who had exclusivity rights assigned to
19  whom -- you know, if you have a one-first-applicant approach, you
20  at least know who to go after with respect to --
21      THE COURT:  Well, if you're making a policy argument, how
22  can you argue that having four generic manufacturers with some

23  ability to put out on the market during an exclusive 180-day
24  period as opposed to just one doesn't advance the Hatch-Waxman
25  goals of getting as many generic -- cheaper generic drugs in the

51

1  market as fast as possible?
2          MS. MAZZOCHI:  I think there are two answers to that
3  response.  First, I think that the sooner the 180-day exclusivity
4  period is triggered, the sooner everybody can get on the market.
5  It wouldn't even necessarily be limited to just four individuals.
6          Second of all, the more people who get put into the
7  exclusivity pie creates a disincentive to undertake the
8  litigation costs associated with being a first filer.  To provide
9  a hypothetical, Apotex -- or Torpharm, rather, was the first to
10  certify to the '723 patent.  Let's assume that there was only one
11  additional patent that was listed in the Orange Book and all of
12  the pending ANDA applicants certified to it on the same day.
13         Under FDA's current regime, all of those ANDA applicants
14  would be entitled to shared exclusivity, so even if Apotex would
15  have done everything right and gotten everything on file
16  immediately the day that a new patent was listed in the Orange
17  Book, what would have been a full exclusivity right for Torpharm
18  would now have been completely eliminated and would become no
19  exclusivity right at all.
20         And when you are dealing with major blockbuster drugs,
21  where the name brand drug companies fight extraordinarily hard
22  over five years -- and longer in our situation here with
23  Paroxetine Hydrochloride -- to try to maintain their own market
24  monopoly, I think that Apotex -- or Torpharm -- sorry; late in
25  the day -- Torpharm believes that the incentive to actually go

52

1  out there and challenge patents will be markedly diminished.
2          THE COURT:  Can I just ask you:  It's a bit of a tangent,
3  but if the FDA shared exclusivity letter ruling was issued in
4  July, why did Torpharm wait until November 11th to sue?
5          MS. MAZZOCHI:  We filed a citizen's petition with FDA
6  asking them to reconsider their ruling and we raised many of the
7  issues that we presented to the Court in its briefing.
8          We spoke with FDA, who had indicated that they were not
9  planning on issuing final approval to anyone -- we actually told
10  FDA that we would be suing earlier; they asked us to wait, on the
11  grounds that there was not going to be anyone receiving final
12  approval, so that they could give due consideration to our
13  citizen's petition, which they declined to take action on.  And
14  the parties then entered into the present briefing schedule.
15         Thank you, Your Honor.
16         THE COURT:  All right.  Thank you.
17         I'm prepared to rule at this point.  And I want to first
18  recite the facts that I think are most important in coming to a
19  decision here.
20         On December 29th of 1992, the FDA approved Glaxo's new
21  drug application for Paxil.  And at the time, Glaxo submitted
22  information only on one patent which was listed in the Orange
23  Book, referred to as patent '723 for Paroxetine.
24         In March -- on March 31st of 1998, Torpharm submitted its
25  abbreviated new drug application for four dosage strengths of

53

1 generic Paroxetine tablets. It included a paragraph IV
2 certification concerning the sole patent then listed in the
3 Orange Book in connection with Paxil -- that's P-A-X-I-L -- the
4 '723 patent.
5     Glaxo sued Torpharm for infringement soon thereafter, but
6 lost. Beginning in March of 1999, Glaxo began to list, within 30
7 days of their issuance by the Patent and Trademark Office, eight
8 additional patents in the Orange Book regarding Paxil.
9     And that triggered the obligation of existing and new
10 ANDA -- that's A-N-D-A -- applicants for generic Paroxetine --
11 and that, I think, is P-A-R-O-X-E-T-I-N-E -- to file paragraph IV
12 certifications concerning the added patents.
13     Torpharm did so at various different times.
14     On October 6th, 1999, Alphapharm filed its ANDA for
15 Paroxetine tablets. Two other companies also filed Paroxetine
16 ANDAs and all three ANDAs included paragraph IV certifications
17 for the '723 patent among the other patent certifications. Some
18 of these three competitors filed certifications concerning some
19 of the eight new patents before Torpharm did.
20     On November 19th, 1999, Glaxo also listed late one patent,
21 the '449 patent, that had been issued 15 months earlier in August
22 of 1998. The existing applicants did not have to file paragraph
23 IV certifications concerning the late-filed '449 patent. While
24 some applicants did, Torpharm did not.
25     On July 30th, 2003, the FDA issued its final approval of

