## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————
IVAX PHARMACEUTICALS, INC.      )
                                        )
                    Plaintiff,      )
        v.                         )     Case No. 05-CV-2180-RWR
                                        )
MICHAEL O. LEAVITT, et al.       )
                                        )
                    Defendants.     )
———————————————————————)

### PLAINTIFF IVAX PHARMACEUTICALS, INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

December 12, 2005

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

ARGUMENT .......................................................................................................................2

I.     **FDA'S DECISION IS ENTITLED TO NO DEFERENCE.** ..............................2

II.    **FDA'S JUSTIFICATIONS FOR ITS ARBITRARY AND
       UNLAWFUL LITIGATION DISTINCTION ARE WHOLLY
       WITHOUT MERIT.** ...............................................................................................6

       A.    FDA's "Ministerial Role" Argument Is Irrelevant And
             Belied By The Agency's Own Practice. ...........................................7

       B.    The Fact That Filing A Paragraph IV Certification Does
             Not Always Ensure Exclusivity Does Not Allow FDA To
             Arbitrarily Deny Exclusivity.............................................................9

       C.    FDA's Decision To Delist The Patents Here Threatens To
             Undermine Generic Drug Companies' Incentive To File
             ANDAs And Exposes The ANDA Process To
             Manipulation. ..................................................................................12

       D.    FDA Cannot Defend The Litigation Line That *Mova* Held
             To Be Contrary To The Statute.........................................................14

       E.    The FDA Decision Is Arbitrary and Capricious Because It
             Is Internally Inconsistent.................................................................18

CONCLUSION...................................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allergan, Inc. v. Crawford*,
   No. CIV.A. 03-2236RMC, -- F.Supp.2d --, 2005
   WL 2692661, at *7 (D.D.C. Jan. 19, 2005) ................................................................. 20

*American Bioscience, Inc. v. Thompson*,
   269 F.3d 1077 (D.C. Cir. 2001) ................................................................. 4, 20

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
   467 U.S. 837 (1984) ................................................................. 2, 4

*Dr. Reddy's Labs., Inc v. Thompson*,
   302 F. Supp. 2d 340 (D.N.J. 2003) ................................................................. 10

*Inwood Labs., Inc. v. Young*,
   723 F. Supp. 1523 (D.D.C. 1989) ................................................................. 10, 13, 17, 18

*Minnesota Mining & Mfg. Co. v. Barr Labs.*,
   289 F.3d 775 (Fed. Cir. 2002) ................................................................. 16

*Mova Pharm. Corp. v. Shalala*,
   955 F. Supp. 128 (D.D.C. 1997) ................................................................. 12, 13

*Mova Pharmaceutical Corp. v. Shalala*,
   140 F.3d 1060 (D.C. Cir. 1998) ................................................................. 1, 2, 4, 5

*Mylan v. Thompson*,
   389 F.3d 1272 (D.C. Cir. 2004) ................................................................. 3, 4

*New York Cross Harbor R.R. v. Surface Transp. Bd.*,
   374 F.3d 1177 (D.C. Cir. 2004) ................................................................. 3

*Purepac Pharm. Co. v. Thompson*,
   354 F.3d 877 (D.C. Cir. 2004) ................................................................. 9, 10

*Purepac Pharm. Corp. v. Thompson*,
   238 F. Supp. 2d 191, 212 (D.D.C. 2001) ................................................................. 4

*Purepac Pharmaceutical Co. v. Friedman*,
   162 F.3d 1201 (D.C. Cir. 1998) ................................................................. 1, 2, 5, 6

*SEC v. Chenery Corp.*,
   318 U.S. 80, 88 (1943) ................................................................. 17

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) ................................................................................. 3

*Teva Pharmaceuticals, USA, Inc. v. U.S. FDA*,
    182 F.3d 1003 (D.C. Cir. 1999) ............................................................. 16

*Thomas Jefferson Univ. v. Shalala*,
    512 U.S. 504 (1994) ................................................................................. 3

*Torpharm, Inc. v. FDA*,
    No. 03-2401, 2004 U.S. Dist. LEXIS 524 (D.D.C. Jan. *, 2004) ........................ 4

*Western Union Corp. v. FCC*,
    856 F.2d 315 (D.C.Cir.1988) .................................................................. 19

*Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*,
    373 F.3d 1335 (D.C.Cir.2004) ................................................................ 19

## Statutes

21 C.F.R. § 314.107(c) ................................................................................ 3, 15, 16

21 C.F.R. § 314.53(f) ....................................................................................... 9

21 C.F.R. § 314.94(a)(12)(viii) ...................................................................... 3

21 C.F.R. § 314.94(a)(12)(viii)(B) .............................................................. 8, 15

Hatch-Waxman Act
    Pub. L. 98-417, 98 Stat. 1585 (1984) ................................................. passim

## Other Authorities

Abbreviated New Drug Application Regulations; Patent and Exclusivity Provisions,
    59 Fed. Reg. 50338, 50348 (Oct. 3, 1994) ........................................ 5, 9, 10

Federal Trade Commission, *Generic Drug Entry Prior to Patent Expiration: An FTC Study* 13
    (July 2002) ............................................................................................. 7

*Guidance for Industry: 180-Day Generic Drug Exclusivity Under the Hatch-Waxman*
    *Amendments to the Federal Food, Drug, and Cosmetic Act* 2 (June 1998), ............... 5, 19

## INTRODUCTION

The Federal Defendants (hereinafter "FDA") struggle to justify the regulatory line drawn by the agency for permitting patent delistings—and thus denying IVAX's statutorily mandated exclusivity—but to no avail.  FDA's memorandum, however, does make two things clear:  (1) that IVAX's interpretation is both reasonable and permissible, *see, e.g.*, FDA Mem. at 15, and (2) the challenged decision was based on the agency's flawed attempt to hold together the fragments of the regulatory regime shattered by *Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998).  Despite all of the energy FDA expends seeking to justify its decision to deny IVAX exclusivity, it studiously ignores the central issue presented in IVAX's motion for summary judgment—namely that the agency's decision to delist the patents at issue and deny IVAX exclusivity turns solely on the presence or absence of litigation, a distinction that is not only arbitrary but, worse, contrary to settled law.