54

1 Torpharm's ANDA and Torpharm began to sell its product on
2 September 8th, 2003, claiming an exclusive right to have no other
3 Paroxetine ANDA approved for 180 days; namely, until about
4 March 6th, 2004.
5     Also on July 30th, 2003, however, the FDA granted shared
6 exclusivity to three other Paroxetine ANDA applicants who had
7 filed paragraph IV certifications concerning some of Glaxo's
8 added nine patents before Torpharm did.
9     The FDA expects for Alphapharm's ANDA to be eligible for
10 final approval on January 3rd, 2004 and Alphapharm asserts its
11 right to sell its generic product on that date under the FDA's
12 shared exclusivity ruling.
13     Now, it seems to me that there is no genuine dispute about
14 these material facts and we can turn to whether either side is
15 entitled to a judgment as a matter of law.
16     Torpharm's first claim for relief asserts that the FDA
17 violated the Food, Drug and Cosmetics Act and the Administrative
18 Procedure Act by awarding shared exclusivity to the three other
19 ANDA applicants that certified first to subsequently listed
20 patents, but certified after Torpharm did to the '723 patent.
21     It seeks, among other things, a declaration of its right
22 to a fully exclusive 180-day marketing period and an injunction
23 against the FDA granting final approval of Alphapharm's or anyone
24 else's ANDA for immediate sale of Paroxetine tablets until after
25 that 180-day period expires.

55

1     Under the APA, whether the FDA's letter ruling was not in
2 accordance with the law is subject to Chevron analysis. If the
3 language of the governing statute speaks unambiguously to the
4 issue in question, the only question is whether the agency has

5   given effect to Congress's clear command; if the statutory
6   language is ambiguous, then the Court must give deference to any
7   reasonable construction of the language by the enforcing agency.
8         In this case, there are two principal statutory provisions
9   at issue.  The first defines what a paragraph IV certification
10  must be.  It is, quote:  "A certification, in the opinion of the
11  applicant with respect to each patent which claims the listed
12  drug for which the applicant is seeking approval, that such
13  patent will not be infringed by the manufacture, use or sale of
14  the new drug for which the application is submitted."  That
15  language is found at 21 U.S. Code section 355(j)(2)(A)(vii)(IV).
16        The second statutory provision is found at 21 U.S. Code
17  355(j)(5)(B)(iv), which provides a 180-day exclusivity for the
18  first applicant.  The pertinent language says about subsequent
19  applications that:  "If the application contains a certification
20  and is for a drug for which a previous application has been
21  submitted under this subsection containing such a certification,
22  the application shall be made effective not earlier than 180 days
23  after the date the secretary receives notice from the applicant
24  under the previous application of first commercial marketing of
25  the drug under the previous application."

56

1         This language may be thick, but in my judgment, it is not
2   ambiguous.  Applying the facts here to the statutory language,
3   Torpharm filed its ANDA in 1998.  It provided a paragraph IV
4   certification regarding the '723 patent.  That was the only
5   patent listed in the Orange Book for this drug.  At the time,
6   there were no other paragraph IV certifications needed to compete
7   Torpharm's paragraph IV certification requirements.
8         Torpharm was then a first filer for the drug product and a
9   first filer on the '723 patent.  It was Glaxo, the brand name
10  manufacturer, that was then seeking to keep this generic
11  competitor off the market, that shortly thereafter began
12  submitting for listing in the Orange Book a series of additional
13  patents that the FDA says created the prospect of exclusivity
14  standoff.
15        It would be ironic if Congress meant to give the drug
16  innovators such power when its aim was to get more and cheaper
17  generics on the market faster.
18        Torpharm, therefore, responded to the incentive that
19  Congress crafted.  It moved before all the others and filed to
20  take advantage of that exclusive 180-day marketing period for the
21  generic drug.
22        The other three filed after Torpharm did.  All filed for
23  the same drug.  All contained the same certifications regarding
24  the '723 patent that Torpharm filed.
25        Nothing in the language of the statute undermines

57

1   Torpharm's status as the previous applicant, entitled to the
2   exclusivity whenever the innovator lists new patents before the
3   first ANDA is approved, that subsequent filers might certify on
4   before the previous applicant does.
5         The plain language of the statute grants one first
6   applicant exclusivity in marketing the new generic drug.  It
7   seems from the FDA's opposition brief that the FDA may have first
8   abandoned the 1999 one-first-applicant proposed regulation
9   because of negative comments received, not because the proposal
10  was not faithful to the command of the statute.