FDA's only answer is to assert that IVAX's arguments are "irrelevant for the obvious reason that there has been no patent litigation of any type in this case."  FDA Mem. at 40; *see also id*. at 3.  But that is ***precisely*** the issue presented—whether FDA erred when it concluded it makes a difference that there "has been no patent litigation" when denying exclusivity.  Indeed, the agency does not even discuss the controlling circuit precedent—the D.C. Circuit's decisions in *Mova* and *Purepac*—until thirty-eight pages into its brief.  There is, however, no ignoring the fact that FDA's litigation requirement is the cornerstone of its delisting regime.  Whatever the merits of the FDA's arguments for permitting the delisting of patents in the abstract, nothing in the Hatch-Waxman Act permits the FDA to distinguish between those applicants who have been sued for patent infringement and those that have not—to the contrary, the D.C. Circuit squarely held such a distinction unlawful.  Indeed, "Section 355(j)(5)(B)(iv) ***does not, on its face require the first applicant to be sued in order to benefit from market exclusivity***."  *Purepac Pharm. Co.*

1

*v. Friedman*, 162 F.3d 1201, 1204 (D.C. Cir. 1998) (emphasis added). The undeniable import of *Mova* and *Purepac* is that the award of exclusivity cannot be predicated on a "litigation requirement." Yet that is exactly what FDA has, by its own admission, imposed. *See* FDA Mem. at 42 (describing the "regulation's litigation requirement"). As such, the agency's decision—to deny IVAX exclusivity because its paragraph IV certifications were not the subject of litigation before the patentee requested delisting—cannot withstand scrutiny. This Court thus should grant IVAX's motion for summary judgment and deny the FDA's cross-motion.

## ARGUMENT

## I.    FDA'S DECISION IS ENTITLED TO NO DEFERENCE.

In support of its contention that the decision to delist the patents at issue and deny IVAX exclusivity is entitled to deference, FDA invokes general principles of administrative law without truly addressing the D.C. Circuit's decisions in *Mova* and *Purepac*. As explained in IVAX's opening memorandum, the FDA's litigation-approach to exclusivity and delisting founders on *Chevron* step one. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The D.C. Circuit made clear in *Mova* that the "successful defense" requirement was contrary to the plain text of the Hatch-Waxman Act. *See Mova*, 140 F.3d at 1069. And to the extent the *Mova* court left any doubt, the D.C. Circuit removed it in *Purepac*, which unambiguously holds that the Act "does not … require the first applicant to be sued in order to benefit from exclusivity." 162 F.3d at 1204. Indeed, the court upheld the FDA's decision to give "first applicants the 180-day exclusivity period even if they have not been sued" ***precisely because "[o]n its face, the statute does the same."*** *Id*. at 120 (emphasis added). Thus, the fact that the FDA's decision to grant or deny exclusivity in the delisting context was based solely on the presence or absence of litigation cannot be squared with the D.C. Circuit's prior holdings and thus is entitled to no deference.

Moreover, FDA's reliance on its pre-*Mova* regulations—regulations that the agency itself has repealed—is inherently unreasonable and entitled to no deference. FDA does not dispute that the agency has resorted to the **pre-*Mova* version** of 21 C.F.R. § 314.107(c)—which granted exclusivity only when "the applicant submitting the first application has successfully defended against a suit for patent infringement," 10/24/05 Letter at 12 n.17—in order to make sense of the outdated litigation reference in 21 C.F.R. § 314.94(a)(12)(viii), which is the cornerstone of the agency's reasoning in denying IVAX exclusivity. Although an agency's interpretation of its own regulations may generally warrant "substantial deference," *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994), deference does not follow where, as here, those regulations have been invalidated by a court and subsequently repealed by the agency. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) ("The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."). Indeed, here the agency's construction of its regulation is contrary to the plain text of 21 C.F.R. § 314.107(c) as now in force, which in no way predicates exclusivity on litigation. Given the inconsistency in its own regulations, and its own interpretation of those regulations, FDA simply has no claim to deference. *See New York Cross Harbor R.R. v. Surface Transp. Bd.*, 374 F.3d 1177, 1182 (D.C. Cir. 2004) (refusing deference where agency "reverses it position in the face of a precedent that it has not persuasively distinguished").

FDA relies heavily on the proposition that it is entitled to deference because of the purported "complexity of the statutory scheme under which FDA operates," citing *Mylan Labs., Inc. v. Thompson*, 389 F.3d 1272, 1279-80 (D.C. Cir. 2004). *See* FDA Mem. at 19. This

3

argument proves too much – if FDA were entitled to deference every time it interpreted the Hatch-Waxman Amendments, its "successful defense" regulations would still be on the books, and the D.C. Circuit decision in *Mova* would have been wrongly decided.  Indeed, FDA is entitled to deference only where the statute itself is ambiguous and the agency's interpretation is reasonable.  *See Chevron*, 467 U.S. at 845.  Where the agency's interpretation cannot pass that test, this Court and other courts have not hesitated to declare the agency's actions contrary to law.  *See e.g.*, *Torpharm, Inc. v. FDA*, No. 03-2401, 2004 WL 64064 (D.D.C. Jan. 8, 2004) (Roberts, J.); [1] *see also American Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1085 (D.C. Cir. 2001) (holding that FDA's determination regarding effect of Hatch-Waxman patent listing not entitled to deference as it was unreasonable); *Purepac Pharm. Co. v. Thompson*, 238 F. Supp. 2d 191, 212 (D.D.C.  2002) (finding FDA not entitled to deference where decision was factually unsupportable and irreconcilable with the language and intent of the FDCA); *see also Ass'n of Am. Physicians and Surgeons, Inc. v. FDA*, 391 F. Supp. 2d 171 (D.D.C. 2005) (Kennedy, J.) (awarding attorneys fees to plaintiffs under the Equal Access to Justice Act for successfully challenging FDA's regulation relating to drug testing on the pediatric population where the court had earlier invalidated the rule under *Chevron*).