11    But nevertheless, the FDA next abandoned the
12 one-first-applicant approach in 2001, based upon its reading of
13 the language not of the statute, but of its own implementing
14 regulation.  That reading created the principle that eligibility
15 for exclusivity is based upon the particular patent at issue and
16 not the drug product as a whole.
17    And I'm not even sure that the language of its own
18 regulation mandates that principle, particularly if you integrate
19 it with the facts here.
20    If you do that, the regulations would read:  If Alpha's
21 abbreviated new drug application contains a certification that
22 the '723 patent will not be infringed and the application is for
23 a generic copy of the same Paroxetine drug for which Torpharm's
24 substantially completed abbreviated new drug application was
25 previously submitted containing a certification that the '723

58

1 patent would not be infringed, approval of Alphapharm's
2 abbreviated new drug application will be made effective no sooner
3 than 180 days from the date Torpharm first commences commercial
4 marking of its Paroxetine tablets."
5    In any event, even giving due deference to the agency's
6 interpretation of its own regulation, as I must, what is key is
7 whether the FDA has given effect to the clear command of the
8 statute, not its own regulation.
9    All of the regulatory discussion about a patent-based
10 approach and exclusivity standoff seems to have sprung from the
11 regulators being enmeshed in the consequences of their
12 interpretation of the regulation, rather than the plain language
13 of the statute.
14    I reach my conclusion wholly independent of the fact that
15 Congress last month amended the statute to make explicit the
16 product-based approach for the 180-day exclusivity period.
17    The FDA argues in its opposition brief that the fact that
18 the amendment added new protections from the potential abuses of
19 a product-based system confirms that the FDA had appropriately
20 construed the previous version of the statute.
21    It might be quite the contrary.  It may suggest that the
22 FDA previously got it wrong, although the FDA's concerns about a
23 product-based system did warrant some statutory fixing.
24    In conclusion then, Torpharm is entitled to a declaration
25 that the FDA acted contrary to the plain language of Section

59

1 355(j)(5)(B)(iv) by awarding it shared exclusivity with three
2 other subsequent ANDA applicants rather than a sole exclusive
3 180-day marketing period for its generic Paroxetine tablets.
4    Torpharm is also entitled to an injunction against the FDA
5 that preserves the status quo by barring the FDA from granting
6 final approval of Alphapharm's or anyone else's ANDA for
7 immediate sale of Paroxetine tablets until after Torpharm's
8 180-day exclusive period expires.
9    I will enter judgment in favor of Torpharm on the first
10 claim of its amended complaint.
11    Because the relief I am granting on the first claim of its
12 amended complaint is, in effect, equal to or broader than the
13 relief sought on the second and third claims of the amended
14 complaint, I will dismiss those claims as moot.
15    This order is effective immediately, but I will ask
16 Torpharm to draft a final written order consistent with this

17 ruling and share it with opposing counsel for comment and joint
18 revision, if any revision is needed, and then file it with the
19 Court so there can be a written version of this oral order.
20      Let me ask counsel for Torpharm how quickly you think you
21 can do that?
22      MS. MAZZOCHI:  We'll do it tonight.
23      THE COURT:  I can't hear you.  Come up to the mike.
24      MS. MAZZOCHI:  I apologize.  We will try to circulate a
25 draft to opposing counsel by the end of the day today or, at the

60

1 very least, by Monday.
2      THE COURT:  All right.  Let me ask that you do that.
3      And let me ask opposing counsel to look carefully at the
4 draft and provide any feedback that you think might be warranted
5 to the drafting counsel so that that can be filed as soon as
6 possible to have a written memorialization of my oral ruling.
7      All right.  Thank you very much, counsel, and good
8 arguments.  I appreciate hearing from all of you.  Thank you for
9 coming in.
10      You may be excused.
11      (Proceedings adjourned at 4:06 p.m.)
12
13
14
15
16           C E R T I F I C A T E
17
18      I, Scott L. Wallace, RDR-CRR, certify that the
   foregoing is a correct transcript from the record of proceedings
19 in the above-entitled matter.
20
   --------------------------------
21 Scott L. Wallace, RDR, CRR
   Official Court Reporter
22
23
24
25