The D.C. Circuit's decision in *Mylan* is not to the contrary.  There, the Court of Appeals took care to note that the "FDA's decision made no great legal leap but ***relied in large part on its previous determination*** of the same or similar issues and on its own regulations."  *Mylan*, at 1279-80 (emphasis added).  In this case, however, the agency ***has*** made a tremendous leap --

---

[1]     FDA, while noting this Court's final order in the *Torpharm* case was vacated by the D.C. Circuit's dismissal of the appeal, also admits that the dismissal and vacatur resulted from mootness, not from any decision on the merits. See FDA Mem. at 9, n.5.

right over *Mova* and *Purepac*. Far from relying on its previous positions, the FDA has **contradicted** its determination that "180 days of marketing exclusivity should be granted to the first ANDA applicant who files a paragraph IV certification, regardless of whether the applicant is subsequently sued for patent infringement," *Guidance for Industry: 180-Day Generic Drug Exclusivity Under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act* 2 (June 1998), and that "the protection offered by 180-day exclusivity should not be undermined" by the patent holder's unilateral decision to remove a patent from the Orange Book right before or soon after the first filer will enjoy exclusivity.  ANDA Regulations; Patent and Exclusivity Provisions, 59 Fed. Reg. 50338, 50348 (Oct. 3, 1994).  This, of course, is not a case in which FDA had been called upon to make a judgment regarding safety or efficacy -- areas in which the agency is typically afforded particular deference -- but rather rests solely on an interpretation of law.

In any event, it obviously makes no difference whether FDA is relying on the "governing regulation" or "regulat[ing] directly from the statute."  FDA Mem. at 19.  In either case, the FDA has determined that it will "delist a patent when requested to do so by the NDA holder *except when there has been litigation as a result of a paragraph IV certification to that patent*."  10/24/05 Letter at 17.  That is precisely what *Mova* and *Purepac* prohibit—the denying of exclusivity based on the absence of litigation.

At bottom, while FDA protests that "plaintiffs improperly conflate the agency's grant of exclusivity, at issue in *Mova*, with the agency's determination to delist the patents in certain circumstances, at issue here," FDA Br. at 38, it is ***the agency*** that has conflated the two by predicating delisting decisions (and the corresponding loss of exclusivity) on litigation.  Thus, it is no answer to say, as the FDA does, that this case involves "delisting" rather than "exclusivity,"

and therefore does not implicate *Mova* or *Purepac*.  FDA may not do indirectly that which the plain text of the statute, as interpreted by the D.C. Circuit, squarely holds it may not do directly.  By interposing a litigation requirement as a predicate to maintaining exclusivity in the delisting context, FDA had done precisely that.  As such, the FDA's decision to deny IVAX exclusivity is not entitled to deference and cannot be sustained.

## II.    FDA'S JUSTIFICATIONS FOR ITS ARBITRARY AND UNLAWFUL LITIGATION DISTINCTION ARE WHOLLY WITHOUT MERIT.

In support of its decision to deny IVAX exclusivity, FDA marshals the same arguments, more or less, presented in its October 24, 2005 letter denying IVAX's citizen petition.[2]  Those arguments are no better now than they were then.  For example, FDA persists in arguing that it has taken a "hands off" approach to delisting (and listing) patents; that leaving patents in the Orange Book after delisting is requested, serves to delay competition; and that the agency's approach does not wholly vitiate the incentives to be the first paragraph IV filer.  But the problem for the agency is that all of these reasons would apply ***regardless whether there is any patent litigation at all***, and thus they cannot justify the line the agency has drawn in this case.  FDA tries to sidestep this issue by insisting that litigation presents a "rare circumstance," FDA Mem. at 2, and "limited exception," *id.* at 11, without citing any evidence whatsoever for that proposition.  Of course, far from being a "limited" or "rare" exception, litigation over paragraph IV certifications is pervasive,[3] and the agency's so-called "exception" broadly rewards those first

---

[2]    The one notable exception is that FDA now recognizes the incongruity of relying on the narrow, pre-*Mova* definition of Hatch-Waxman litigation and therefore it abandons its October 24 definition of the litigation requirement and argues for an interpretation that the plain language of the regulation cannot sustain. *See infra* pp. 15-17.

[3]    For example, a 2002 Federal Trade Commission study noted that paragraph IV filings had increased dramatically and that 75% of studied Paragraph IV certifications resulted in the

(Continued…)

applicants who are sued and, inversely, penalizes those who are not.  Thus, it is no answer to say, as FDA does, that this "rare circumstance" of patent litigation is "not present in the instant case," FDA Mem. at 2, when that is the very issue presented—whether such litigation should be a prerequisite to maintaining exclusivity in the face of a proposed delisting.

Similarly, FDA responds by erecting various straw men about whether exclusivity permanently vests at the moment the first paragraph IV certification is filed and then knocking down those arguments as though IVAX had made them.  But IVAX has never made such sweeping arguments and does not deny that merely filing the first paragraph IV certification does not always ensure that the applicant will be able to exercise 180 days of exclusivity.  Its more modest point is that the 180-day exclusivity period may not be won or lost solely based on the presence or absence of litigation.  As explained below, FDA has no response to this basic proposition, and thus the decision to deny IVAX exclusivity must be reversed.

A.    **FDA's "Ministerial Role" Argument Is Irrelevant And Belied By The Agency's Own Practice.**

As in the October 24 letter, FDA seeks to justify its decision by arguing that the agency's "ministerial role" in listing and delisting patents requires that the NDA holder be afforded "unfettered control" over the patents in the Orange Book.  FDA Br. at 5, 20-21, 36-37 & n.17.  Were it otherwise, FDA suggests that the agency would be drawn into "review[ing] patent listings to determine whether they meet the statutory criteria for listing," a subject matter outside FDA's expertise.  *See* 10/24/05 Letter at 4.  This argument completely misses the point.[4]  FDA

brand company filing patent litigation.  *See* Federal Trade Commission, *Generic Drug Entry Prior to Patent Expiration: An FTC Study* 13 (July 2002).

[4]    The cases cited by FDA for this proposition, FDA Br. at 20-21, note that FDA's role in reviewing Orange Book patent listings is limited by the agency's lack of expertise and ability to undertake patent claims construction or to make determinations of validity.  *See Apotex, Inc. v.*

(Continued…)

already has chosen to regulate the circumstances under which an NDA holder can delist the patent by permitting delisting *sometimes*—when there is no patent litigation—and prohibiting delisting at *other times*—when there is.  Thus, the question is not whether FDA should regulate the delisting process—it already does—but rather the terms on which it will do so.  FDA's claimed interest in preserving its "ministerial role" cannot justify the litigation line that the agency has drawn here.

Neither FDA nor the Hatch-Waxman Act grants the NDA holder "unfettered control" over the listing and delisting decision.  Rather, as FDA recognizes, the statute itself sets the terms for listing, and where those requirements are met, "an NDA holder has no discretion to list or delist a patent."  *See* 10/24/05 Letter at 15-16.  FDA's own regulation further limits the NDA holder's discretion by not permitting the delisting of patents that are subject to litigation, but allowing delisting at other times.  *See* 21 C.F.R. § 314.94(a)(12)(viii)(B).  Thus, while FDA does not choose to second-guess an NDA applicant's submissions to the agency, the Hatch-Waxman Act does set standards for those submissions, and FDA has supplemented those standards by further defining when the NDA holder may delist the patent.  FDA cannot justify the litigation requirement that it set based on its professed hands-off approach, particularly where, as here, the interpretation of the statute would neither increase FDA's burden nor require FDA to make judgments about the validity of the patents that go beyond its area of expertise.  FDA would have

---

*Thompson*, 347 F.3d 1335, 1349 (Fed. Cir. 2003) ("the Act does not require [FDA] to police the listing process by analyzing whether the patents listed by NDA applicants actually claim the subject drugs or applicable methods of using those drugs"); *aaiPharma Inc. v. Thompson*, 296 F.3d 227, 241 ("… FDA has no expertise in making patent law judgments"); *Alphapharm PTY, Ltd. v. Thompson*, 330 F. Supp. 2d 1, 7 (D.D.C. 2004) ("This reading is consistent with FDA's claim … that it 'has no expertise in the field of patents,' and, therefore, 'no basis for determining whether a use patent covers the use sought by the generic applicant.'").  No case cited by FDA, however, relieves FDA of its obligation to enforce the exclusivity provisions of the statue in a manner consistent with this Circuit's decisions in *Mova* and *Purepac*.

to expend no more administrative resources to prohibit delisting patents subject to paragraph-IV challenges, than it would to prohibit delisting patents subject to litigation challenges. FDA's appeal to its "ministerial role" thus falls flat.[5]

**B.    The Fact That Filing A Paragraph IV Certification Does Not Always Ensure Exclusivity Does Not Allow FDA To Arbitrarily Deny Exclusivity.**

FDA next argues that IVAX has no claim to exclusivity here, because there are *other* circumstances in which the first ANDA filer may not enjoy exclusivity. FDA Mem. at 22-23. These arguments are yet more straw men. IVAX has never argued that the first filer must always receive exclusivity, only that exclusivity under the Hatch-Waxman Act cannot turn on the very litigation requirement that *Mova* and *Purepac* rejected. Moreover, these examples once again do not justify the particular line that the FDA drew here—permitting a loss of exclusivity when a patent is subject only to a paragraph-IV challenge but not where it is also subject to a litigation challenge.

In any event, the three examples offered by the FDA address a situation wholly different from that presented here. In these cases, the applicant was ineligible for exclusivity either because the underlying patent expired or the ANDA filer itself could not maintain its paragraph

---

[5]    Because FDA's scientific role under the statute is only "ministerial," FDA cannot rely on the "patent challenge process" to justify permitting delisting after a paragraph-IV filing. FDA claims that if the NDA holder were prohibited from delisting, then there would be no reason for a party to invoke the "patent challenge" process under 21 C.F.R. § 314.53(f). FDA Mem. at 25. But because FDA's role regarding the basis for a patent is only "ministerial," all FDA does in response to a "patent challenge" is to forward the comments along to the NDA holder so that the NDA holder can judge its own case and decide whether to delist or amend the patent. As explained in IVAX's opening memorandum, an applicant ultimately "must, if it submits an ANDA, treat the disputed patent as valid" and include a Paragraph IV certification if it wishes to challenge the patent—regardless of whether it is improperly listed. *Purepac*, 354 F.3d at 880. Thus, FDA's attempt to rely on a toothless regulatory process as a justification for depriving a first filer of exclusivity is curious to say the least, and in any event, it cannot justify the agency drawing the litigation distinction rejected by *Mova* and *Purepac*.

IV application.  FDA's primary example is the situation addressed by the district court in *Dr. Reddy's Labs., Inc v. Thompson*, 302 F. Supp. 2d 340, 354-55 (D.N.J. 2003), where the first filer sought to preserve its exclusivity even though the patent subject to the ANDA challenge expired prior the grant of exclusivity.  *See* FDA Mem. at 22.  As the district court emphasized, the policies under the Hatch-Waxman Act are not served by encouraging challenges to expired patents or awarding exclusivity after the patent has expired.  *See Dr. Reddy's Labs.*, 302 F. Supp. at 354.  The purpose of the Hatch-Waxman Act is to enable the marketing of generic products more quickly, and it thus provides an incentive structure to do so ***before*** the term of a patent expires.  Once a patent naturally expires, however, there is no need to challenge a patent.  To add on exclusivity ***after*** a patent expires would effectively extend the life of the patent by granting an additional 6-month duopoly period.  Moreover, the ANDA filer knows the expiration date of the challenged patents beforehand and, therefore, cannot claim any unfairness by being deprived of exclusivity once that patent has expired.  Thus, while the holding in *Dr. Reddy* is consistent with the Hatch-Waxman Act, it in no way justifies FDA's decision here.  When the ANDA filer challenges the patent through a paragraph IV certification, and the patentee subsequently seeks to delist the patent, the ANDA challenge has served the very purposes set out by the Hatch-Waxman Act, and therefore, exclusivity is warranted under the statute.  *E.g.*, *Inwood Labs., Inc. v. Young*, 723 F. Supp. 1523, 1527 (D.D.C. 1989).[6]

---

[6]     FDA also is mistaken in suggesting that the D.C. Circuit approved, either expressly or implicitly, its authority to delist a patent in *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877 (D.C. Cir. 2004).  *See* FDA Mem. at 27.  In that case, the court upheld the FDA's decision to request that the brand-name maker consent to delisting the patent from the Orange Book—even though the patent holder had filed an infringement suit against Torpharm, the first paragraph-IV filer—because FDA found that "Torpharm's paragraph IV certification as to the [challenged] '479 patent was improper" and the patent was mistakenly listed in the first place.  *See Purepac*,

(Continued…)

The FDA's other two examples are equally unavailing.  The FDA first points to the circumstance in which the ANDA filer loses a patent case, and therefore, is required to replace its paragraph-IV certification with a paragraph-III certification.  It is hardly surprising that if the paragraph-IV filer loses a patent infringement lawsuit through a final judgment, then it cannot continue to maintain that representation with the FDA when it has been adjudicated to be incorrect.  FDA Mem. at 22.  Similarly, it is hardly surprising that an ANDA filer who submits an inaccurate or materially incomplete certification could lose its status as a first filer upon amending the application.  *See id.* at 22-23.  Were it otherwise, a company could ignore all of the requirements of the statute and submit a patently defective ANDA solely to be the first filer in the door.  The policies of the Hatch-Waxman Act are not undermined if an ANDA filer loses exclusivity because the initial filing was erroneous.

These two examples, like the first, are readily distinguishable from the situation here, where IVAX did exactly what it was supposed to do—identify a potentially vulnerable patent and run the risks of patent litigation.  Yet FDA still seeks to deprive IVAX of the statutory grant of exclusivity, simply because IVAX was never sued.  FDA thus has made the exclusivity decision turn on the existence of patent litigation.  This is the precise condition that FDA had sought to impose pre-*Mova* and that the D.C. Circuit held to have no justification in the text of the statute.

---

354 F.3d at 882, 886.  Thus, consistent with the policies underlying the delisting regulation, the D.C. Circuit held that the FDA could properly delist the patent where the listing was mistaken, and no generic drug company had filed a valid paragraph-IV certification.  That is a far cry from here, where IVAX has a valid paragraph-IV certification, and FDA delisted the patent at the patent holder's request, solely because no lawsuit had ever been filed.

**C.    FDA's Decision To Delist The Patents Here Threatens To Undermine Generic Drug Companies' Incentive To File ANDAs And Exposes The ANDA Process To Manipulation.**

FDA recognizes that depriving an ANDA filer of exclusivity through delisting may have some "effect[] on the exclusivity incentive" that encourages generic drug companies to identify and design around vulnerable patents.  FDA Mem. at 30.  FDA argues, however, that its decision is "not likely to be a significant deterrent to an ANDA applicant's patent challenge" because "patent delisting is relatively uncommon."  *See id.* at 32.  The fact that FDA's interpretation of the statute does not wholly deprive generic companies of an incentive does not mean that the interpretation is correct.  The ANDA filer will be reluctant to expend the time and money to locate those patents if the potential reward is the same as the generic competitor that does nothing.  Exclusivity is the necessary carrot to ensure that generic competitors challenge patents, of all types, when it is appropriate to do so.

FDA also ignores the other financial incentives that patentees may have to delist vulnerable patents.  For instance, the patentee might choose to delist a patent as consideration in a broader agreement with a subsequent ANDA filer.  Most alarmingly, however, is that certain branded companies could well develop a pattern of delisting patents on the eve of exclusivity to thwart the Hatch-Waxman incentive structure and thus systematically discourage paragraph IV challenges generally.  The patent holder would gain much more if it could reduce the number of paragraph IV challenges, by removing the incentives caused by exclusivity or breaking a competitor whose investment depends largely on the return promised by the six-month exclusivity period.  *See Mova Pharm. Corp. v. Shalala*, 955 F. Supp. 128, 131 (D.D.C. 1997) (recognizing the particular value of exclusivity to small companies that to be competitive require the "officially sanctioned headstart" provided by the Hatch-Waxman Act), *aff'd*, 140 F.3d 1060 (D.C. Cir. 1998).

Moreover, from the standpoint of the first filer, there is a very significant difference between the cost of preparing to enter the market as the exclusive generic supplier and to enter the market as one of a crowd of five or six generic drug companies.  In the former case, the first-filer may wind up with 50% or more market share (depending on whether the patent holder authorizes a generic product), rather than 20% or less.  FDA's decision, therefore, places the patent holder in a position to impose significant harm on the first-filer by allowing the generic company to prepare for an expected six-months of exclusivity and then delisting the patent on the eve of the exclusivity period, thereby leaving the first filer with significant over-supply.[7]

It is not hard to imagine these or other examples in which the NDA holder has an incentive to delist its patents and to systematically gut the generic drug industry's economic return from exclusivity.  That is why this Court has repeatedly cautioned the FDA against interpreting the Hatch-Waxman Act in ways that give the branded company unfettered control over exclusivity.  *See Inwood Labs.,* 723 F. Supp. at 1527 ("By subjecting the exclusivity entitlement to the caprices of the patent holder, the FDA's interpretation would seem to affect adversely the incentives that Congress sought to create in providing for 180 days of exclusivity for the manufacturers of generic drugs."); *Mova*, 955 Supp. at 131.  FDA shrugs these cases off as involving the initial grant of exclusivity, rather than delisting, *see* FDA Mem. at 37, but that

_____

[7]    To give the Court a sense of these potential costs, Merck recently estimated its 2005 Zocor sales to reach $4.5 billion**,** which means that if the first filer would have to prepare sufficient product to supply up to 50 percent or more of such a market.  *See* Kevin McCoy, *Merck Plan to Cut Jobs, Close Plants Doesn't Help Stock*, USA Today, Nov. 29, 2005, at B1.  Indeed, Merck anticipates that, once it begins to face generic competition in June 2006, its sales will decline precipitously to $2.3 billion for calendar year 2006.  *Id.*  Not only does this $2.2 billion difference represent a significant opportunity for IVAX (or a lost opportunity if its rightful exclusivity is denied) but also a significant challenge in ramping up production to meet the market demand for a generic alternative.

misses the point.  Whether or not these cases contemplated the specific mechanism of a branded company denying the first filer exclusivity, they speak directly to this issue.  The question here is not about delisting in the abstract; it is about the first filer enjoying the statutory exclusivity right provided by the Hatch-Waxman Act.  FDA's policy here once again threatens to undermine the statute's exclusivity incentive based on a litigation requirement not found in the statute and already declared unlawful by the D.C. Circuit.  Moreover, allowing the patent to remain listed causes no harm at all as, at that point, it is certain that no litigation will be filed.

> **D.  FDA Cannot Defend The Litigation Line That *Mova* Held To Be Contrary To The Statute.**

In an effort to ignore the real legal issue here, FDA does not address the D.C. Circuit's decision in *Mova* until page 38 of its memorandum.  There, it argues that *Mova* does not bar FDA from imposing a litigation requirement because *Mova* was a case that addressed "exclusivity," outside the delisting context.  FDA Mem. at 38.  FDA concedes, however, that *Mova* recognized that the "successful defense approach to awarding exclusivity was ***inconsistent with the plain statutory language***," the same Hatch-Waxman Act that governs exclusivity in the delisting context.  FDA Mem. at 39 n.18 (emphasis added).  *Mova* and *Purepac* specifically held that Congress did not permit FDA to distinguish between those applicants who have been sued for patent infringement and those who have not.  How then can a resurrected litigation requirement possibly be the statutory standard for determining when the NDA holder may or may not delist the patent?

As IVAX demonstrated in its opening memorandum, FDA's current delisting regulation is a vestige of the "successful defense" requirement, which FDA can hardly dispute given that the regulation actually cross-references a now repealed regulatory provision.  The regulation provides that delisting shall be permitted unless the patent is the "subject of a lawsuit under §

314.107(c)." 21 C.F.R. § 314.94(a)(12)(viii)(B). FDA argues, however, that it is irrelevant as "it does not matter what type of lawsuit is referenced by the regulation" because no lawsuit was filed concerning the patents in this case. FDA Mem. at 40. FDA permitted delisting here precisely because the requirements of that regulation were not met. It is thus highly relevant what those requirements are, and it is doubly relevant that those requirements turn on a distinction that the D.C. Circuit held contrary to the statute and that FDA subsequently abandoned.

Recognizing the problem with relying on a pre-*Mova* regulation, FDA departs from the rationale of its October 24 letter and argues for the first time that the litigation distinction does not simply reiterate the "pre-*Mova* definition of a lawsuit, *i.e.*, a defensive lawsuit in which the first ANDA applicant is sued within 45 days of the patent owner's receipt of notice," but rather includes a "broader definition," which would include all court decisions that might trigger exclusivity, such as declaratory judgment actions. *See* FDA Mem. at 40. Given that FDA never amended this regulation after *Mova*, it is simply a mystery how the pre-*Mova* regulation would have encoded a broader litigation requirement than the one at issue in *Mova*.

In its memorandum, the FDA carefully parses the words from its October 24 letter, stating that while it has not defined the litigation requirement before, it encompasses "a lawsuit as a result of the first applicant's paragraph IV certification," and that this definition is "broader than the pre-*Mova* [litigation] requirement." *Id.* (quoting 10/24/05 Letter at 12 n.17). The agency's litigation position, however, stands at odds with what it said quite clearly in the letter. There, FDA said that the only "litigation" that would prevent delisting would be a "suit for patent infringement" brought by the patent owner within 45 days of notice – and not a declaratory judgment action brought by the ANDA applicant against the NDA holder or a patent

infringement suit brought by the NDA holder against someone else.  *See* 10/24/05 Letter at 12 n.17 ("'lawsuit under § 314.107(c)'" means "a lawsuit as a result of the first applicant's paragraph IV certification, as described in 21 C.F.R 314.107(c) before it was amended … rather than a lawsuit arising from any ANDA applicant's paragraph IV certification").  The ***only*** lawsuit contemplated by § 314.107(c), however, was a lawsuit "brought within 45 days of the patent owner's receipt of notice."  *Id*.

     The real reason that FDA seeks to back away from this original position is clear.  FDA claims that the litigation distinction is needed to prevent the patentee from delisting after losing an infringement lawsuit and thereby depriving the ANDA filer of the fruits of the judicial decision trigger.  But exclusivity may be triggered not only when the NDA holder loses an infringement lawsuit brought under § 314.107(c), but also where the NDA holder loses an infringement lawsuit against any party, *see Minnesota Mining & Mfg. Co. v. Barr Labs.*, 289 F.3d 775, 780 (Fed. Cir. 2002), or even where there is no infringement lawsuit, where an ANDA filer prevails in a declaratory judgment action, *see Teva Pharmaceuticals, USA, Inc. v. FDA*, 182 F.3d 1003 (D.C. Cir. 1999).  FDA's delisting regulation may have made some sense in its pre-*Mova* world, where FDA thought that an ANDA filer could only win exclusivity by prevailing in an infringement litigation, and therefore, this regulation would prohibit delisting in any case in which the ANDA filer may win an entitlement to exclusivity.  But in the post-*Mova* world, FDA's delisting regulation is too restrictive as a matter of law because it would permit situations in which an applicant not only filed the first paragraph-IV ANDA, but also won—or was on the verge of winning—a court decision that would trigger exclusivity, so long as it was not the particular litigation described under § 314.107(c).  Thus, despite the clear statement in the

16

October 24 letter, FDA now concedes the need to broaden its litigation requirement to encompass other judicial-decision triggers.

FDA cannot go beyond the interpretation articulated in the October 24 letter, because the agency's decision must stand and fall with the reasons in the administrative record. *See, e.g.*, *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943). But even if one accepted that a declaratory judgment action would constitute "litigation" that would prevent the patentee from delisting the patent, then that would simply prove the arbitrariness of the FDA's reliance on a litigation distinction. If the first ANDA filer could prevent delisting simply by filing a declaratory judgment suit, then every ANDA filer in the future would no doubt take that step so as to prevent delisting, whether or not there was any reasonable apprehension of a patent infringement lawsuit. The ANDA filer, therefore, might be able to protect its interests through such a lawsuit, but it would do so only at the cost of inviting pointless litigation in the federal courts.

Thus, FDA suffers from an insoluble problem in trying to explain how this "successful defense" requirement can make sense in the post-*Mova* world. FDA contends that the regulation still has some bite because anything that encourages delisting would "allow[] for more extensive generic competition, sooner" than allowing the first filer to enjoy exclusivity. FDA Mem. at 40. But as courts recognized the last time they voided the FDA's effort to impose a "successful defense" requirement, the agency may not ignore a party's statutory right to exclusivity on the ground that the agency wants to promote generic competition. *See Mova*, 140 F.3d at 1067; *Inwood Labs*, 723 F. Supp. at 1527. Indeed, such an argument, if credited, would justify any effort by FDA to gut the congressional grant of exclusivity.

FDA also trots out a narrower, incentive-based argument: prohibiting delisting in the face of a litigation challenge is necessary to "provide[] a continuing incentive to the first ANDA

applicant to challenge the patent in litigation." FDA Br. at 40-41. That same argument, however, could be made with respect to the first applicant's original incentive to file the ANDA. The purpose of the 180-day exclusivity provision is to give the generic drug company an incentive not simply to defend a lawsuit, but to bring a paragraph-IV ANDA challenge in the first place. An applicant will have little incentive to bring that ANDA challenge if it believes that its chance at exclusivity lies entirely in the hands of the NDA holder.

Ultimately, FDA's argument here is nothing more than the argument previously rejected in *Mova*: FDA's belief that an applicant is only entitled to exclusivity to the extent, and for so long as, it incurs actual litigation costs in an effort to challenge a vulnerable patent. Congress did not condition exclusivity, however, on the first filer's payment of litigation costs. Rather, Congress granted a broader right so as to give generic drug companies the incentive to identify and/or design around vulnerable patents. As this Court has recognized, FDA's rationale here "ignores the contribution that manufacturers … make by submitting documentation to a patent holder which is so detailed and persuasive that the patent holder decides not to file a lawsuit. Such a contribution is equally valuable in terms of opening up the market to generic competition." *Inwood*, 723 F. Supp. at 1526. So too here, where the ANDA submission with its paragraph IV certification and notice did not merely prevent litigation, but it actually convinced the NDA holder not to sue within the 45 day period. Because IVAX's submission complied with the text and policies underlying the Hatch-Waxman Act, FDA cannot deprive the company of its statutory right of exclusivity simply based on the happenstance that IVAX had never been sued.

### E. The FDA Decision Is Arbitrary and Capricious Because It Is Internally Inconsistent.

At bottom, FDA's arguments contradict themselves because the fact of litigation has no bearing on the policies underlying the Hatch-Waxman Act. FDA has repeatedly acknowledged

that "180 days of marketing exclusivity should be granted to the first ANDA applicant who files a paragraph IV certification, regardless of whether the applicant is subsequently sued for patent infringement." *Guidance for Industry: 180-Day Generic Drug Exclusivity Under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act* 2 (June 1998). At the same time, the agency has recognized that "the protection offered by 180-day exclusivity should not be undermined" by the patent holder's unilateral decision to remove a patent from the Orange Book right before or soon after the first filer will enjoy exclusivity. ANDA Regulations; Patent and Exclusivity Provisions, 59 Fed. Reg. 50338, 50348 (Oct. 3, 1994). Yet FDA now takes the position that first filer's exclusivity remains subject to defeasance by the NDA holder, unless "the applicant is subsequently sued for patent infringement."

FDA attempts to justify these contradictory statements by asserting that the delisting regulation predates *Mova*, and it did not make its post-*Mova* statements about exclusivity in the context of delisting. But that is precisely the point. FDA recognized in its initial regulation that a patentee should not be able to remove a patent from the Orange Book whenever the first filer had the opportunity to enjoy exclusivity—which, pre-*Mova*, did turn on the question of whether the ANDA filer had been sued. After the D.C. Circuit held this distinction unlawful, however, FDA recognized that exclusivity should not turn on the existence of a suit, but the agency neglected to amend the delisting regulation—a regulation that incorporates by reference the original exclusivity regulation that has now been repealed. This inconsistency is, on its face, arbitrary and capricious, and FDA's post hoc rationales for its delisting policy cannot change that fact. *See Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*, 373 F.3d 1335, 1345 (D.C. Cir. 2004) ("[P]ost hoc rationalizations by agency counsel will not suffice.") (*quoting Western Union Corp. v. FCC*, 856 F.2d 315, 318 (D.C. Cir. 1988)); *Allergan, Inc. v. Crawford*, No. 03-

2236, -- F.Supp.2d --, 2005 WL 2692661, at *7 (D.D.C. Jan. 19, 2005) (collecting cases). Additionally, this Court "owe[s] no deference to an agency's reading of judicial orders and decisions." *American Bioscience*, 269 F.3d at 1085.[8]

FDA's arguments in its response memorandum only deepen this inconsistency. FDA justifies its rule on the ground that once a patent is delisted, it no longer stands in the way of competition, and therefore, there is no warrant for granting the first filer exclusivity. FDA Mem. at 34. But if that argument were correct, there is no reason why FDA should prohibit the first filer also from delisting its patent after the beginning of litigation—the same logic applies. Under the FDA's reasoning, a patentee should be permitted to delist its patents mid-suit. But the FDA does not permit such delistings; instead it draws the line at the commencement of litigation, which is precisely what *Mova* and *Purepac* prohibit. Indeed, if FDA's argument were taken to its logical extension, then a patent holder should be able to delist the patent even after a court declared it invalid. Invalid patents, like delisted patents, similarly do not stand in the way of competition, yet the very purpose of exclusivity is to reward the ANDA applicant for being the first to identify the vulnerability of the patent. While in one breath the FDA says delisting is justified because the patent is no longer a barrier to competition, FDA Mem. at 33, in the next breath it attempts to distinguish its prohibition of delisting during litigation because the litigation would remove a barrier to competition, *id*. at 36. But under the FDA's reasoning, there would be

---

[8] Indeed, in FDA recently conceded this point in *Teva Pharmaceuticals USA, Inc. v. FDA*, No. 05-1469, -- F. Supp. 2d --, 2005 WL 2692489, *5 n.3 (D.D.C. Oct. 21, 2005) ("As FDA itself acknowledged, *Chevron* …. is not implicated in this case, which focuses on FDA's interpretations of judicial precedent.").

no barrier for litigation to remove.  In sum, whatever the merits of delisting patents in the abstract, the FDA simply is unable to justify the litigation line it has drawn here.

While FDA contends that the first filer should not receive exclusivity if the patent holder chooses to delist outside litigation, FDA also faults IVAX for not seeking a "successful notice" rule whereby an ANDA applicant would be entitled to exclusivity where it could prove that "an ANDA applicant has provided 'successful notice' and thereby prompted the NDA holder to withdraw its patent."  FDA Mem. at 32.  Of course, FDA's argument echoes the "successful defense" requirement that the D.C. Circuit invalidated.  There, FDA argued that a first filer should only merit exclusivity if it could claim responsibility for successfully defending its paragraph-IV certification in court.  Here, FDA argues that a first filer would only merit exclusivity—via protection against delisting—if it could demonstrate that the request for delisting was prompted by the ANDA filing itself.  While that may be FDA's continuing view about the merits of exclusivity, it is not the view that Congress encoded into the Hatch-Waxman Act, and it is not a view that can be defended before this Court post-*Mova*.

## CONCLUSION

For the foregoing reasons, IVAX respectfully requests that the Court grant its motion for summary judgment and enjoin the FDA from approving ANDAs filed subsequent to IVAX's for 5-mg, 10-mg, 20-mg, and 40-mg simvastatin except as consistent with IVAX's 180-day exclusivity.

Dated: December 12, 2005

Respectfully submitted,

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
150 West Flagler Street
Suite 2200
Miami, FL  33130
(305) 789-3200
(305) 789-3395
Jay B. Shapiro (*pro hac vice* motion pending)
jshapiro@swmwas.com
Samuel O. Patmore (same)
spatmore@swmwas.com

HYMAN, PHELPS & MCNAMARA, P.C.
700 Thirteenth St. N.W.
Washington, D.C. 20005
202-737-4282
202-737-9329(facsimile)


By: /s/ Douglas B. Farquhar
      Robert A. Dormer
      rad@hpm.com
      John R. Fleder
      jrf@hpm.com
      Douglas B. Farquhar
      dbf@hpm.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 12th day of December, 2005, a copy of the foregoing Reply Memorandum of IVAX Pharmaceuticals in Support of Its Motion for Summary Judgment and in Opposition to the Federal Defendants' Motion for Summary Judgment
was served via first-class mail, postage-prepaid, upon:


Drake S. Cutini, Esq.
Office of Consumer Litigation
U.S. Department of Justice
P.O. Box 356
Washington, D.C.  20044

Counsel for the Federal Defendants.




/s/ Douglas B. Farquhar
           Douglas B. Farquhar

23